## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
## AT HARRISBURG

LOWER SUSQUEHANNA
RIVERKEEPER ASSOCIATION,

        Plaintiff,

    v.

REPUBLIC SERVICES OF
PENNSYLVANIA, LLC,

        Defendant.

Civil Action No. 1:23-CV-00044-JPW

## STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANT REPUBLIC SERVICES OF PENNSYLVANIA, LLC IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

I.   Modern Landfill's Operations and Permitting ....................................................1

  A.   Modern's Treatment of Landfill Leachate .....................................................2

  B.   Modern's 2017 Permit ..................................................................................4

      1.   Republic Investigates Increasing Boron and OP ...............................6

  C.   PADEP and Republic's 2020 Consent Order and Agreement ........................9

  D.   Republic Upgrades Its Treatment Plant with Reverse Osmosis....................12

  E.   Republic's 2024 Permit Renewal .................................................................14

II.   Lower Susquehanna Riverkeeper Association's Organization and
    Operations ........................................................................................................15

  A.   LSRA's Inexperienced Sampling of Kreutz Creek .......................................16

  B.   LSRA's Proposed Standing Plaintiff Members.............................................16

  C.   LSRA's Alleged "Harm" from Republic's Discharges in Kreutz Creek......19

      1.   Allison Did Not Change His Behavior toward Kreutz Creek due
          to Discharges from Modern's Outfall 001...............................19

      2.   Evgeniadis Did Not Change His Behavior toward Kreutz Creek
          due to Discharges from Modern's Outfall 001.....................22

      3.   Johnson Did Not Change Her Behavior toward Kreutz Creek due
          to Discharges from Modern's Outfall 001...............................23

      4.   Kostas Did Not Change Her Behavior toward Kreutz Creek due
          to Discharges from Modern's Outfall 001...............................25

      5.   Monticchio Did Not Change Her Behavior toward Kreutz Creek
          due to Discharges from Modern's Outfall 001.....................26

      6.   Winand Did Not Change His Behavior toward Kreutz Creek due
          to Discharges from Modern's Outfall 001...............................28

III.   LSRA's Demands Are Duplicative of the COA .................................................30

IV.   Exceedances Prior to July 2019 Are Not at Issue in this Litigation ...............31

V.   Republic Complied As Soon As Practicable.....................................................34

## I.    Modern Landfill's Operations and Permitting

1.    Defendant Republic Services of Pennsylvania, LLC ("Republic") is a limited liability company focused on the solid waste industry, including the operation of landfills. Ex. 1 at 5:24-6:5 (O'Donnell Dep. Tr., Feb. 26, 2024); *see* Republic Services Website, "Landfill Services" (*available at* https://www.republicservices.com/environmental-solutions/treatment-disposal/landfill-services) (last accessed Jun. 28, 2024).

2.    Modern Landfill ("Modern") has been operating for 42 years, and has been operated by Republic since 1999. *See* Ex. 1 at 6:10-13 (O'Donnell Dep. Tr., Feb. 26, 2024); *see also* Modern Website (*available at* https://modernlandfillpa.com/) (last accessed Jun. 28, 2024).

3.    Modern accepts municipal solid waste and residual/industrial wastes, but it does not accept hazardous waste. *See* Ex. 2 at 1 (NPDES Permit Fact Sheet); Ex. 3 at 7 (Toxic Reduction Evaluation Phase I).

4.    Republic is an active member of the community, engaging in cleanup efforts and donations to local organizations. Republic Services Website, "Insights & Articles: Communities" (*available at* https://www.republicservices.com/blog?rsid=communities) (last accessed Jun. 28, 2024).

5.    In addition to LSRA, Modern has supported over 30 local community

and charitable organizations in the York area, including Eastern York Recreation Authority, Pine Grove Furnace State Park, and York County Farm and Natural Lands Trust. Modern Website, "Community" (*available at* https://modernlandfillpa.com/community/) (last accessed Jun. 28, 2024).

6.      Timothy O'Donnell was the General Manager of Modern between 1999 and 2011. Ex. 1 at 14:21-15:4 (O'Donnell Dep. Tr., Feb. 26, 2024). In 2013,[1] O'Donnell became the General Manager for Republic's hauling operations. *Id.* at 16:1-25. In 2018, the business unit that contained Modern was combined with the business unit that O'Donnell was managing. From 2018 until his retirement in 2023, O'Donnell was the General Manager for the overall business unit that included Modern. *Id.* at 17:1-18, 18:12-15.

## A.    Modern's Treatment of Landfill Leachate

7.      Modern has continuously operated its wastewater treatment plant since 1988 to treat leachate generated by the landfill. *Id.* at 26:4-10, 27:24.

8.      Leachate is the liquid product that results from the mixture of decomposing trash and precipitation infiltration from a landfill's surface. Ex. 3 at 7 (Toxic Reduction Evaluation Phase I).

9.      Modern's wastewater treatment plant discharges from what is

---

[1] From 2011-2013, O'Donnell was employed by Republic Services, Inc. as an Area President for the West PA Area and later as a Regional Operations Manager in Charlotte, North Carolina. Ex. 1 at 15:5-10 (O'Donnell Dep. Tr., Feb. 26, 2024).

designated as Outfall 001, which discharges to Kreutz Creek, a tributary of the Susquehanna River. *See* Complaint, ECF No. 1 ¶ 22; Ex. 4 (2017 Permit); Ex. 5 (2024 Permit).

10.    Modern's wastewater treatment plant is permitted to discharge up to 500,000 gallons per day (gpd), consisting of a mixture of groundwater, landfill leachate, landfill gas condensate, and other plant wash water. Ex. 3 at 7 (Toxic Reduction Evaluation Phase I).

11.    At Modern, the majority of treatment processes at the wastewater treatment plant are designed to treat leachate. *Id.*

12.    The landfill leachate is "collected at the base of the landfill on the liner system" and "transferred to the wastewater treatment plant" "through pipes and pumps." Ex. 1 at 28:6-10 (O'Donnell Dep. Tr., Feb. 26, 2024).

13.    Leachate treatment involves pumping the leachate to the wastewater treatment plant by four pump stations. Ex. 3 at 7 (Toxic Reduction Evaluation Phase I). The leachate is then removed by pumps connected to the under drain leachate collection pipes. *Id.* The leachate is pumped to storage tanks and then treated in the wastewater treatment plant. *Id.*

14.    The treated leachate from Modern then combines with collected groundwater prior to being discharged to Kreutz Creek. *Id.*

**B.    Modern's 2017 Permit**

15.    The  Pennsylvania  Department  of  Environmental  Protection ("PADEP") is the primary regulatory authority for Modern. *See, e.g.*, Ex. 2 (NPDES Permit Fact Sheet); Ex. 4 (2017 Permit); Ex. 5 (2024 Permit).

16.    Modern  has  a  National  Pollutant  Discharge  Elimination  System ("NPDES") permit issued by PADEP for the wastewater discharge point into Kreutz Creek. That discharge point is known as Outfall 001. Ex. 1 at 28:13-14, 29:5-11 (O'Donnell Dep. Tr., Feb. 26, 2024); Ex. 5 (2024 Permit); Ex. 4 (2017 Permit).

17.    Wastewater discharges from Outfall 001 consist exclusively of liquid that has been treated at the wastewater treatment plant. Ex. 1 at 27:21-28:14 (O'Donnell Dep. Tr., Feb. 26, 2024).

18.    Prior to February 1, 2017, Modern's NPDES permit had a "report only" requirement for osmotic pressure ("OP"). *Id.* at 36:13-17.

19.    On  January  23,  2017,  Modern  was  issued  its  NPDES  permit PA0046680,  with  an  effective  date  of  February 1, 2017.  The  permit  was  later amended on April 27, 2017 ("2017 Permit"). Ex. 4 (2017 Permit); Ex. 1 at 33:4-7 (O'Donnell Dep. Tr., Feb. 26, 2024).

20.    The  2017  Permit  detailed  a  "partial  limit"  on  OP  in  Modern's wastewater  discharges  from  Outfall  001  into  Kreutz  Creek.  Ex. 1 at 33:15-16 (O'Donnell Dep. Tr., Feb. 26, 2024); Ex. 4 (2017 Permit). The limits for Outfall 001

included a daily maximum of 183 milligrams per liter, an average monthly limit of 129 milligrams per liter, and an instantaneous maximum of 322 milligrams per liter. Ex. 4 at 3, 5 (2017 Permit).

21.    The 2017 Permit also included a new requirement for Modern to monitor and report levels of boron, starting February 2017 and through January 2020. *Id.* at 3.

22.    During this time frame, the 2017 Permit did not contain any limit for boron and instead contained a "report only" requirement. Ex. 1 at 34:21-35:3 (O'Donnell Dep. Tr., Feb. 26, 2024); Ex. 4 at 3 (2017 permit).

23.    Starting February 1, 2020, new limits for total boron effluent concentration and loading limitations would become effective for Outfall 001, with a daily maximum of 5.52 milligrams per liter, an average monthly limit of 4.12 milligrams per liter, and an instantaneous maximum of 10.3 milligrams per liter. Ex. 4 at 5 (2017 Permit).

24.    In its December 1, 2016 comments to PADEP on the then-draft but soon-to-be-issued permit, Republic reported to PADEP that effluent discharges for OP at Modern were historically "well below the limit proposed in the draft permit." Ex. 6 at 2 (Draft NPDES Permit Comments). At this time, Republic also agreed to the boron limits proposed by PADEP for inclusion in Modern's 2017 NPDES permit. *Id.* These positions indicate Republic did not foresee exceedances of those

limits at that time. *Id.*

25.     Modern's 2017 Permit also had a limit on Outfall 001 for color, which is unrelated to boron or OP. Ex. 4 at 3, 5 (2017 Permit). Further, the Complaint contains no allegations related to color. *See generally* Complaint, ECF No. 1.

### 1.     Republic Investigates Increasing Boron and OP

26.     In October 2018, the levels of OP started to rise and Modern began encountering periods of exceedances with its 2017 Permit for OP effluent limits. Ex. 1 at 93:19-23 (O'Donnell Dep. Tr., Feb. 26, 2024). In response, Republic took immediate action to understand and solve this issue. *Id.* at 94:8-22. Republic hired consultants and "went through extensive review." *Id.* at 94:14-15. This review first included processes to identify the issues at the landfill and develop solutions. *Id.* at 94:18-22. Based on these findings, Republic engaged in engineering and design work for Modern. *Id.* at 94:18-22.

27.     Republic developed an "action plan" and identified several completed and ongoing tasks as of October 17, 2018. Ex. 7 at 1, 3 (Email re Modern LF call today). These included budgeting for activities related to the "installation of a Reverse Osmosis system to address new limits for Boron and treat . . . Osmotic Pressure" and commissioning an "evaluation of the entire [Leachate Treatment Plant] including all infrastructure." *Id.* at 3.

28.     In 2019, Republic budgeted capital for the installation of a reverse

osmosis system to address new limits for boron and treat OP. *Id.* The "design and engineering and the permitting" was the "first part of that process." Ex. 1 at 93:13-18 (O'Donnell Dep. Tr., Feb. 26, 2024). The "money would have been spent in 2019, not the actual install." *Id.*

29.    Reverse osmosis is a pressure-driven process that separates dissolved wastewater constituents, or Total Dissolved Solids ("TDS") from wastewater through the use of a semi-permeable membrane. Ex. 8 at 10 (Toxic Reduction Evaluation Phase II). The process creates two streams, one with high flow/low TDS and one with low flow/high retained TDS. *Id.* Through the use of both increased pH and the semi-permeable membrane, boron is no longer present in high quantities in a facility's wastewater stream. *See id.* at 11.

30.    As part of its action plan, Republic engaged Civil & Environmental Consultants, Inc. ("CEC") to design a reverse osmosis system "to meet the boron and [OP] effluent limits at the site." Ex. 9 at 2 (2018 Proposal for Consulting and Engineering Services).

31.    In October 2018, Republic also explored alternative options to achieve compliance with its effluent limits for boron and OP. In its action plan, Republic was developing a "Leachate Haul Plan," identifying leachate disposal sites, costs, contacts, and locations "to most effectively plan and execute hauling, if needed." Ex. 7 at 3 (Email re Modern LF call today). These alternatives also involved the

suggested engagement of a local publicly owned treatment works, like nearby Springettsbury Township's local facility, and converting that facility's technology to properly treat all waste streams, including Modern's. Ex. 10 at 2 (Email re Reverse Osmosis Plant at Modern Landfill).

32.    As a requirement of the 2017 Permit and subject to the approval of PADEP, Republic conducted studies of OP and boron to determine whether those levels were increasing or decreasing at Modern, the cause(s) of those fluctuations, and whether there were other means of Modern to comply with the limits set forth in permit. *See* Ex. 1 at 94:8-22 (O'Donnell Dep. Tr., Feb. 26, 2024); Ex. 11 at 32:1-33:1 (Werner Dep. Tr., Mar. 19, 2024); Ex. 8 at 4 (Toxic Reduction Evaluation Phase II). Republic "assess[ed] all available pollution control options including best management practices, treatment technologies, and other structural alternatives for meeting NPDES discharge boron limits." Ex. 8 at 8 (Toxic Reduction Evaluation Phase II).

33.    With new effluent limits for boron on the horizon, Republic investigated potential reasons for the higher amounts of boron and OP than had historically been measured and engaged in "the conversation . . . not just [for reverse osmosis], but any other technology, any other alternative" to bring Modern into compliance with its 2017 Permit. Ex. 1 at 75:23-76:10 (O'Donnell Dep. Tr., Feb. 26, 2024). These alternative technologies included evaporation, ion exchange, as well

as reverse osmosis. Ex. 12 at 8 (Modern Landfill Boron Treatment System Update); Ex. 13 at 8 (Modern Landfill Boron Removal and Osmotic Pressure Treatment Evaluation).

34.    Prior to the boron effluent limits going into effect, and as required by its NPDES permit, Republic commissioned a Phase I Toxics Reduction Evaluation ("TRE Phase I Report") to "confirm and quantify the presence of boron in the discharge effluent; verify or refine the modeling data and/or assumptions used to develop the [Water-Quality Based Effluent Limits ("WQBEL")]; identify sources of boron; and recommend management practices, wastewater treatment technologies, or other control techniques to reduce or eliminate boron." Ex. 3 at 4 (Toxic Reduction Evaluation Phase I). The TRE Phase I Report was prepared on Republic's behalf by its consultant CEC in 2019. *See id.*

35.    The TRE Phase I Report could not identify the major source for boron at Modern. *Id.* at 18.

### C.    PADEP and Republic's 2020 Consent Order and Agreement

36.    Prior to the new boron effluent limits' effective date of February 1, 2020, Republic proactively engaged with PADEP, both through in-person meetings and written correspondence regarding the new OP limit and upcoming boron limit. *See generally* Ex. 14 (Email re Modern Landfill Leachate Plant NOV)' Ex. 15 (Discharge Monitoring Reports Effluent Violations); Ex. 16 (Compliance Timeline,

Boron and Osmotic Pressure); Ex. 17 (Compliance Extension Total Boron Outfall 001). Republic also routinely self-reported exceedances to PADEP through Non-Compliance Reporting Forms. *See, e.g.*, Ex. 18 (NCRs 2019-23 combined).

37.    Further, Republic explained to PADEP that it was "committed to expeditiously addressing effluent discharge conditions so as to achieve and maintain full compliance with all permit conditions." Ex. 16 at 2 (Compliance Timeline, Boron and Osmotic Pressure). Republic was "working in cooperation with the [PA]DEP through the entire process" of determining how Modern could come into compliance with its 2017 Permit. Ex. 1 at 101:20-21 (O'Donnell Dep. Tr., Feb. 26, 2024).

38.    Republic had many communications with PADEP regarding compliance with the new OP and boron effluent limits and provided updates on its reverse osmosis installation and compliance timeline. *See generally* Ex. 14 (Email re Modern Landfill Leachate Plant NOV); Ex. 15 (Discharge Monitoring Reports Effluent Violations); Ex. 16 (Compliance Timeline, Boron and Osmotic Pressure); Ex. 17 (Compliance Extension Total Boron Outfall 001).

39.    On August 25, 2020, Republic entered into a Consent Order and Agreement ("COA") with PADEP. Under the COA, Republic agreed to a document submission schedule to allow for PADEP permitting for construction of treatment plant upgrades necessary to achieve compliance with NPDES effluent limits. Ex. 19

at 7 (COA). The COA also included a milestone schedule for construction of those upgrades. *Id.*

40.    Through the COA, PADEP required that upgrades to Modern's wastewater treatment plant be completed within 330 days of starting construction of the upgrades. *Id.*

41.    The COA imposed civil penalties if there was a delay in construction of the upgrades. *Id.* at 9.

42.    The COA also required Republic to pay civil penalties to PADEP for each instance of exceedance of its permit limits for both boron and OP. These penalties were assessed daily. *Id.* at 9. Republic paid all penalties when assessed. ECF No. 24 (Stipulation).

43.    Republic and PADEP had been working collaboratively on compliance solutions for Modern for over 3 years prior to LSRA's filing of the present lawsuit and at no point was LSRA's influence needed to memorialize or carry out the COA. *See, e.g.*, Ex. 19.

44.    The timeline for this project was set and construction was underway before Plaintiff Lower Susquehanna Riverkeeper Association ("LSRA") even filed its notice to sue on November 2, 2022. *See* Complaint at ¶ 4, ECF No. 1.

45.    The stipulated penalties imposed under the COA are the same relief that LSRA is currently seeking in this lawsuit. *See id.* at ¶¶ 1-6.

**D.      Republic Upgrades Its Treatment Plant with Reverse Osmosis**

46.      On October 20, 2020, as a requirement of Modern's 2017 Permit, Republic submitted a Phase II Toxics Reduction Evaluation ("TRE Phase II Report") for the on-site leachate treatment plant at Modern for total boron under Modern's 2017 permit. Ex. 8 at 1 (Toxic Reduction Evaluation Phase II). The TRE Phase II Report was prepared by CEC in October 2020. *Id.* at 3. The TRE Phase II Report was submitted following PADEP's July 3, 2019 approval of Modern's TRE Phase I Report, submitted on February 18, 2019. *Id.* at 6.

47.      The TRE Phase II Report evaluated (1) a source reduction evaluation, to determine if, instead of upgrading the wastewater treatment plant, the boron sources could be intercepted prior to generating leachate, and (2) a final WQBEL compliance strategy and schedule. *Id.*

48.      The TRE Phase II Report concluded that "[t]here are no best management practices or non-structural alternatives that could improve boron removal, and there is no cost-effective way to perform source reduction." *Id.* at 22. Instead, the TRE Phase II Report recommended an upgrade to Modern's wastewater treatment plant to add reverse osmosis treatment. *Id.* Reverse osmosis was recommended to effectively treat for boron and OP. *Id.*

49.      After reviewing the results of the TRE Phase II Report, PADEP approved the reverse osmosis improvement plans at Modern as capable of

maintaining the facility's compliance with its NPDES permit. In a letter dated November 17, 2020, PADEP explained that it "feels that [Republic has] adequately addressed both components of [the] Phase II TRE. At this time, we request that [Republic] immediately proceed to the permitting and construction of the proposed facilities." Ex. 45 (Letter re Phase II Toxic Reduction Evaluation).[2]

50.    In addition to the reverse osmosis upgrades, PADEP required Republic to simultaneously upgrade its wastewater treatment plant in ways unrelated to boron or OP. Ex. 11 at 28:10-25, 116:11-20 (Werner Dep. Tr., Mar. 19, 2024) (describing additional CEC work at Modern related to environmental compliance). These upgrades are also unrelated to LSRA's claims as set forth in the Complaint, but contributed to the time frame for completion of the upgraded treatment plant. *Id.*

51.    In September 2021, PADEP approved Modern's water quality management permit, a permit which "approves the proposed plant upgrades, which will enable the treatment plant to meet discharge limits under its current NPDES permit . . . and should address any new or additional limits that might be imposed as a result of the pending NPDES permit renewal." Ex. 20 at 2 (Protecting Water Sources).

52.    Further, PADEP found that "[t]he planned upgrades to the plant are

---

[2] This exhibit was produced by LSRA and LSRA did not apply bates stamps to any of their productions.

expected to result in consistent compliance with the new osmotic pressure standards." *Id.* at 3.

53.    In April 2023, Republic completed installation of the reverse osmosis system to treat boron and OP, and thereafter has been in compliance with the boron and OP limits in the 2017 Permit. Ex. 21 at 91:11-92:9 (Haydar Dep. Tr., Mar. 26, 2024).

54.    This upgrade completion date met the required timeline under the COA. Ex. 19 at 7 (COA).

55.    In March 2024, PADEP evaluated that Republic has complied fully with the COA and terminated the obligations under the COA, finding that Republic completed all actions required and demonstrated at least six months of consecutive compliance with its NPDES permit. Ex. 22 (COA Termination); *see also* Ex. 2 at 3 (NPDES Permit Fact Sheet) (stating that there are no outstanding violations for Modern under the CWA as of 08/01/2023).

**E.    Republic's 2024 Permit Renewal**

56.    On May 31, 2024, PADEP issued Republic a permit renewal effective July 1, 2024 ("2024 Permit"). Ex. 5 (2024 Permit).

57.    Prior to issuing the renewal permit, PADEP conducted the statutorily-required notice and comment period whereby third parties could review and comment on the draft permit. Ex. 23 (Draft NPDES Permit-Industrial Waste).

PADEP also held a public hearing related to the renewal permit on October 4, 2023. Ex. 2 at 1 (NPDES Permit Fact Sheet); Ex. 25 (PADEP's Responses to Comments).

58.    LSRA participated in the comment period, and submitted several comments to PADEP regarding the permit. *See* Ex. 24 (Comments from LSRA); Ex. 25 (PADEP's Responses to Comments).

59.    Republic's 2024 Permit maintains the same effluent limits as the previous permit for boron and OP. Ex. 5 (2024 Permit).

60.    To the extent LSRA disagrees with the requirements in Modern's 2024 Permit, it had a right to appeal to Pennsylvania's Environmental Hearing Board. Section 4 of the Environmental Hearing Board Act, Act of July 13, 1988, P.L. 530, § 4, as amended, 35 P.S. § 7514.

61.    LSRA has not filed an appeal of Modern's 2024 Permit and the time for appeal of the permit has expired.

## II.    Lower Susquehanna Riverkeeper Association's Organization and Operations

62.    LSRA is a nongovernmental organization. Ex. 26 at 14:16-20 (Evgeniadis Dep., Mar. 14, 2024).

63.    Ted Evgeniadis is the "Riverkeeper" for LSRA, and one of four paid LSRA employees. *Id.* at 14:16-18; 48:11-19.

64.    During his deposition, Evgeniadis testified to his understanding of the community work that Republic does in the York area, describing a period of "20

years" where Republic provided LSRA with dumpsters at no charge for cleanup efforts along Kreutz Creek and the Susquehanna River. *Id.* at 158:23-159:14.

### A.    LSRA's Inexperienced Sampling of Kreutz Creek

65.    Evgeniadis and another member of LSRA conducted sampling in Kreutz Creek. *Id.* at 72:15-22; 91:22-23. The other member who conducted the sampling is not a proffered standing plaintiff and has not submitted a declaration in this matter. *Id.* at 72:15-73:1.

66.    Evgeniadis testified to the fact that, in 2020, he conducted boron sampling at Kreutz Creek. *Id.* at 68:18-22. However, Evgeniadis confirmed that he did not sample for OP and that there "shouldn't be any records around [OP]" from LSRA. *Id.*

67.    Evgeniadis does not hold any certifications related to conducting water sampling. *Id.* at 132:2-9.

68.    When sampling Kreutz Creek, Evgeniadis did not consistently sample at the same locations or for the same constituents. *Id.* at 106:8-24, 111:16-112:4.

69.    Evgeniadis's inconsistent sampling resulted in incomplete data sets for certain locations. *Id.* at 108:19-109:10.

### B.    LSRA's Proposed Standing Plaintiff Members

70.    LSRA is not alleging harm on behalf of the organization. *See* Complaint, ECF No. 1. Instead, it proffers six members, including Evgeniadis, with

alleged harmed. *Id.*

71.    A donation is required to obtain LSRA membership, but there is no required amount for this donation. Ex. 26 at 25:21-26:7 (Evgeniadis Dep. Tr., Mar. 14, 2024).

72.    To be a current member, LSRA requires a donation within the last year. *Id.* at 26:4-7.

73.    In addition to Evgeniadis, LSRA proffers Devin Winand, current Deputy Director and one of the paid employees of LSRA, as a member of LSRA to support its claims in this action. Ex. 27 at 22:14-23:12 (Winand Dep. Tr., Apr. 22, 2024); Ex. 26 at 50:9-16 (Evgeniadis Dep. Tr., Mar. 14, 2024).

74.    Evgeniadis and Winand recruited the other four individuals who have alleged harm in LSRA's complaint—Shane Allison, Adrienne Johnson, Anne Kostas, and Carla Monticchio—to submit declarations for this lawsuit. Ex. 26 at 49:10-51:2 (Evgeniadis Dep. Tr., Mar. 14, 2024).

75.    Allison, Evgeniadis, Johnson, Kostas, Monticchio, and Winand all signed declarations in support of the Complaint after the Complaint was filed. Ex. 28 (Allison Decl.); Ex. 29 (Evgeniadis Decl.); Ex. 30 (Johnson Decl.); Ex. 31 (Kostas Decl.); Ex. 32 (Monticchio Decl.); Ex. 33 (Winand Decl.).

76.    Allison, Johnson, Kostas, Monticchio, and Winand, testified to the fact that they did not personally write all or some of their declarations. Ex. 34 at 49:18-

21 (Allison Dep. Tr., Apr. 24, 2024); Ex. 35 at 46:17-22 (Johnson Dep. Tr., April 26, 2024); Ex. 36 at 41:9-18 (Kostas Dep. Tr., Apr. 9, 2024); Ex. 37 at 56:7-11 (Monticchio Dep. Tr., Apr. 16, 2024); Ex. 27 at 88:9-15 (Winand Dep. Tr., Apr. 22, 2024).

77.    Other than Evgeniadis, none of the other five reviewed the Complaint prior to submitting declarations in support of it. Ex. 34 at 35:9-19 (Allison Dep. Tr., Apr. 24, 2024); Ex. 35 at 40:10-19 (Johnson Dep. Tr., Apr. 26, 2024); Ex. 36 at 28:12-19 (Kostas Dep. Tr., Apr. 9, 2024); Ex. 37 at 48:2-17 (Monticchio Dep. Tr., Apr. 16, 2024); Ex. 27 at 51:15-20 (Winand Dep. Tr., Apr. 22, 2024).

78.    Several of LSRA's proffered members ("Members*")  including Shane Allison, Anne Kostas, and Carla Monticchio, failed to prove that they were members of LSRA at the time the Complaint was filed. *See* Ex. 34 at 19:7-13; 45:19-46:4; 46:19-22 (Allison Dep. Tr., Apr. 24, 2024) (testifying that he was "unsure" on how LSRA's memberships "are covered" and could not confirm if his membership lapsed prior to the filing of the Complaint and his rejoining sometime in January 2023); Ex. 36 at 16:7-9; 19:11-16; 43:12-44:2 (Kostas Dep. Tr., Apr. 9, 2024) (testifying that she renewed her membership sometime in January 2023, but did not know which day, and her LSRA membership may have lapsed because she did not "remember the last time" that she contributed); Ex. 37 at 28:12-17; 29:6-9; 32:14-22 (Monticchio Dep. Tr., Apr. 16, 2024) (testifying that she heard about the lawsuit and

then became a member sometime in January 2023, and was unsure if she was still a member of LSRA at the time of her deposition).

79.     The Complaint does not allege any adverse health effects on behalf of its members. *See* Complaint, ECF No. 1. Testimony confirmed this. Ex. 35 at 57:3-5 (Johnson Dep., Apr. 24, 2024); Ex. 36 at 59:18-21 (Kostas Dep. Tr., Apr. 9, 2024); Ex. 37 at 68:16-22 (Monticchio Dep. Tr., Apr. 16, 2024); Ex. 27 at 103:17-20 (Winand Dep. Tr., Apr. 22, 2024).

**C.     LSRA's Alleged "Harm" from Republic's Discharges in Kreutz Creek**

**1.     Allison Did Not Change His Behavior toward Kreutz Creek due to Discharges from Modern's Outfall 001**

80.     Shane Allison became a member of LSRA in 2020 after being contacted by Evgeniadis. Ex. 34 at 17:15-18; 19:23-20:3 (Allison Dep. Tr., Apr. 24, 2024).

81.     Allison is not sure at which points in time he was a member or not a member of LSRA, and LSRA produced no evidence showing at which points in time Allison was a current member. *Id.* at 19:7-13; 45:19-46:4.

82.     Allison testified that he "believed" he donated to the organization in 2020 and again in early 2023, but does not know the dates of either donation that trigger his membership. *Id.* at 18:10-20:5; 21:18-21.

83.     Allison has never interacted with any of the other declarants in this action despite alleging involvement with LSRA and activities related to Kreutz

Creek. *Id.* at 34:8-20. Allison has also never attended any organizational meetings for LSRA or any events put on by LSRA. *Id.* at 21:24-22:6.

84.    Allison did not write the declaration he submitted in support of LSRA's Complaint. *Id.* at 49:18-21.

85.    Before submitting his declaration, Allison participated in a video interview, and the declaration was "supplied" to him. *Id.*

86.    Allison testified that he originally changed his behavior toward the creek due to a purported "color" in Kreutz Creek, *id.* at 40:1-18, but he could not state whether the coloration was due to boron or OP. *Id.* at 88:9-12. "Color" is an entirely separate permit parameter in Modern's 2017 Permit, and it is unrelated to boron or OP. Ex. 4 at 2 (2017 Permit).

87.    Allison made a request for information about Modern's NPDES permit compliance on December 5, 2015 through the "Ask DCNR" email address. Ex. 34 at 62:22-63:9 (Allison Dep. Tr., Apr. 24, 2024). In response to his request, Allison was provided with data from sampling of Kreutz Creek near Modern's Outfall 001. *Id.* at 64:22-65:14. Allison's understanding was that Modern was "within spec" or within its permit limits as of April 28, 2015. *Id.* at 65:11-19. However, during his testimony, Allison described his concerns about "another water source that comes in the creek" in addition to the outfall at issue in this case. *Id.* at 73:3-4. According to Allison, this "source" is "different from the NPDES outfall." *Id.* at 73:3-4, 74:2-4.

88.    In January 2019, Allison contacted the PA Fish & Boat Commission about what he believed was an invasive species growing in Kreutz Creek. *Id.* at 68:12-15; 69:5-70:24. In response to his inquiries and photos of the observed growth, the Commission identified the species as a type of bacteria that occurs in areas with high protein discharge. *Id.* at 71:2-7.

89.    Based on his exchanges with the PA Fish & Boat Commission, Allison believes there is "some influence of obviously high protein coming into the creek," but he does not "have any data to prove" that Modern is this source of high protein or that it is related to permit level exceedances of boron or OP. *Id.*

90.    Allison testified to his observance of a difference between the water immediately upstream from Modern's NPDES outfall discharge and farther upstream because he feels "like there's other stuff coming in the creek through the groundwater above the discharge." *Id.* at 58:4-11. Allison estimates that within 100 yards upstream of Modern's NPDES outfall discharge, there is "another water source that comes in the creek just above" where the bacteria identified by the PA Fish & Boat Commission was growing. *Id.* at 72:8-10, 73:3-4.

91.    Allison testified he would not increase his use of Kreutz Creek even if Modern was within its NPDES permit limits. *Id.* at 94:5-8. He has not changed his behavior related to Kreutz Creek in the past year even though he saw the "coloration go away." *Id.* at 95:3-6.

92.     Allison was not aware of whether Modern has been in compliance with its permit limits on boron and OP since April 2023. *Id.* at 52:6-9. He did not inquire of Evgeniadis or anyone else about the status of Modern's compliance. *Id.* at 52:10-53:1.

### 2.     Evgeniadis Did Not Change His Behavior toward Kreutz Creek due to Discharges from Modern's Outfall 001

93.     Evgeniadis admitted that he waited two and a half years from his initial Kreutz Creek sampling for boron to file a notice of intent to sue, despite only needing to have information on violation to file a lawsuit. Ex. 26 at 150:18-151:2; 151:14-19 (Evgeniadis Dep. Tr., Mar. 14, 2024).

94.     Despite Evgeniadis' alleged "major concerns," he admitted that waiting two years was a "pretty good gap of time" between his initial concern for discharges at Kreutz Creek in 2020 and when he began conducting sampling at Kreutz Creek in 2022. *Id.* at 151:14-19.

95.     From 2016 to present, Evgeniadis has changed the frequency of his use of Kreutz Creek for activities like fishing, but Evgeniadis attributed these changes only to "being in the area" of Kreutz Creek "a lot more" before taking his present job at LSRA in Wrightsville. *Id.* at 76:6-8; 77:4-9.

96.     Evgeniadis did not attribute any of his changes in activity to the amounts of boron, or OP in Kreutz Creek or Modern's discharges to the creek, and instead agreed that his decision to fish or not to fish at Kreutz Creek is a personal

preference based on factors like flow, temperature, and weather. *Id.* at 76:6-77:12.

97.    Evgeniadis has not experienced a difference in his use of Kreutz Creek from 2022 to March 14, 2024, the day of his deposition. *Id.* at 77:10-12.

### 3.    Johnson Did Not Change Her Behavior toward Kreutz Creek due to Discharges from Modern's Outfall 001

98.    Adrienne Johnson did not write the language included in her declaration and believes it came from "somebody in Washington, DC." Ex. 35 at 46:17-22 (Johnson Dep. Tr., April 26, 2024).

99.    Johnson initially changed her behavior towards the creek due to the "general environmental impact" of what was happening upstream—which she testified includes activities of excavators/earthmovers from housing developments—and her observations of the "flattening of biodiversity." *Id.* at 28:15-19; 29:24-30:2. She credited these impacts to the housing development activities upstream as well as "general changes in the environment" which result in "air, land, and water pollutants." *Id.* at 30:16-18; 45:3-9.

100.    Johnson described "a change in the environment" in and around Kreutz Creek. However, she could not "make a scientific linear relationship between what [she had] observed and the property at Modern Landfill and their activities." *Id.* at 30:12-31:3.

101.    Johnson does not have knowledge of Modern's permit or personal knowledge of the "discharges" referenced in her declaration. *Compare id.* at 46:23-

47:16; *with* Ex. 30 ¶ 3 (Johnson Decl.)

102.   Johnson does not have knowledge of boron as it relates to Kreutz Creek. Ex. 35 at 57:21-23 (Johnson Dep. Tr., Apr. 26, 2024).

103.   Despite stating in her declaration that she no longer allows her sons to swim in Kreutz Creek due to the risk of "swallowing or contacting water that contains . . . the chemicals that cause elevated [OP]," Johnson testified that she first heard about OP as it relates to Kreutz Creek during the course of her deposition on April 26, 2024. *Compare* Ex. 30 ¶¶ 5-6 (Johnson Decl.), *with* Ex. 35 at 57:24-58:7 (Johnson Dep. Tr., Apr. 26, 2024).

104.   Johnson was concerned about pollution in Kreutz Creek and requested testing by LSRA for the portion of Kreutz Creek that abuts her property. Ex. 35 at 26:9-17 (Johnson Dep. Tr., Apr. 26, 2024). Johnson testified that her concern came from the "general environmental impact of what's upstream," but she did not cite Modern as her concern. *Id.* at 28:17-18; 28:23-25. Instead, Johnson described a lot of "development" in the area, specifically for housing developments that could encourage pollutants "to get down in the water." *Id.* at 24:1-17.

105.   Johnson testified that she did not recall the results of this testing and LSRA did not produce any evidence showing that there had been any levels of boron or OP. *Id.* at 26:18-23; 27:24-28:4; Ex. 38 (A. Johnson Well Testing Aug 2023).

106.   Johnson also testified that she would not change her behavior even if

Modern was in compliance with is permit because she "already avoids the creek." Ex. 35 at 51:21-23 (Johnson Dep. Tr., Apr. 26, 2024).

### 4. Kostas Did Not Change Her Behavior toward Kreutz Creek due to Discharges from Modern's Outfall 001

107.   Kostas did not write her declaration in the present lawsuit. Ex. 36 at 41:13-15 (Kostas Dep. Tr., Apr. 9, 2024).

108.   There is no evidence in the record that Kostas had an active LSRA membership when the Complaint was filed. By her own deposition testimony, Kostas admitted that her membership may have lapsed and stated that "I don't remember the last time I contributed." *Id.* at 19:11-16. Kostas testified that she joined LSRA when she contributed to LSRA for the first time "approximately two years" prior to the deposition, but could not say when she last contributed and could not confirm whether she was a current member or a member at the time the Complaint was filed. *Id.* at 16:7-9. Her declaration did not even include an allegation of membership at the time the Complaint was filed. *See generally* Ex. 31 (Kostas Decl.).

109.   Kostas never reviewed LSRA's Complaint prior to signing her declaration in its support—or since. Ex. 36 at 28:12-23 (Kostas Dep. Tr., Apr. 9, 2024); *see supra* ¶ 78.

110.   Kostas has never done any water sampling from Kreutz Creek or the Susquehanna River. Ex. 36 at 31:14-19 (Kostas Dep. Tr., Apr. 9, 2024).

111.   Kostas is not aware of whether Modern is currently in compliance with its NPDES permit. *Id.* at 47:18-21.

112.   Kostas started noticing a difference in color at Kreutz Creek "probably months before" signing her declaration. *Id.* at 50:13-16. Kostas testified to continuing to observe an "orange color" in Kreutz Creek after that time and including two weeks prior to her deposition on April 9, 2024. *Id.* at 54:15-20. At that time, Modern had been in compliance with its NPDES permit for boron and OP for over a year. *See supra* ¶¶ 53, 55. Despite citing the coloration as a reason for changing her use of Kreutz Creek and believing that this coloration is related to Modern's discharges, Kostas has continued to see this "orange color" past the time that Modern has been in compliance with its permit. Ex. 36 at 53:11-16; 54:15-20 (Kostas Dep. Tr., Apr. 9, 2024).

113.   Kostas is not alleging any adverse health effects related to Modern and/or Kreutz Creek. *Id.* at 59:18-21.

114.   Kostas would not feel comfortable using Kreutz Creek even if Republic adheres to environmental regulations. Kostas cites not "observing a healthy stream" at Kreutz Creek as her source of discomfort, regardless of Modern's discharges. *Id.* at 75:10-24.

### 5.   Monticchio Did Not Change Her Behavior toward Kreutz Creek due to Discharges from Modern's Outfall 001

115.  Carla Monticchio is not sure if she is currently a member of LSRA or

when she became a member. Ex. 37 at 28:12-17; 31:25-32:7 (Monticchio Dep. Tr., Apr. 16, 2024).

116.   Monticchio was made aware of the opportunity to submit a declaration for the present lawsuit by Devin Winand. Winand "sent out communication and awareness to the neighborhood" to seek declarants for the lawsuit. *Id.* at 42:3-11.

117.   Monticchio did not review LSRA's Complaint prior to signing the declaration in its support. *Id.* at 48:7-17.

118.   Further, Monticchio had never seen LSRA's complaint in the present lawsuit prior to her deposition. *Id.*

119.   Monticchio does not know the frequency of Modern's alleged exceedance of its NPDES permit, and, at the time of her deposition, she did not know if Modern was in compliance with its permit. *Id.* at 59:1-15.

120.   Despite her declaration stating that she will not allow her sons to catch fish in Kreutz Creek until it "can support a healthy population of fish and aquatic life," Monticchio abandoned this statement, testifying to clarify that she "can't really speak to the fish" in Kreutz Creek and does not have direct knowledge of whether it has ever supported healthy fish and aquatic populations. *Compare* Ex. 32 at ¶ 9 (Monticchio Decl.), *with* Ex. 37 at 73:3-8 (Monticchio Dep. Tr., Apr. 16, 2024).

121.   Monticchio testified that she was not aware of Modern entering into an agreement with PADEP regarding its discharges. Ex. 37 at 78:15-22 (Monticchio

Dep. Tr., Apr. 16, 2024).

122.    Monticchio was clear that she would not change her behavior if Modern was in compliance, testifying that "it does not matter to me if Modern Landfill is within their permit." *Id.* at 81:2-4; *see also id.* at 60:15-17 ("I don't think it would change whether I use the creek or not if they were within their permit limits."); *id.* at 72:10-17 (testifying that she would not let her children fish in the creek if Modern was in compliance with its permit).

### 6.    Winand Did Not Change His Behavior toward Kreutz Creek due to Discharges from Modern's Outfall 001

123.    Despite being a currently paid employee as Deputy Director for LSRA, Devin Winand did not have any involvement with writing the Complaint and did not review it or ask to review it prior to submitting his declaration. Ex. 27 at 51:11-20 (Winand Dep. Tr., Apr. 22, 2024).

124.    Winand did not write his declaration and his understanding is that it was written by "the attorneys representing LSRA and the plaintiffs." *Id.* at 88:10-15.

125.    Winand has never done any sampling himself in Kreutz Creek. *Id.* at 66:12-14   He has done "some sampling" in other streams, but not for boron or OP. *Id.* at 66:14-18, 23-24.

126.    Winand has observed an "orange color" in Kreutz Creek, but he has not done any research about what constituents would cause that. *Id.* at 77:10-20. He also

testified that he could "see an argument" that coloration in Kreutz Creek is "naturally occurring." *Id.* at 77:25-78:1.

127.   Winand has a "general understanding" of wastewater treatment plants, but his knowledge is not specific to Modern. *Id.* at 92:3-13.

128.   Winand discontinued his use of Kreutz Creek several years prior to having any knowledge of the relationship between boron and OP and Kreutz Creek. *Id.* at 99:1-4.

129.   Specifically, Winand pointed to an orange color in the creek, which he saw as early as 2017, and has consistently seen since. *Id.* at 48:23-49:6; *see also id.* at 95:10-15 (considering "less polluted" to include a correction in color); *id.* at 56:11-13 (testifying that "the visual color was a dead give-away" that "something was not right"). Winand estimated that the last time he used Kreutz Creek was in "the summer of 2018" or "maybe 2019." *Id.* at 99:1-4. This timeframe is several years prior to LSRA's testing of Kreutz Creek and the allegations of exceedances in Plaintiff's Complaint. *See generally* Complaint, ECF No. 1.

130.   Winand first became aware of boron and OP in relation to Kreutz Creek at the time the present lawsuit was filed in 2023. Ex. 27 at 17:1-13 (Winand Dep. Tr., Apr. 22, 2024).

131.   Winand also testified that he would "still be hesitant" to use Kreutz Creek even with an understanding that Modern is now in compliance with its current

permit. *Id.* at 116:10-23.

## III.   LSRA's Demands Are Duplicative of the COA

132.   Allison's understanding is that the lawsuit is about "permit limits on discharges." Ex. 34 at 28:21-22 (Allison Dep. Tr., Apr. 24, 2024).

133.   Evgeniadis was not aware of the penalties that Republic paid to PADEP for violations of boron and OP. Ex. 26 at 166:24-167:6 (Evgeniadis Dep. Tr., Mar. 14, 2024). Further, despite being "unaware" of the penalties, Evgeniadis erroneously assumed that "they don't represent the violations that have been occurring." *Id.* at 167:9-14.

134.   Evgeniadis confirmed that in an interview with the York Dispatch newspaper around December 27, 2023, it was Evgeniadis's understanding that Republic was in compliance with its NPDES permit. He stated: "The reverse osmosis is doing what it's supposed to do and the violations we saw are no longer there." *Id.* at 175:18-22, 176:15-24.

135.   Evgeniadis understands that, as of April 2023, there have been no exceedances of boron or OP from Modern's Outfall 001. *Id.* at 187:20-188:1.

136.   In its Complaint, LSRA is requesting relief in the form of a declaration that Republic has violated and is continuing to violate its NPDES permit. Complaint at 7, ¶ 1, ECF No. 1. Evgeniadis agreed, however, that Republic is currently in compliance with its NPDES permit. Ex. 26 at 193:17-22, 194:24-195:4 (Evgeniadis

Dep. Tr., Mar. 14, 2024).

137.   Evgeniadis also agreed that since Republic is currently in compliance with its NPDES permit, Republic doesn't need to be enjoined from operating its facility. *Id.* at 195:11-14.

138.   Because Evgeniadas agreed that Republic is currently in compliance with its NPDES permit, he further acknowledged that the Court does not need to order Republic to immediately comply with the effluent limitations contained in Republic's NPDES permit. *Id.* at 195:15-21.

139.   Winand testified that he was aware that Republic was under a consent decree with PADEP to improve Modern's wastewater treatment plant. Winand could not describe the actions Republic promised to take under the COA as "different" from what LSRA is seeking as redress through its lawsuit. Ex. 27 at 84:11-20 (Winand Dep. Tr., Apr. 22, 2024).

## IV.   Exceedances Prior to July 2019 Are Not at Issue in this Litigation

140.   More than two years after Republic and PADEP entered into the COA and Republic was well underway to achieving compliance with Modern's boron and OP limits, on November 2, 2022, LSRA filed its 60-Day Notice of Intent to Sue, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). Ex. 39 (Notice of Intent).

141.   LSRA alleged that Republic had violated effluent limitations for boron and OP "since July 2019 and continuing to the present." *Id.* at 2.

142.   As required by the CWA, LSRA also specifically listed dates of alleged effluent violations, with July 31, 2019 as the first effluent violation of OP for which LSRA was giving notice of its intention to file suit. *Id.* at 6.

143.   LSRA included a qualifier that when filed, its suit would also address violations "for months subsequent to the most recent month in the attached list." *Id.* at 1.

144.   LSRA did not allege in its NOI any violations prior to July 31, 2019 or that it intended to pursue unlisted violations prior to that date. *Id.* at 6.

145.   On September 10, 2020—over two years before LSRA submitted its Notice of Intent—PADEP emailed Evgeniadis, acting on behalf of LSRA as "Riverkeeper," attaching a copy of the COA executed between Republic and PADEP. *See* Ex. 40 (Email re Modern Landfill Consent Order and Agreement); Ex. 19 (COA). The COA lists pre-2019 violations. *See* Ex. 19 (COA).

146.   Modern's Discharge Monitoring Reports ("DMRs") are public and LSRA could have asked PADEP informally for this information (as it did to obtain the COA) or submitted a formal Right to Know request to receive these reports.

147.   On January 11, 2023, LSRA filed its Complaint in this action. Complaint, ECF No. 1.

148.   Similar to LSRA's allegations in its NOI, LSRA's Complaint included only allegations of Republic's effluent violations for boron and OP "since July 2019

and continuing to the present." *Id.* ¶ 23.

149.   Attachment A to LSRA's Complaint is the same list of violations included in LSRA's NOI and does not include any violations prior to July 31, 2019. *See id.* at Attachment A.

150.   During the course of the litigation, LSRA sought, and Republic agreed to, a stipulation regarding the relevant exceedances. This Stipulation, drafted by Plaintiff and finalized between the parties, does not include any pre-July 2019 violations. *See* Stipulation, ECF No. 24.

151.   During written discovery in this litigation, LSRA did not indicate any intent to litigate pre-July 2019 violations. In response to Republic's interrogatory requesting LSRA list each instance where it alleges Republic is in violation of its permit, LSRA listed, without qualification, only violations occurring after July 2, 2019. *See* Ex. 41 at 10–20 (Responses to Defendant's First ROGs and RFPs); *see also id.* at 24–25 (listing only violations after August 27, 2020 as instances where Republic exceeded its NPDES limits for OP and boron and failed to pay the stipulated penalties).

152.   Republic objected to LSRA's discovery requests if there was an implication that it sought information regarding pre-2019 violations. For example, LSRA requested documents "from 2016 to the present" and Republic objected on the basis that this request sought evidence of violations prior to the allegations in the

Complaint. *See* Ex. 42 at RFP 3 (Objections and Responses to Plaintiff's First RFPs); *see also id.* at RFP 9 (objecting to a request for documents from 2017 to the present because the request was not limited to the time frame relevant to LSRA's claims and agreeing to produce only documents from 2019 to the present).

153.   Despite making a deliberate choice not to include pre-July 2019 OP violations in both its NOI and Complaint, and making no attempt to rectify these omissions during the litigation, LSRA nonetheless sought Summary Judgment on thirty pre-2019 OP violations. *See* LSRA Reply Brief, ECF No. 47 at 18–19.

## V.   Republic Complied As Soon As Practicable

154.   Jonathan Shefftz, LSRA's proffered expert, testified that he was supplied the dates for compliance in his report and that even though he modeled his calculations "as if all those monies could have been spent at an earlier point in time but I am not -- that does not mean that I have an independent expert opinion on whether that was feasible." Ex. 43 at 81:3-11 (Shefftz Dep. Tr., Aug. 12, 2024); *see also id.* at 32:15-18 (testifying that he does not have an expert opinion on what the non-compliant dates should be).

155.   Mr. Shefftz also did not have any information or opinion on whether the exceedances were foreseeable. *Id.* at 81:12-23.

156.   Mr. Shefftz further did not have an understanding of the COA or the timeline propounded in the COA by PADEP. *Id.* at 81:24-82:9.

157.   Mr. Shefftz testified that the noncompliance date has a significant impact on an economic benefit calculation, agreeing that "if you move the non-compliance date backward in time, the economic benefit analysis is higher[,] [a]nd if you move the non-compliance date forward in time, the . . . economic benefit analysis is lower." *Id.* at 32:2-14.

158.   Mr. Evgeniadis testified that his understanding is that the treatment plant upgrades should have been completed in May 2022—only 11 months before the actual completion of the upgrades and achievement of full compliance. *See* Ex. 26 at 174:7-11 (Evgeniadis Dep. Tr., Mar. 14, 2024).

159.   Mr. O'Donnell testified that even though Republic took "immediate action" to come into compliance, the process of designing, installing, and completing the upgrade project was "very time consuming" since it takes years to identify the issue and solution, begin the engineering and design work, and obtain the necessary permits. *See* Ex. 1 at 94:17-22 (O'Donnell Dep. Tr., Feb. 26, 2024).

160.   The time needed to obtain a permit from PADEP was a factor that impacted Republic's timeline for the construction, installation, and startup of the RO System. Mr. O'Donnell testified that "to say that in . . . 11 months you could design, install and start this up . . . completely ignores the fact that you've got to get a permit" a process which Mr. O'Donnell testified that it often takes a year or even much longer. *See id.* at 113:17-22.

161.    The permitting process, in fact, did take a significant amount of time because there many levels of review and numerous steps "before you have the ultimate green light" from PADEP to go forward with the project. *See id.* at 119:25-120:2. For example, Republic had to go through a design team, corporate leadership, and a number of consultants, all while working with PADEP. *See id.* at 120:5-12. Mr. O'Donnell testified that going through these multiple levels of review and obtaining approval at each level was a "long, drawn out process." *See id.* at 120:14-20.

162.    Mr. O'Donnell testified that the COVID-19 pandemic and its lasting effects may have had an impact on timing and that in light of delays due to COVID-19, such as supply chain issues, the RO System became operational earlier than he even anticipated due to Republic's perseverance. *See id.* at 115:5-9; 122:9-15.

163.    There were also a number of obstacles due to contractor delays. For example, Mr. Haydar testified that it took the contractors longer than it should have to install basic foundational piping and other parts to the RO System. *See* Ex. 21 at 115:5-9; 122:9-15 (Haydar Dep. Tr., Mar. 26, 2024); *see also id.* at 98:18-19 (testifying that "[t]he delay of the project . . . is simply because some of the tanks were delayed. And some of [the contractor's] own work got delayed").

164.    There were also a number of supply chain issues caused in part by COVID-19. *See* Ex. 44 (Letter re COVID supply issues and construction delays)

(explaining the significant delays with tanks, blowers, and emergency generators).

165.    Additionally, Republic's contractor tried to invoke a force majeure clause to relieve itself of its obligation to supply Republic with the parts necessary to complete the RO System. *See id.* Republic refused to accept the contractor's invocation of force majeure. *Id.* Further, Republic took efforts to find an alternative supplier but could not find suitable alternative options, rejecting its contractor's use of a force majeure clause and holding them to their obligations to complete the project on time. *See id.*

166.    Despite all of these obstacles, Republic completed the upgrades to its wastewater treatment plant, installing the new RO component, in the time frame set by PADEP and has been in compliance with the limits in Modern's permit ever since.


Dated:  September 16, 2024          Respectfully submitted,
                                    **P. Leigh Bausinger**

                                    P. Leigh Bausinger (*pro hac vice*)
                                    Bonnie A. Barnett
                                    Antoinette M. Snodgrass (*pro hac vice*)
                                    FAEGRE DRINKER BIDDLE & REATH LLP
                                    One Logan Square, Suite 2000
                                    Philadelphia, PA 19103
                                    Telephone:  (215) 988-2700
                                    Fax:  (215) 988-2757
                                    bonnie.barnett@faegredrinker.com
                                    leigh.bausinger@faegredrinker.com
                                    antoinette.snodgrass@faegredrinker.com

*Attorneys for Defendant*
*Republic Services of Pennsylvania, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2024, a copy of the foregoing STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANT REPUBLIC SERVICES OF PENNSYLVANIA, LLC IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

Dated: September 16, 2024                    Respectfully submitted,

                                             **_s/P. Leigh Bausinger_**
                                             P. Leigh Bausinger (*pro hac vice*)
                                             Bonnie A. Barnett
                                             Antoinette M. Snodgrass (*pro hac vice*)

                                             *Attorneys for Defendant*
                                             *Republic Services of Pennsylvania, LLC*