## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION, | : : : | Civil No. 1:23-CV-00044 |
| Plaintiff, | : : | |
| v. | : : | |
| REPUBLIC SERVICES OF PENNSYLVANIA LLC, | : : : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Plaintiff, Lower Susquehanna Riverkeeper Association ("LSRA"), initiated this citizen suit against Defendant, Republic Services of Pennsylvania LLC ("Republic"), for alleged violations of the Clean Water Act.  Now before the court are cross-motions for summary judgment.  LSRA's motion seeks summary judgment on issues of subject matter jurisdiction and Republic's liability, the latter of which is mostly uncontested.  Republic's motion similarly seeks judgment on issues of subject matter jurisdiction.  Republic also seeks judgment finding that no statutory civil penalty is warranted for its violations of the Clean Water Act.  For the reasons that follow, the court will grant in part and deny in part LSRA's motions, and deny Republic's motion.

### BACKGROUND

LSRA is a nonprofit organization whose mission is to "improv[e] and protect[] the ecological integrity of the Susquehanna River watershed and

1

Chesapeake Bay." (Doc. 38-7, ¶ 3.) In this lawsuit, LSRA contends that Republic has violated the Clean Water Act and should be assessed civil penalties for its pollution of Kreutz Creek, a tributary of the Susquehanna River. LSRA also seeks injunctive relief.

Republic's business is in the "solid waste industry" and includes "the operation of landfills." (Doc. 58, ¶ 1.) One such operation is Modern Landfill, which Republic has controlled since 1999. (*Id.* ¶ 2.). Modern Landfill processes "municipal solid waste and residual/industrial wastes." (*Id.* ¶ 3.) A byproduct of Modern Landfill's operation is a liquid known as leachate, which "results from the mixture of decomposing trash and precipitation infiltration from a landfill's surface." (*Id.* ¶ 8.) To treat leachate, Modern Landfill operates a wastewater treatment facility and has done so since 1988. (*Id.* ¶ 7.) There, treated leachate eventually mixes with collected groundwater. (*Id.* ¶ 14.) This mixture ultimately discharges into Kreutz Creek from a point designated as "Outfall 001." (*Id.* ¶ 9.) The composition of the material that Modern Landfill was discharging out of Outfall 001 is the subject of LSRA's lawsuit.

On January 23, 2017, the Pennsylvania Department of Environmental Protection ("PADEP") issued National Pollutant Discharge Elimination System Permit Number PA0046680 ("2017 NPDES Permit") to Republic. (*Id.* ¶¶ 16, 19.) The 2017 NPDES Permit took effect on February 1, 2017. (*Id.* ¶ 19.) Under this

permit, Outfall 001 may discharge "up to 500,000 gallons per day . . . consisting of a mixture of groundwater, landfill leachate, landfill gas condensate, and other plant wash water." (*Id.* ¶ 10.)  The permit also contains effluent limitations comprised of both an average monthly limit and a daily maximum limit.  Limits pertaining to two parameters—osmotic pressure and total boron—are at the center of this case.[1] The average monthly limit for osmotic pressure was 129 mOs/kg, and the daily maximum was 183 mOs/kg.[2]  (Doc. 58-4, p. 6.)[3]  The 2017 NPDES Permit did not initially include any exact limitation for total boron.  (Doc. 58, ¶ 22.)  Instead, it required Republic to monitor and report total boron discharge levels until February 1, 2020.  (*Id.* ¶ 21.)  On that date, total boron effluent concentration and total mass limitations became effective.  (*Id.* ¶ 23.)  With respect to concentration, the average monthly limit was 4.12 mg/L and the daily limit was 5.52 mg/L.  (*Id.*)  With respect to total mass, the average monthly limit was 17.2 pounds per day, and the daily limit was 23 pounds per day.  (Doc. 58-4, p. 6.)

---

[1] LSRA's complaint also brought claims related to alleged discharges of per-and polyfluoroalkyl substances ("PFAS").  The parties stipulated to dismiss with prejudice any claims related to PFAS.  (Doc. 45.)  The court approved the stipulation.  (Doc. 46.)

[2] The unit of measure "mOs" stands for milliosmole, *i.e.*, one one-thousandths of an osmole. (Doc. 62, ¶ 20.)  An osmole is the "amount of a substance that contributes to the osmotic pressure of a solution." (*Id.*)

[3] For ease of reference, the court uses the page numbers from the CM/ECF header.

Republic immediately recognized that its "wastewater treatment plant was not capable of meeting the effluent limitations for total osmotic pressure" and "total boron." (Doc. 38-4, pp. 5–6.)[4] Eventually the insufficiencies of Republic's facilities led to exceedances of the osmotic pressure effluent limits. PADEP sent Notices of Violations to Republic concerning these exceedances in January 2018 and January 2019, respectively. (*See* Docs. 61-1, 61-2.) Republic's response to the January 2019 PADEP Notice of Violation acknowledged that its wastewater treatment facility "was not designed to reduce Osmotic Pressure" and also "suggested installation of a Reverse Osmosis . . . treatment system." (Doc. 58-19, p. 4.) Later in 2019, Republic also notified PADEP that its wastewater treatment plant was also "not designed to treat for Total Boron." (*Id.* at 5.)

These realities led Republic and PADEP to enter into a Consent Order and Agreement on August 25, 2020 ("COA") pursuant to the Pennsylvania Clean Streams Law. (Doc. 58, ¶ 39.) Through the COA, Republic agreed to upgrade its wastewater treatment facility in accordance with a timeline detailed therein. (*Id.*) The COA also imposed prospective penalties on Republic for all "exceedances of effluent limitations for total osmotic pressure and total boron" that occurred after

---

[4] Republic conceded that it was "definitively aware" of its facility's inadequacy upon learning what the final effluent limitations would be in the 2017 NPDES Permit. Nevertheless, Republic contends that this does not mean that it definitively knew its facility would exceed the limitations at that time. (Doc. 44, ¶ 4.) This distinction is immaterial for the purpose of resolving the present motions.

June 2020. (Doc. 24, ¶ 5.) The COA "scaled" penalty amounts "to the magnitude of the exceedance." (*Id.*) Specifically, penalties for monthly average exceedances ranged from $250 to $400 per exceedance. (*Id.*) Those for daily maximum exceedances ranged from $125 to $200 per exceedance. (*Id.*) Between July 2020 and April 2023, Republic incurred $77,800 in penalties under the COA for exceedances of these effluent limits. (*Id.* ¶ 6.)

On April 19, 2023, Republic completed the agreed-upon upgrades to its wastewater treatment facility. (Doc. 58, ¶ 53.) Republic has since been in compliance with the 2017 NPDES Permit's effluent limitations for osmotic pressure and total boron.[5] (*Id.*)

## PROCEDURAL HISTORY

On November 2, 2022, LSRA sent a notice of intent ("NOI") to Republic, PADEP, and the United States Environmental Protection Agency, which informed them of LSRA's intent to file a citizen suit against Republic for its alleged violations of osmotic-pressure and total-boron effluent standards occurring between July 2019 and the date of the NOI. (Doc. 39-9, pp. 5–10.) LSRA then filed suit in this court on January 11, 2023. (Doc. 1.) LSRA seeks injunctive relief, civil penalties, as well as attorneys' fees and other expenses.

---

[5] After this lawsuit was filed, PADEP issued a permit renewal that took effect on July 1, 2024. (Doc. 58, ¶ 56.) The 2024 permit has the same effluent limits for osmotic pressure and total boron as the 2017 NPDES Permit. (*Id.* ¶ 59.)

The parties stipulated that Republic exceeded its various effluent limitations for osmotic pressure and total boron on 419 occasions, collectively, during the period of July 2019 through April 2023. (Doc. 24, ¶ 2.) Thereafter, the parties filed cross-motions for summary judgment. (Docs. 38, 56.) In support of their respective motions, the parties each filed a brief in support, a statement of material facts, and a reply brief. (Docs. 39, 40, 47, 57, 58, 63.) In opposing the other party's motion, the parties each filed a brief in opposition and an answer to the other's statement of material facts. (Docs. 43, 44, 61, 62.) The court has considered all of these submissions. The motions are now ripe for review.

## JURISDICTION

LSRA's lawsuit arises under the laws of the United States. Therefore, the court has jurisdiction over the general subject matter of this lawsuit pursuant to 28 U.S.C. § 1331. The court, however, must resolve two jurisdictional issues. First, the parties each seek judgment on whether LSRA has standing to bring this lawsuit. Second, the parties seek judgment on whether the COA triggers a statutory bar of LSRA's lawsuit. The court considers each issue in turn.

### A. Standing

Federal courts only have the power to adjudicate "Cases" and "Controversies" brought by those who have standing. *California v. Texas*, 593 U.S. 659, 668 (2021) (quoting U.S. Const. art. III, § 2). Standing is an "irreducible

constitutional minimum" for a litigant to bring suit. *Road-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 354 (3d Cir. 2024) (quoting *Uzuegbunam v. Preczewski*, 529 U.S. 279, 285 (2021)). The Supreme Court has long recognized that "an association has standing to bring suit on behalf of its members" if it satisfies three factors. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). First, the association's "members would otherwise have standing to sue in their own right." *Id.* Second, "the interests it seeks to protect are germane to the organization's purpose." *Id.* And third, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Here, Republic only challenges LSRA's standing on the first element. It argues that LSRA's members would not have standing in their own right. (*See* Doc. 57, pp. 17–22.)

Article III's standing requirement is satisfied when a plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). LSRA bears the burden of establishing that its proffered members satisfy these three elements. *Id.* Republic insists that none of these factors are satisfied here.

### 1. LSRA's Members

LSRA proffers six of its members for standing purposes: Ted Evgeniadis, Anne Kostas, Adrienne Johnson, Devin Winand, Carla Monticchio, and Shane Allison.[6]  (*See* Doc. 38-7, ¶ 4.)  As a threshold issue, Republic argues that LSRA has failed to establish that Allison, Kostas, and Monticchio were actually LSRA members when the complaint was filed.  (Doc. 57, p. 18.)  Republic's argument is unpersuasive.

Evgeniadis, LSRA's executive director, is "responsible for maintaining [LSRA's] membership records."  (Doc. 38-7, ¶ 4.)  He declared that one becomes a member in LSRA "by making a monetary contribution."  (*Id.*)  He further declared that Allison, Kostas, Monticchio, and the other proffered individuals "had made monetary contributions and were [LSRA] members" at the time the complaint was filed.  (*Id.*)  Republic points to discrete portions of each challenged member's deposition to rebut Evgeniadis's statements.  (*See* Doc. 58, ¶¶ 81, 108, 115.)

These excerpts do not contradict Evgeniadis's declaration.  At most, these excerpts show that Allison, Kostas, and Monticchio are unsure about the formal requirements of becoming an LSRA member and could not provide the exact dates they made monetary contributions.  For instance, Allison testified at his deposition that he had been an LSRA member for about three to four years (*i.e.*, since 2020 or

---

[6] The court hereafter refers to these members by their last names.

2021), but was unaware of the "requirement[s] for membership," other than a

monetary donation.  (Doc. 58-34, pp. 5–6.)  Kostas testified that she became an

LSRA member approximately two years before her deposition (*i.e.*, 2022) but

could not remember the exact dates that she made monetary contributions or the

exact amount.  (Doc. 58-36, p. 6.)  Similarly, Monticchio, confirmed that she had

joined LSRA online in January 2023 but was not sure if her membership was

active in April 2024 since she was unaware of exactly how often membership

renewed.  (Doc. 58-37, pp. 4–5, 6.)  In none of these depositions did Allison,

Kostas, or Monticchio disavow that they were LSRA members or otherwise

contradict Evgeniadis's declaration.  Republic faults Allison, Kostas, and

Monticchio for not having a detailed factual understanding of LSRA's membership

processes.  This is information that LSRA does not need to establish through

individual members, especially considering they are non-parties.  *See Pub. Interest

Research Grp. of N.J. v. Yates Indus., Inc.*, 757 F. Supp. 438, 443 (D.N.J. 1991)

("[S]ince the members are nonparties, they need not be familiar with the specific

facts of the case.")  Accordingly, the court finds that LSRA sufficiently proved the

membership status of Allison, Kostas, and Monticchio.

### 2.  Injury in Fact

An "environmental plaintiff" satisfies the injury-in-fact element of standing

"when they aver that they use the affected area and are persons 'for whom the

aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000).  In *Laidlaw*, the Supreme Court examined member averments that it concluded satisfied the injury-in-fact element.  *Id.* at 182–83.  Those members collectively averred, *inter alia*, that they lived near the river at issue; that due to the defendant's discharged pollutants, they no longer enjoyed the aesthetic beauty of the river or recreational activities near the river; and that the value of one member's property dropped.  *Id.*

Here, the member declared, under the penalty of perjury, they suffered injuries very similar to those in *Laidlaw*.  Johnson and Monticchio no longer swim or fish in Kreutz Creek because of concerns about pollutants and are concerned that Republic's pollution adversely affects the value of their properties, which are next to Kreutz Creek and about 380 feet away, respectively.  (Doc. 38-14, pp. 2–3; Doc. 38-16, pp. 2–3.)  Winand avers that his property is a few hundred yards away from the creek, that he stopped using the creek due to pollution concerns, and that his recreational and aesthetic appreciation for Kreutz Creek has been diminished by its pollution.  (Doc. 38-15, p. 3.)  Similarly, Allison declared that Outfall 001 discharges into Kreutz Creek about 400 feet from his property and that due to pollution, he too no longer fishes or swims in Kreutz Creek.  (Doc. 38-17, pp. 2–3.) These declarations undoubtedly show that LSRA's members are attempting to

vindicate "threatened concrete interest[s] of [their]' own" and are "precisely the type of plaintiff[s]" who can demonstrate injury in fact. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 159 (4th Cir. 2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992)).

Republic advances two unavailing arguments to the contrary. First, Republic faults LSRA's members for failing to aver harm to human health. (Doc. 43, p. 14.) Yet, harm to human health is not a necessary condition of satisfying the injury-in-fact element in this context. *See Laidlaw*, 528 U.S. at 183 (finding harm to "recreational, aesthetic, and economic interests" sufficient); *Pub. Interest Research Grp. of N.J. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 71 (3d Cir. 1990) (explaining that "harm to aesthetic and recreational interests is sufficient to confer standing"). Second, Republic points to deposition excerpts in which some members purportedly stated that they would not increase their use of Kreutz Creek even if Republic was in compliance with its effluent limits. According to Republic, this testimony purportedly proves that its pollution is immaterial to the members' decision not to enjoy Kreutz Creek. Republic's argument relies on an obvious sleight of hand. The testimony Republic cites actually shows that certain members are skeptical that they would resume enjoyment of Kreutz Creek regardless of whether Republic was compliant with the specific limitations at issue, given its past pollution and their concern about whether Kreutz Creek is, in fact,

safe for use.  (*See* Doc. 44-15, pp. 16–17; Doc. 44-17, p. 12; Doc. 44-18, pp. 11–

12; Doc. 44-19, p. 14.).  No LSRA member testified, or even suggested, that

Republic's previous exceedances of their effluent limits had no effect on their

enjoyment of Kreutz Creek.  Accordingly, these members' testimonies do not

undermine the conclusion that LSRA's members suffered an injury in fact.

### 3.  Traceability

In this case, the traceability element of standing "may be established by

showing that a defendant has 1) discharged some pollutant in concentrations

greater than allowed by its permit 2) into a waterway in which the plaintiffs have

an interest that is or may be adversely affected by the pollutant and that 3) this

pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs."

*Powell Duffryn*, 913 F.2d at 72.  There is little doubt that LSRA has satisfied the

first two factors.  Republic's exceedances are stipulated.  (Doc. 24.)  And, the

LSRA members' declarations make clear that they have an interest in Kreutz

Creek.

Republic argues that the third factor of traceability is not satisfied here.  it

faults LSRA for not relating its members aesthetic injuries specifically to boron or

osmotic pressure.  (Doc. 57, p. 19–21.)  But, LSRA's members' have shown

injuries that are beyond the aesthetic.  As noted above, some have stopped fishing

in Kreutz Creek due to pollution and noticed decreased wildlife biodiversity.

(Doc. 38-14, ¶¶ 8–9; Doc. 38-15, ¶ 7; Doc. 38-16, ¶ 9; Doc. 38-17, ¶ 7.).  Others have averred that they have stopped swimming in Kreutz Creek because of potential harmful effects on their health.  (Doc. 38-14, ¶ 8; Doc. 38-16, ¶ 8; Doc. 38-17, ¶ 6.)  LSRA provides evidence that high concentrations of osmotic pressure and boron can be harmful to aquatic life and human health, respectively.  (Doc. 40, ¶¶ 18–20.)  Republic fails to provide rebutting evidence.  Instead, Republic dismisses LSRA's evidence as irrelevant.  (Doc. 44, ¶¶ 18–20.)

The evidence is, indeed, relevant and shows that boron and osmotic pressure can contribute to the type of injuries LSRA's members have shown.  Nothing more is necessary under this element of standing.  *See Powell Duffryn*, 913 F.2d at 73 n.10 (explaining that plaintiffs do not need to show "to a scientific certainty" that defendant's specific pollutants caused their injuries).  To require a "tort-like causation" would be inconsistent with Article III and would dimmish the strict-liability nature of the Clean Water Act.  *Id.*  Therefore, LSRA has established that its members' injuries are traceable to Republic's pollution.

### 4. Redressability

It is undisputed that Republic's violations were ongoing at the time LSRA commenced this lawsuit.  (*See* Doc. 24, ¶ 2.)  Given this fact, injunctive relief and civil penalties at that point would have provided redress and served an important

deterrent function. *PennEnvironment v. RRI Energy Ne. Mgmt. Co.*, 744 F. Supp. 2d 466, 481–82 (W.D. Pa. 2010). Republic makes no argument to the contrary.

Instead, Republic argues that injunctive relief and civil penalties would no longer redress the injuries of LSRA's members. According to Republic, injunctive relief and civil penalties would serve no deterrent effect—and therefore are useless—because it has been in compliance with its 2017 NPDES Permit since April 2023 and is unlikely to violate its effluent limits in the future. (Doc. 43, pp. 17–19.) In essence, Republic argues its post-complaint reformed behavior has obviated the need for such remedies. Republic's argument speaks to mootness rather than redressability.

Standing and mootness are distinct doctrines, though related to similar justiciability concerns. "Standing ensures that each plaintiff has '[t]he requisite personal interest . . . at the commencement of the litigation,' while mootness ensures that this interest 'continue[s] throughout' the duration of the case." *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Laidlaw*, 528 U.S. at 174. Only when "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" will a defendant's voluntary cessation moot a

14

case. *Hartnett v. Pa. State. Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020) (quoting

*Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir.

2019)).  The "heavy" burden of establishing mootness on the basis of voluntary

cessation lies with the defendant.  *West Virginia v. EPA*, 597 U.S. 697, 719 (2022)

(quoting *Laidlaw*, 528 U.S. at 189).

The question, then, is whether Republic's post-complaint compliance with

the 2017 NPDES Permit has mooted this case.  In considering this precise

question, the Third Circuit has held that post-complaint compliance with an

NPDES permit does not moot claims for civil penalties under the Clean Water Act.

*Nat. Res. Def. Council, Inc. v. Texaco Refining & Mktg., Inc.*, 2 F.3d 493, 503 (3d

Cir. 1993).  In so holding, the Third Circuit emphasized that the Clean Water

Act specifies that violators "shall be subject to a civil penalty."  *Id.* (quoting 33 U.S.C.

§ 1319(d)).  "This mandatory language demonstrates that once a citizen plaintiff

establishes an ongoing violation of a parameter at the time the complaint is filed,

the court is obliged to assess penalties for all proven violations of that parameter."

*Id.*  The Third Circuit's holding aligns with those from other circuits.  *See, e.g.*, *Atl.

States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir.

1997); *Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp.*, 993 F.2d 1017,

1020–21 (2d Cir. 1993); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897

F.2d 1128, 1135 (11th Cir. 1990). Accordingly, Republic's post-complaint remediation does not moot LSRA's claim for civil penalties.[7]

LSRA has satisfied the requirements for standing. Therefore, the court will grant judgment on this jurisdictional issue in LSRA's favor and deny Republic's motion on this issue.

### B. Statutory Preclusion

The other jurisdictional issue the court must address is whether the COA triggers one of the Clean Water Act's provisions that bars citizen suits. Specifically, the Clean Water Act states that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection ... shall not be the subject of a civil penalty action." 33 U.S.C. § 1319(g)(6)(A). The parties each seek judgment on whether the COA triggers this statutory provision.

This court previously addressed whether a COA issued pursuant to the Clean Streams Law bars a citizen suit pursuant to 33 U.S.C. § 1319(g)(6)(A). *Lower Susquehanna Riverkeeper v. Keystone Protein Co.*, 520 F. Supp. 3d 625, 635–36 (M.D. Pa. 2021). In *Keystone*, the court found that the Clean Streams Law is not a law "comparable" to the Clean Water Act. *Id.* at 636. In reaching this conclusion,

---

[7] Republic's remediation may well have mooted LSRA's request for injunctive relief. *See Tyson Foods*, 897 F.2d at 1135. The court, however, need not decide that question now.

the court recognized that there is a circuit split on the appropriate standard of comparability and that the Third Circuit had not weighed in on the issue. *Id.* at 634. The court analyzed two competing standards, respectively known as the "overall comparability" standard and the "rough comparability" standard. *Id.* at 634–35. The "overall comparability" standard "asks a district court to look at the state law in a holistic manner" using several factors. *Id.* at 634. The "rough comparability" standard requires a district court to determine whether the state law contains the same "three categories of provisions" as 33 U.S.C. § 1391(g): "penalty assessment, public participation, and judicial review." *Id.* at 634–35 (quoting *Paper, Allied-Indus., Chem & Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1294 (10th Cir. 2005)).

The court adopted the "rough comparability" standard in *Keystone* for three reasons:

> "First, requiring compatibility between each class of provisions makes § 1319(g)(6) easier to apply," and prevents this court from having to "weigh incommensurable values." Second, adopting this standard reduces uncertainty for litigants, the legislature, and administrative agencies. And third, this standard is the most logical consequence of the text of § 1319(g)(6), which provides that the state law in question must be "comparable to this subsection" as a whole (which would include all three of the above classes of provisions).

*Id.* at 635 (internal citations omitted) (quoting *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1254 (11th Cir. 2003)).

Applying this standard, the court found that the Clean Streams Law was not comparable to the Clean Water Act due to the differences in public participation with respect to civil penalties. *Id.* at 636. "[T]he Clean Streams Law," the court explained, "does not provide the public with adequate notice and the opportunity to participate in PADEP's initial assessment of a civil penalty." *Id.* Republic does not take issue with the court's previous application of the "rough comparability" standard.

Instead, Republic urges the court to apply the "overall comparability" standard. (Doc. 57, pp. 27–30.) Republic argues that the "rough comparability" standard undermines efforts at environmental enforcement by permitting duplicative, non-deterring lawsuits against defendants who have already remediated their pollution.[8] Moreover, Republic insists that the "overall comparability" standard is "the logical extension of" the Supreme Court's holding in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60–61 (1987). Yet, Republic points to no binding precedent that conflicts with

---

[8] In its briefing, Republic uses the terms "rough comparability" and "rough similarity" to describe the standard adopted by the Fifth and Eighth Circuits. (Doc. 57, p. 28.) In *Keystone*, the court referred to that standard as the "overall comparability" standard. Republic uses the term "strict comparison" to describe the standard which this court adopted in *Keystone*, *i.e.*, the "rough comparability" standard. Republic's choice of phrasing is strange considering the *McAbee* and *Continental Carbon* courts explicitly rejected a "rigorous" comparability standard. *Cont'l Carbon*, 428 F.3d at 1293; *McAbee*, 318 F.3d at 1252. For clarity, the court refers to these two standards here as it did in *Keystone*.

*Keystone*.  The Third Circuit has still not weighed in on the appropriate standard of comparability.

The court will again apply the "rough comparability" standard.  Republic's policy arguments do not sufficiently consider the statutory language, which states that the state law must be "comparable *to this subsection*."  33 U.S.C. § 1319(g)(6)(A) (emphasis added).  The Eleventh Circuit described the significance of this language:

> Unlike many of the other paragraphs in § 1319(g), paragraph (6) makes no references to particular paragraphs within the subsection.  Instead, paragraph (6) refers to the subsection as a whole, which includes not only penalty-assessment provisions but also public-participation and judicial-review provisions.  This is strong textual evidence that Congress intended courts to consider all three classes of provisions when deciding whether state law is "comparable" to § 1319(g) of the [Clean Water Act].

*McAbee*, 318 F.3d at 1254 (internal citations omitted).  The court does not find Republic's policy argument convincing in light of this statutory language.

Republic's reference to *Gwaltney* does little to move the needle.  The court disagrees that *Gwaltney* necessitates application of the "overall comparability" standard.  The *Continental Carbon* and *McAbee* courts both found the "rough comparability" standard compatible with *Gwaltney*.  *Cont'l Carbon*, 428 F.3d at 1293; *McAbee*, 318 F.3d at 1252.  The court agrees with those courts on this point.

For these reasons, the court is not persuaded that it should revisit its previous conclusion that the Clean Streams Law is not comparable to the Clean Water Act

19

under 33 U.S.C. § 1319(g)(6)(A). *Keystone*, 520 F. Supp. 3d at 635–36. Thus, the COA does not preclude LSRA's lawsuit. Therefore, the court will grant judgment on this issue in LSRA's favor. Having found LSRA has standing and its case is not statutorily barred, the court properly has subject matter jurisdiction over this lawsuit.[9]

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher*

---

[9] Venue properly lies in this court pursuant to 28 U.S.C. § 1391(b).

*Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the

jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

Two issues remain for judicial resolution on these cross-motions for summary judgment. First, LSRA seeks judgment on Republic's liability for its alleged exceedances of the 2017 NPDES Permit's effluent limitations for total boron and osmotic pressure. Second, Republic seeks judgment concluding that the imposition of a civil penalty is unwarranted under the Clean Water Act.

**A. Liability**

Republic has stipulated that its discharges exceeded the relevant limits on 419 occasions between July 2019 and April 2023. (Doc. 24, ¶ 2.) These exceedances involved both the daily maximum limit and the monthly average limit. (*Id.*) The Clean Water Act imposes strict liability, meaning that the statute "is violated if a permittee discharges pollutants in violation of its permit, regardless of the permittee's *mens rea*." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 175 (3d Cir. 2004). Republic does not dispute that it is liable for 419 violations of the Clean Water Act. Accordingly, the court will grant judgment in favor of LSRA with respect to these 419 violations.

LSRA additionally seeks judgment as to liability for another 30 exceedances by Republic that occurred between October 2017 and June 2019.  Republic contests liability for these 30 exceedances.  (Doc. 40, ¶ 5; Doc. 44, ¶ 5.)  Republic argues that LSRA has failed to allege these 30 exceedances in its complaint.  (Doc. 57, p. 23.)  It is true that LSRA's complaint only alleges that Republic violated the Clean Water Act dating back to July 2019.  (Doc. 1, ¶¶ 23, 29.)  There is no allegation of any violation predating July 2019.  "A party may not utilize a summary judgment motion as a vehicle to raise claims not supported by the pleadings."  *Schultz v. Wilson*, No. 1:04-CV-1823, 2007 WL 4276696, at *2 n.11 (M.D. Pa. Dec. 4, 2007).

LSRA counters that Republic consented to litigate these claims pursuant to Federal Rule of Civil Procedure 15(b)(2).  (Doc. 47, pp. 23–24.)  Rule 15(b) is captioned "Amendments During and After Trial."  Fed. R. Civ. P. 15(b).  Rule 15(b)(2) states:

> ***For Issues Tried by Consent.***    When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2).  The applicability of Rule 15(b)(2) to summary judgment is an open question in the Third Circuit.  *See Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 327 n.7 (3d Cir. 2012) (declining to weigh in on circuit

split over applicability of Rule 15(b) to summary judgment).  This court, too, need not weigh in on this issue.  Even assuming, without deciding, that Rule 15(b)(2) were applicable at this stage of the proceeding, LSRA has failed to show that Republic consented to litigate the pre-July 2019 exceedances.

LSRA has failed to adduce any evidence that Republic expressly consented to litigate these claims.  Thus, LSRA must show that Republic impliedly consented to litigating them.  Analyzing implicit consent under Rule 15(b)(2) requires consideration of three factors: (1) "whether the parties recognized that the unpleaded issue entered the case"; (2) "whether the evidence that supports the unpleaded issue was introduced . . . without objection"; and (3) "whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Liberty Lincoln-Mercury*, 676 F.3d at 327 (quoting *Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995)).  LSRA proffers nothing to suggest factors one and three weigh in its favor.

As to factor two, LSRA contends that Republic's acknowledgment of the pre-July 2019 exceedances in response to a few interrogatories, in its general manager's deposition, and in its statement of facts all evidence Republic's consent. (Doc. 47, p. 24; Doc. 61, p. 7.)  The court disagrees.  LSRA explicitly admitted that its written discovery "did not indicate any intent to litigate pre-July 2019 violations."  (Doc. 58, ¶ 151; Doc. 62, ¶ 151.)  Moreover, the pre-July 2019

exceedances are relevant to LSRA's originally pleaded claims.  As discussed

below, a violator's history of violations is a factor a court must consider when

determining an appropriate civil penalty under the Clean Water Act.  33 U.S.C.

§ 1319(d).  Given this, a few references to these exceedances would not necessarily

have given Republic "any notice that the implied claim[s] [were] being tried."

*Liberty Lincoln-Mercury*, 676 F.3d at 328 (quoting *Douglas*, 50 F.3d at 1236).

The court cannot conclude that the pre-July 2019 exceedances were introduced into

this case without objection. [10]  Thus, LSRA is not entitled to judgment on these

claims violations.[11]

---

[10] Republic sought summary judgment on this issue.  (Doc. 57, pp. 23–27.)  Since the pre-July 2019 exceedances are not pleaded and not part of this case, the court sees no reason to grant judgment in favor of Republic.  Instead, the court will simply deny this aspect of LSRA's motion.  However, this ruling does not preclude the consideration of the pre-July 2019 exceedances at the penalty phase of this litigation when analyzing the factors outline in 33 U.S.C. § 1319(d).

[11] The parties devoted some of its briefing to the issue of whether the NOI—which included a list of violations beginning in July 2019—was legally sufficient to initiate a suit vis-à-vis the pre-July 2019 exceedances.  Before initiating a citizen suit, a plaintiff must provide notice in the manner prescribed by 33 U.S.C. § 1365(b)(1) and 40 C.F.R. § 135.3(a).  Such notice is a jurisdictional prerequisite of filing suit.  *Pub. Interest Research Grp. of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995).  There is no dispute that the NOI was sufficient with respect to the 419 violations that occurred between July 2019 and April 2023.  The court need not determine whether the NOI was sufficient with respect to the pre-July 2019 exceedances, since LSRA did not plead them and the parties did not consent to litigate them under Rule 15(b)(2).

**B. Civil Penalty**

Republic seeks a judgment that no civil penalty is warranted for its 419 violations of the Clean Water Act. LSRA retorts that genuine issues of material fact preclude summary judgment on this issue. The court agrees with LSRA.

Having been found liable for 419 violations of the Clean Water Act, Republic "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d). This court is "accord[ed] . . . wide discretion" in determining an appropriate penalty, given the "highly discretionary calculations" involved in doing so. *United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 264 (3d Cir. 1998) (hereinafter "Dean Dairy") (quoting *Tull v. United States*, 481 U.S. 412, 426–27 (1987)). In determining a penalty, the court must consider six statutory factors: "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

Upon review of the record, it is clear that an issue of material fact exists as to what economic benefit Republic received from its violations. Both parties prepared expert reports that address this factor. LSRA's expert opined that Republic's delayed compliance with its legal obligations generated an economic

benefit of approximately $4.1 million.  (Doc. 61-13, p. 4.)  Republic's expert

opined that Republic's net economic benefit was $569,904.  (Doc. 61-15, p. 5.)

This wide gap is a genuine issue of material fact that is sufficient to defeat

summary judgment.

Republic resists this conclusion.  According to Republic, the economic-

benefit factor is calculated based on "the date that compliance allegedly should

have been achieved, but was not."  (Doc. 57, p. 34.)  Republic argues that it

achieved compliance by the earliest practicable date, *i.e.*, April 2023.  (*Id.* at 37.)

It insists that it could not have remediated its ongoing pollution any faster than it

did, given the research and construction steps required to do so.  (*Id.* at 36.)  Under

Republic's theory, this means it experienced "*no* period of noncompliance" for the

purpose of this factor and, by definition, *no* economic benefit.  (*Id.* at 37)

(emphasis added.)  Republic attempts to explain its expert report away as

"irrelevant" by contending that the report assumes a noncompliance period that the

court should not accept, *i.e.*, July 2019 to the date of the report.  (Doc. 63, p. 23.)

Republic's position flies in the face of law and logic.  First, Republic fails to

cite any case that supports its concept of a non-compliance period.  Second, the

Third Circuit has made clear that this factor "is intended, at its base, to identify the

benefit realized by a violator from delayed expenditures to comply with the [Clean

Water Act]."  *Allegheny Ludlum*, 366 F.3d at 178.  This factor is also intended to

27

"prevent a party violating the [Clean Water Act] from gaining an unfair advantage against its competitors, and to prevent it from profiting from its wrongdoing." *Id.* at 177 (citing *Powell Duffryn*, 913 F.2d at 80). The relevant period of non-compliance, therefore, must bear some relationship to the period during which the defendant was actually violating the Clean Water Act. Otherwise, good faith efforts at compliance would entirely negate the economic-benefit factor. This is an impermissible outcome considering § 1319(d) requires courts to consider all six enumerated factors. *See* 33 U.S.C. § 1319(d). Although Republic claims that it is not arguing one statutory factor can negate another, that is the practical effect of its argument.

The court does not make any finding as to what Republic's specific period of non-compliance is for determining a penalty in this case or that Republic, in fact, derived any economic benefit. The court will consider these issues at the appropriate fact-finding proceeding. The court simply finds at this time that Republic cannot show as a matter of law that it did not receive an economic benefit and, thus, a genuine issue of material fact exists as to this factor.[12]

---

[12] The court need not consider any other of the § 1319(d) factors at the present time. The court will consider all relevant factors at the penalty phase of this case.

### C. Approach to Calculating Civil Penalty at Penalty Phase

For the benefit of the parties moving forward, the court will preview the approach it will use to calculate the appropriate civil penalty in this case. The Third Circuit has stated that district courts are "free to use its discretion in choosing" between two appropriate methods of calculating a civil penalty under § 1319(d). *Dean Dairy*, 150 F.3d at 265. One method is the "'top down' approach in which the maximum possible penalty is first established, then reduced following an examination of the six 'mitigating' factors." *Id.* The other approach is the "'bottom up' approach whereby the economic benefit a violator gained by non-compliance is established and adjusted upward or downward using the remaining five factors in § 1319(d)." *Id.* In this case, the court will employ the "bottom up" approach.

CONCLUSION

For the reasons articulated above, the court will grant in part and deny in part LSRA's motion, and deny Republic's motion.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: March 31, 2025