**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION,** | ) | |
| **Plaintiff,** | ) | **CASE NO. 1:23-cv-00044** |
| **v.** | ) | **JUDGE JENNIFER P. WILSON** |
| **REPUBLIC SERVICES OF PENNSYLVANIA LLC,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

James M. Hecker
Public Justice
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
jhecker@publicjustice.net

Stephen G. Harvey
Michael E. Gehring
E. Kelly Conway
Steve Harvey Law LLC
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
(215) 438-6600
steve@steveharveylaw.com
mike@steveharveylaw.com
kelly@steveharveylaw.com

Attorneys for Plaintiff

## Table of Contents


I. A Civil Penalty Is Required Under CWA § 309(d) ........................................ 1

II. Analysis of the Six Penalty Factors Demonstrates that Republic Should Pay a Large Civil Penalty ........................................ 1

A. Republic Obtained a $4.5 Million Economic Benefit from Its Delayed Compliance ........................................ 2

B. Republic's Violations Were Serious in Terms of Number, Magnitude, and Potential Environmental Harm ........................................ 6

C. Republic's History of Violations Was Persistent and Lengthy ........................................ 8

D. Republic Did Not Act in Good Faith to Achieve Compliance ........................................ 9

1. The Permit, Not the COA, Set the Applicable Requirements for Compliance with the CWA ........................................ 9

2. Republic's Knowledge and Delay Indicate a Lack of Good Faith Efforts to Comply ........................................ 12

a. Years Before 2017, Republic Knew or Should Have Known Its Increasing TDS Levels Created an OP Compliance Problem ........................................ 12

b. Republic's Delayed Response to Its OP Compliance Problem Shows a Lack of Good Faith ........................................ 13

E. A Civil Penalty Would Not Have a Substantial Economic Impact on Republic's Operations ........................................ 15

F. Under the "Other Matters as Justice May Require" Factor, the Court May Consider Penalties Imposed in Prior Similar Cases ........................................ 15

III. For Injunctive Relief, the Court Should Require Republic to Establish a Remedial Fund for York County to Restore Kreutz Creek ........................................ 18

Conclusion ........................................ 21

# Table of Authorities

## Cases

*Citizens for a Better Environment-California v. Union Oil Co. of California*,
861 F. Supp. 889 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111 (9th Cir. 1996) ..........10

*In re Donald Cutler*,
11 E.A.D. 622, 2004 WL 3214474 (EPA Envtl. Appeals Board 2004)..............8

*Ecological Rights Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ..........................................................19

*Formosa Plastics Corp., U.S.A. v. ACE Am. Ins. Co.*,
2024 WL 4891740 (D.N.J. Nov. 25, 2024), ECF 95-1 ......................................19

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) ..........................................................7

*Friends of the Earth v. Laidlaw Environmental Services*,
890 F. Supp. 470 (D.S.C. 1995) ..........................................................10

*NRDC v. Texaco Refining & Marketing Inc.*,
800 F. Supp. 1 (D. Del. 1992), *aff'd in relevant part*, 2 F.3d 493
(3d Cir. 1993)..........................................................7

*Ohio Valley Envtl. Coal., Inc. v. Hobet Min., LLC*,
723 F. Supp.2d 886 (S.D.W. Va. 2010)..........................................................10, 11

*Pennsylvania PIRG v. P.H. Glatfelter Co*.,
128 F. Supp. 2d 747 (M.D. Pa. 2001)..........................................................9, 10

*Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., Md.*,
82 F. Supp. 2d 464 (D. Md. 2000), *vacated on other grds*., 268 F.3d 255
(4th Cir. 2001)..........................................................5

*PIRG v. Powell Duffryn Terminals*,
720 F. Supp. 1158 (D.N.J. 1989), *aff'd in relevant part*, 913 F.2d
64 (3d Cir. 1990)..........................................................6, 7, 3, 15, 19

*Sierra Club v. SCM Corp*.,
572 F. Supp. 828 (W.D.N.Y. 1983)..........................................................11

*U.S. v. Allegheny Ludlum Steel Corp.*,
187 F. Supp. 2d 426 (W.D. Pa. 2002), *aff'd in relevant part,* 366 F.3d 164 (3rd Cir. 2004) ....1, 2, 7, 17, 18

*U.S. v. Mun. Auth. of Union Twp.*,
929 F. Supp. 800 (M.D. Pa. 1996), *aff'd*, 150 F.3d 259 (3d Cir. 1998) ....5, 6, 7, 16

*U.S. v. Smithfield Foods, Inc.*,
972 F. Supp. 338 (E.D. Va. 1997), *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999)....8, 9, 13, 15

*United States v. Brace*,
41 F.3d 117 (3d Cir. 1994) ....1

*United States v. Gulf Park Water Co., Inc.*,
14 F. Supp. 2d 854 (S.D. Miss. 1998) ....5

*United States v. Mun. Auth. of Union Twp.*,
150 F.3d 259 (3d Cir. 1998) ....2, 16, 17

*United States v. Righter*,
2010 WL 4977046 (M.D. Pa. 2010)....1, 2, 16

**Statutes**

33 U.S.C. § 1319(d) ....1, 2, 9, 5

**Other Authorities**

40 C.F.R. § 19.4 ....1

40 C.F.R. § 122.44(d)(1)(i)....12

40 C.F.R. § 123.45(a)(2)....6

25 Pa. Code § 92a.44 ....12

## I. A Civil Penalty Is Required Under CWA § 309(d)

Section 309(d) of the Clean Water Act (CWA) provides that "[a]ny person who violates . . . any permit condition or limitation . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation for each violation." 33 U.S.C. § 1319(d). This language means that "once a violation has been established, some form of penalty is required." *United States v. Brace*, 41 F.3d 117, 129 (3d Cir. 1994) (citation omitted); *United States v. Righter*, 2010 WL 4977046, at *1 (M.D. Pa. 2010), Doc. 61-18. Republic is liable for a maximum of $68,445 in civil penalties per day for each violation after November 2, 2015. 40 C.F.R. § 19.4.

Republic had 419 permit violations in the four years from July 2019 to April 2023, including 112 violations of the monthly average limits. Plaintiff's Finding of Fact (FF) ¶ 48. A violation of a monthly average limit may be counted as a violation for up to the total number of days of the month that the facility operated. *U.S. v. Allegheny Ludlum Steel Corp.,* 366 F.3d 164, 169 (3d Cir. 2004). There are 3,404 days in those months. Republic violated its maximum limits on 307 days. The total days of violation are therefore 3,711 days. Republic's maximum potential statutory penalty is therefore $253,999,395.

## II. Analysis of the Six Penalty Factors Demonstrates that Republic Should Pay a Large Amount

In assessing penalties, the Court must consider six factors: "the seriousness of the violation or violations, the economic benefit (if any) resulting from the

violations, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d). The Court is free to choose either a "top-down" or "bottom up" method to apply those factors. *United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 265 (3d Cir. 1998). The Court has chosen the "bottom up" approach. ECF 65 at 29. Under the "bottom-up" method, the Court first calculates the economic benefit a violator gained by noncompliance and then adjusts that amount upward or downward using the remaining five factors. *Righter*, 2010 WL 4977046, at *1.

### A. Republic Obtained a $4.5 Million Economic Benefit from Its Delayed Compliance

Economic benefit calculations "identify the benefit realized by a violator from delayed expenditures to comply with the CWA." *Allegheny Ludlum*, 366 F.3d at 178. In brief, the calculation "starts with the costs spent or that should have been spent, to achieve compliance," and then "appl[ies] an interest rate to determine the present value of the avoided or delayed costs." *Id.*

Republic delayed paying the capital and operating costs of building a reverse osmosis (RO) treatment system and a RO reject solidification system that were needed to achieve compliance with its total boron (TB) and osmotic pressure (OP) limits. It obviously knew that it needed to do something to achieve compliance prior to the OP limit becoming effective in February 2017, because it knew that OP levels

were rising (FF3, 16-18), and it knew that the existing wastewater treatment plant could not achieve compliance with the limits (FF14). Further, it knew that it experienced an OP permit violation in October 2017 (FF21) with repeated, regular, and continuous OP violations beginning in 2018 (FF35), and specific identification of the need to implement an RO system in the summer of 2018 (FF25). Yet even with this knowledge, and also knowledge in 2017 that it would not meet the TB limits in February 2020 (FF16-18), it did not decide to install an RO system to address OP and TB until February 2020 (FF33) and did not procure a working RO system until April 2023 (FF45). The noncompliance period was from July 2, 2019 (the first OP violation) to April 25, 2023 (the RO completion and compliance date), a period of 1,393 days. FF53. For the first 464 days after the RO system started operations (until August 1, 2024), Republic incurred increased operating costs for transporting and disposing of landfill leachate and RO reject off-site for disposal. FF46, 68, 71, 75. After 464 days, Republic ceased transporting RO reject off-site and incurred costs to solidify it on-site. FF69, 78. It also incurred new costs for RO system maintenance and treatment during the noncompliance period. FF73-74.

Using that cost information, Plaintiff's economic expert, Jonathan Shefftz, calculated that Republic gained an economic benefit of about $4.5 million as of the February 2026 trial date. FF84. That figure incorporates a credit of about $100,000 for the stipulated penalties that Republic paid to PADEP from 2020-23 for the same

violations. FF52. Thus, despite those payments and RO costs, Republic is much better off financially now than if it had complied on time in 2019.

Republic's economic expert, Michael Rockel, used the same cost information that Shefftz used but calculated a lower economic benefit of $534,992 after crediting Republic's payment of stipulated penalties. FF86-88. The difference between the Shefftz and Rockel benefit figures derives entirely from their different treatment of RO operating and maintenance costs and RO reject solidification costs during the noncompliance period. FF81-83, 86-88. Shefftz treated those costs as avoided while Rockel treated them as delayed. FF88.

Those costs are not delayed because Republic will never incur and pay for them. The RO system did not exist during the noncompliance period. From July 2019 to April 2023, Republic discharged 156 million gallons of wastewater without RO treatment to remove OP and TB. FF20, 83, 91. That wastewater cannot be recovered and treated by RO later. FF81, 82. It was not stored on site. FF82. It was discharged into Kreutz Creek and flowed downstream into the Chesapeake Bay and the Atlantic Ocean. Rockel had no response to Shefftz on this point and agreed that "you can't turn back the clock." FF92. Shefftz is therefore correct that those recurring operating costs are avoided, not delayed, and that Republic's economic benefit is $4.5 million.

Shefftz's analysis is supported by relevant excerpts from EPA's BEN Help System document that he wrote and edited from 1998 to 2017. FF94-96. That document states that in the usual scenario where a violator delays installing pollution control equipment, the capital costs are delayed costs and the operating costs during the noncompliance period are avoided costs. FF95-96. Operating costs can be treated as delayed costs if the material requiring treatment remains on site during the noncompliance period and can be treated later after the control equipment is installed. FF94. That is not the case here. The untreated wastewater Republic discharged during the noncompliance period is unrecoverable.

"In order for the penalty to serve the purpose of deterrence, it should exceed the economic benefit enjoyed by the defendants." *United States v. Gulf Park Water Co., Inc.*, 14 F. Supp. 2d 854, 862 (S.D. Miss. 1998). A penalty that is limited to recovery of economic benefit "is no deterrent at all because the violator would be no worse off than if it had complied in the first place." *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., Md.*, 82 F. Supp. 2d 464, 472 (D. Md. 2000), *vacated on other grds*., 268 F.3d 255 (4th Cir. 2001). The penalty "must include a punitive component in the form of a sum in addition to economic benefit which accounts for the degree of seriousness and/or willfulness of the violations." *U.S. v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, 806 (M.D. Pa. 1996), *aff'd*, 150 F.3d 259 (3d Cir. 1998).

### B. Republic's Violations Were Serious in Terms of Number, Magnitude, and Potential Environmental Harm

The Third Circuit has assessed the seriousness of CWA violations by evaluating the number of violations, the amount by which the discharges exceeded permit limits, and the toxicity of the pollutants discharged. *PIRG v. Powell Duffryn*, 913 F.2d 64, 79 (3d Cir. 1990). In addition, seriousness requires consideration of the potential harm to the environment caused by the violations. *Union Twp.*, 929 F. Supp. at 807.

With regard to the number of violations, the Third Circuit considered 386 violations over a seven-year period to be a "very large number." 913 F.2d at 68, 79. Republic had more violations in a shorter time: 419 violations (112 average, 307 maximum) in four years. In terms of frequency, Republic violated its monthly average limit for OP in 42 of the 46 months from July 2019 to April 2023, its monthly average TB concentration limit in all 39 months from February 2020 to April 2023, and its monthly average TB mass limit in 31 of those 39 months. FF 49. In terms of magnitude, EPA has classified a monthly average violation as "significant noncompliance (SNC)" if it exceeds the permit limit by 40% or more. 40 C.F.R. § 123.45(a)(2) and Appendix A. By that standard, 84 of 112, or 75%, of Republic's monthly average violations were SNC. FF50 (27+35+22). In addition, 155 (49+106) of 307, or 50%, of Republic's maximum violations exceeded the permit limits by more than 100%. FF50.

With regard to environmental harm, PADEP set Republic's permit limits to comply with state water quality standards for those pollutants to protect human health and aquatic life. FF8. When discharge limits "are set at the level necessary to protect the designated uses of the receiving waterways, their violation necessarily means that these uses may be harmed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*., 204 F.3d 149, 157 (4th Cir. 2000). Republic discharged 156 million gallons of inadequately treated wastewater in violation of those limits, which caused substantial potential harm. Excessive osmotic pressure can kill aquatic organisms and boron is a toxic pollutant that is harmful to humans and aquatic life. FF11-13.

The lack of actual measurable harm is not a defense to imposition of a civil penalty. *Powell Duffryn*, 913 F.2d at 79 (a "particularized showing of the harm" is not required and proof of the overall risk of the pollutants is sufficient). "So long as the Plaintiff[s] have proved that there is at least a potentially destructive impact on the waterway, penalties are not inappropriate." *NRDC v. Texaco Refining & Marketing Inc.*, 800 F. Supp. 1, 24 (D. Del. 1992), *aff'd in relevant part*, 2 F.3d 493 (3d Cir. 1993). "[B]ecause actual harm to the environment is by nature difficult and sometimes impossible to demonstrate, it need not be proven to establish that substantial penalties are appropriate in a Clean Water Act case." *Union Twp.*, 929 F. Supp. at 807.

### C. Republic's History of Violations Was Persistent and Lengthy

"In determining the 'history of such violations,' courts [have] considered the duration of defendants' current violations, whether defendants have committed similar violations in the past, and the duration and nature of all of the violations, including whether the violations are perpetual or sporadic." *U.S. v. Smithfield Foods, Inc.*, 972 F. Supp. 338, 349 (E.D. Va. 1997), *aff'd in relevant part*, 191 F.3d 516, 527 (4th Cir. 1999). The relevant history includes the "complete history of compliance," even including violations predating the five-year statute of limitations. *U.S. v. Allegheny Ludlum Steel Corp.*, 187 F. Supp. 2d 426, 443, 445 (W.D. Pa. 2002), *aff'd in relevant part,* 366 F.3d 164 (3rd Cir. 2004) (considering violations in the 1980's, long before the complaint was filed in 1995); *see also In re Donald Cutler*, 11 E.A.D. 622, 2004 WL 3214474, at *22 & n.23 (EPA Envtl. Appeals Board 2004) (collecting cases).

The Court can consider violations prior to July 2019 under this factor. Republic had thirty violations of its OP permit limits prior to that date and back to October 2017, including 15 monthly average violations and 15 daily maximum violations. FF35.

Republic's OP limit took effect in February 2017, but Republic did not achieve compliance until it completed its RO system upgrade in April 2023, more than six years later. That long and continuous duration of noncompliance warrants a

heavy penalty. *See Smithfield Foods, Inc.*, 972 F. Supp. at 349, 354 (six-year history of CWA violations deemed "lengthy and persistent").

### D. Republic Did Not Act in Good Faith to Achieve Compliance

Good faith is measured by Republic's "efforts to comply with the applicable requirements." 33 U.S.C. § 1319(d).

#### 1. The Permit, Not the COA, Set the Applicable Requirements for Compliance with the CWA

After receiving two NOVs from PADEP in 2018 and 2019, Republic asked PADEP to negotiate a compliance schedule to build an RO system. FF32. Republic knew it would "struggle with OP until the plant is operational," and preferred a COA to receiving further NOVs. *Id.* O'Connell testified that he "loved" the 2020 COA because it gave him "hard dates to work with." FF39. However, the "hard" compliance dates and "applicable requirements" were those in the 2017 permit, not the compliance schedule in the 2020 COA.

The COA did not, and could not, modify Republic's permit limits or extend the permit's 2017 and 2020 compliance deadlines. *Pennsylvania PIRG v. P.H. Glatfelter Co*., 128 F. Supp. 2d 747, 758-61 (M.D. Pa. 2001). In *Glatfelter,* this Court rejected defendant's argument that a 1989 consent agreement with PADEP modified the color limits in its 1984 NPDES permit. *Id.* at 750-761. The Court stated that "[m]odifications to permits must comport with the same procedures as the issuance of an original permit," including public notice and comment. *Id.* at 759. "Absent

these procedures, DEP could not modify Defendant's [permit], and therefore the terms contained in the 1984 Permit apply." *Id.* at 760. Since those permit modification procedures were not followed here, the COA does not and cannot modify Republic's permit limits or compliance deadlines.[1]

The COA was merely an exercise of PADEP's prosecutorial discretion and is not binding on citizens. *Citizens for a Better Environment-California v. Union Oil Co. of California*, 861 F. Supp. 889, 899-902 (N.D. Cal. 1994), *aff'd*, 83 F.3d 1111 (9th Cir. 1996). "[S]uch [consent] orders constitute agreements by the issuing enforcement authority on how the authority — be it EPA or a state agency — plans to exercise its prosecutorial discretion." *Id.* at 902. "[T]hey cannot shield polluters from citizen suits brought to enforce the terms of NPDES permits." *Id.*

In any event, the COA has no preclusive or other effect on this case because it was not a diligent prosecution. PADEP did not calculate or consider Republic's economic benefit. The "failure of the state enforcement agency to recover, or even to determine, a violator's economic benefit is strong evidence that the agency's prosecution of that violator was not diligent." *Friends of the Earth v. Laidlaw Environmental Services*, 890 F. Supp. 470, 497 (D.S.C. 1995). *See also Ohio Valley Envtl. Coal., Inc. v. Hobet Min., LLC*, 723 F. Supp.2d 886, 908 (S.D.W. Va. 2010)

---

[1] PADEP also expressly rejected Republic's request for a permit amendment to extend its boron compliance deadline. FF36.

(finding no diligent prosecution in part because the consent decree's penalties "appear inadequate to remove the economic benefit of non-compliance"). The COA also did not deter Republic's continuing violations. *Sierra Club v. SCM Corp.*, 572 F. Supp. 828, 831 n. 3 (W.D.N.Y. 1983) (the government may "fail the test of diligent prosecution if it … permits new and independent pollution law violations to occur").

The COA set stipulated penalties at a nominal level of $125 to $400 per violation. FF38. A rational actor would view such low penalties as an acceptable risk of doing business and as a cheap license to pollute, with no economic incentive for prompt compliance. Indeed, Republic's Plant Manager agreed that they are a "drop in the bucket" compared to total RO costs, and Republic's environmental manager stated that, because the penalties were "quite nominal," "our greater focuses [sic] would be continuing to discharge rather than trucking leachate and not receiving compliance violations." FF39. *See Hobet*, 723 F. Supp.2d at 908 ("A lenient penalty that is far less than the maximum penalty may provide evidence of non-diligent prosecution" (internal quotation omitted)). Republic's stipulated penalty payments of about $100,000 are only 2% of its $4.5 million economic benefit. FF52, 84. In effect, it has not been penalized at all and has retained almost all of its profit from its wrongdoing.

### 2. Republic's Knowledge and Delay Indicate a Lack of Good Faith Efforts to Comply

#### a. Years Before 2017, Republic Knew or Should Have Known Its Increasing TDS Levels Created an OP Compliance Problem

PADEP's water quality standard for OP of 50 mOsm/kg has been in place and unchanged since 1984. FF11. Republic's pre-2017 permit required it to monitor OP levels for three years prior to the 2017 compliance date. FF3. Under the CWA, PADEP must include water quality-based permit limits in an NPDES permit whenever a discharge poses a reasonable potential of exceeding a water quality standard. 40 C.F.R. § 122.44(d)(1)(i); 25 Pa. Code § 92a.44. The potential for such an exceedance is the reason PADEP included an OP monitoring requirement in the pre-2017 permit.

Republic's internal monitoring data showed increasing TDS levels from 2013 to 2018. FF3, 16-17. Increased TDS results in increased OP at a 60:1 ratio. FF17. Based on a 60:1 ratio, the 50 mOsm/kg standard translates to about 3,000 mg/l of TDS. FF11. After considering the flow in the Kreutz Creek, PADEP translated the OP water quality standard into a 2017 permit limit of 129 mOsm/kg, which is equivalent to 7,740 mg/l. FF6, 17. Republic knew or should have known that its increasing TDS levels would cause an OP compliance problem. Republic's leachate contained over 11,000 mg/l of TDS in the fourth quarter of 2013. FF16. The TDS

levels rose to over 16,000 mg/l in 2018, more than five times the OP standard and double the 2017 OP limit. FF16.

Republic's high and increasing TDS levels from 2013 to 2017 made it likely that PADEP would impose a more stringent OP limit in the 2017 permit. Republic had time to evaluate and begin designing RO treatment equipment to meet such a limit. RO is the "most effective" method for reducing TDS and "was selected for its ability to reduce both boron and TDS." FF32. Republic also had high and increasing TB levels in 2017 and 2018 that exceeded the permit limits scheduled to take effect in 2020. FF18. Republic did not use that time to evaluate that risk, design treatment upgrades, or take any other preventative or corrective actions.

**b. Republic's Delayed Response to Its OP Compliance Problem Shows a Lack of Good Faith**

Under the good faith factor, "a court evaluates the evidence to determine whether the permittee took any actions to reduce the number of violations or attempted to lessen the impact of their discharges on the environment." *Smithfield Foods*, 191 F.3d at 531. A lack of good faith is demonstrated by a permittee's long delays in taking concrete actions to solve its treatment problems. *PIRG v. Powell Duffryn Terminals*, 720 F. Supp. 1158, 1163-1164 (D.N.J. 1989), *aff'd in relevant part*, 913 F.2d 64 (3d Cir. 1990).

When Republic received the final 2017 permit in January 2017, it "definitively became aware" that its wastewater treatment system could not meet the

permit limits for OP. FF14. But Republic still did not act promptly to upgrade that system and started violating the OP limits in October 2017. FF21.

PADEP issued a Notice of Violation for that OP violation in January 2018. FF23. In July 2018 Republic paid a penalty to PADEP for that violation and four more OP violations. FF27. In July 2018 Republic's environmental staff recognized that a RO system was needed "immediately" for compliance. FF25. In November 2018, Republic's wastewater consultant started "very preliminary" work on an RO system, but that work was "nowhere close to a design for that plant." FF30.

PADEP issued a second Notice of Violation in January 2019, citing twelve OP violations from June to November 2018. FF31. Republic responded that RO "appears to be the best treatment option," but did not decide to start building it at that time. FF32-33. Republic did not decide to do so until February 2020 when it submitted its application for a RO construction permit. FF33. Republic filed two TRE reports in 2019 and 2020 analyzing the RO option. The first report was over six months past its required due date and the second was over eleven months late. FF34, 41.

In August 2020, Republic and PADEP signed the COA. It contained a 600-day compliance schedule and a calculated construction completion date of April 19, 2023. FF37.

Republic did not obtain a construction permit for the RO system until September 2021. FF42. Republic did not approve funding of the system until March 2022 and then only after determining that it would save Republic $4.4 million per year. FF43. Republic began construction in May 2022. FF44. The RO system became operational in April 2023. FF45. Thus, Republic achieved compliance over six years late for OP and over three years late for TB. That long delay—after two NOVs and hundreds of permit violations—does not show good faith efforts at compliance.

### E. A Civil Penalty Would Not Have a Substantial Economic Impact on Republic's Operations

The CWA requires the Court to consider the "economic impact" of the penalty on the violator. 33 U.S.C. § 1319(d). Republic has the burden of establishing that the penalty should be reduced based on this factor and that a penalty "would jeopardize defendant's continued operation." *Powell Duffryn*, 720 F. Supp. at 1165-1166. In the Joint Case Management Plan, Republic "agreed not to raise as a defense its inability to pay any penalty appropriately assessed." ECF 17 at 6. Consequently, that factor cannot mitigate Republic's penalty.

### F. Under the "Other Matters as Justice May Require" Factor, the Court May Consider Penalties Imposed in Prior Similar Cases

The final factor allows the Court to address such other matters as justice requires, or essentially any other facts deemed relevant. *Smithfield Foods*, 972 F.

Supp. at 353. This factor has been used as a tool to determine whether the civil penalty is equitable in relation to other analogous cases. *Righter*, 2010 WL 4977046, at *4 (performing a side-by-side comparison of two prior cases to fashion an equitable penalty).

In *Union Twp.*, Dean Dairy committed 2,360 days of violation of its permit limits for several pollutants, including total suspended solids and biological oxygen demand, over a six-year period, a number the court characterized as "very large." 929 F. Supp. at 807. The statutory maximum penalty was $45.8 million. *Id.* at 806. Dean Dairy delayed its noncompliance for five years and thereby gained an economic benefit of $2,015,500. *Id.* The monthly average violations were only 40% or less over the permit limit, and the court characterized them as "serious," but did not quantify the environmental harm. *Id.* at 807. The court imposed a penalty of $4,031,000, double the economic benefit. *Id.* at 809. Excluding economic benefit, the penalty per day of violation was $854.

Here, Republic had 419 violations in four years, comprising 3,711 days of violation, which is 57% more days than in *Union Twp.* Republic's full history of violations extends from October 2017 to April 2023, some five and a half years. Republic's maximum potential statutory penalty is $254 million, 5.5 times higher than the $45.8 million statutory maximum in *Union Twp*. Between July 2019 and

April 2023, Republic exceeded its permit limits by the following cumulative averages:

| Parameter | Avg. % Over |
|---|---|
| Boron conc. avg. | 339 |
| Boron mass avg. | 44 |
| OP avg. | 82 |
| Boron conc. max. | 236 |
| Boron mass max. | 33 |
| OP max. | 52 |

FF51. In comparison, the monthly average violations in *Union Twp.* were only 40% or less over the permit limit.

The table below summarizes the differences between the two cases. If we apply the $854 penalty per day from *Union Twp.* to Republic's 3,711 days of violation, and then add Republic's economic benefit, the penalty would be $7,545,123.

| Case | Days of Viol. | Avg % Exceed | Economic Benefit (EB) | Delay Yrs | Harm | Stat Max | Penalty | Penalty per day w/o EB |
|---|---|---|---|---|---|---|---|---|
| Dean Dairy | 2360 | <40% | $2.015M | 6 | not quantified | $45.8M | $4M | $854 |
| Republic | 3711 | 33-339% | $4.168M | 5.5 | not quantified | $247.5M | | |

Republic's days of violation, average percent exceedance, maximum penalty, and economic benefit are all greater than those indicia in *Union Twp*. Republic's duration of noncompliance is similar. Based on that comparison, Plaintiff submits that Republic should be required to pay a combined amount of at least $7.5 million in civil penalties and toward a remedial fund.

The penalty concerns that the Third Circuit identified in *Allegheny Ludlum*

are consistent with imposing a large penalty based on the relationship between Republic's average and maximum violations. The court of appeals stated that:

> permit limits can be exceeded in many different ways, both by very large, isolated discharges and by moderate continuous discharges. Furthermore, daily and monthly average limits are designed to avoid distinct environmental harms. As a result, in some cases a violator's wrongful conduct will merit punishment for both daily and monthly violations, while in others, the conduct will have been sufficiently punished by penalties for daily violations alone.

366 F.3d at 169. Republic's continuous wrongful conduct merits serious punishment. Its maximum violations are worse than "large and isolated," and its average violations are worse than "moderate." Later in its opinion, the court of appeals stated that:

> A discharger who exceeds the monthly average maximum by a great amount will probably also have committed a number of daily violations, and the penalties for those violations will mete out at least part of the total punishment that the permittee's conduct for the month merits.

366 F.3d at 188. The 307 days that Republic violated its daily maximum limit mete out only a small part of the total punishment that Republic's conduct merits for its 112 violations of its monthly average limits for 3,404 days over four years. Consequently, the continuity and persistence of Republic's average violations support a penalty that is greater than the penalty that would be based on the maximum violations alone.

## III. For Injunctive Relief, the Court Should Require Republic to Establish a Remedial Fund for York County to Restore Kreutz Creek

This Court has ruled that Plaintiff can seek injunctive relief requiring Republic to pay monies into a remedial fund to mitigate the harm caused to Kreutz Creek by its past violations of its water-quality based permit limits for boron and OP. ECF 99 at 4-10. This remedy can be used to ameliorate the effects of past noncompliance. *Formosa Plastics Corp., U.S.A. v. ACE Am. Ins. Co.*, 2024 WL 4891740, at *25 (D.N.J. Nov. 25, 2024), ECF 95-1.

Civil penalties and injunctive relief in the form of a remedial fund are alternative payment scenarios. LSRA has agreed to limit its request under either remedial alternative to the same dollar amount. Doc. 88-3 at 2. Civil penalties cannot be applied to a remedial fund. Once monies are designated as penalties, they must go the U.S. Treasury. *Powell Duffryn*, 913 F.2d at 81-82. The Court may elect, however, to assign payments that are not designated as penalties to a remedial fund. *Id*. at 82.

The standard in *Powell Duffryn* for granting a remedial fund is whether "there is a nexus between the harm and the remedy." 913 F.2d at 82. Under the CWA "harm to the environment need not ever be proved." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000). A "particularized showing of the harm" is not required and proof of the overall risk of the pollutants is sufficient.

*Powell Duffryn*, 913 F.2d at 79. As we have shown above, both OP and TB have potentially harmful environmental effects.

There is a geographical nexus between Republic's violations and harm to Kreutz Creek because the discharges flow directly into that Creek. There is a chemical and biological nexus between Republic's violations and harm to Kreutz Creek because Republic's permit limits for OP and TB are based on water quality standards designed to protect human health and aquatic life related to that Creek. There is also an administrative nexus between Kreutz Creek and York County's efforts to restore that Creek to comply with EPA's Total Maximum Daily Load (TMDL) for the Chesapeake Bay watershed, which includes Kreutz Creek.

PADEP has established a Watershed Implementation Plan to reduce pollution from streams that flow into the Susquehanna River. ECF 93-2. To implement those plans, Pennsylvania Counties, including York County, have established Countywide Action Plans to improve those streams at the County level. ECF 93-3. As a part of its Countywide Action Plan, York County has planned about a dozen projects which would cost over $10 million and are designed to improve water quality and aquatic life in Kreutz Creek and meet state water quality standards, including the TMDL. FF99, 100. Those projects are supervised by the Watershed Alliance of York and funded by federal, state, and private grants. FF100. Consequently, there is a nexus between Republic's violations of water quality standards in Kreutz Creek and the

projects that York County has planned to improve water quality in that Creek. Republic's violations made the water quality in Kreutz Creek worse and York County's projects can improve it. The Court therefore can and should require Republic to pay money to York County for remedial projects to improve water quality in Kreutz Creek.[2]

**Conclusion**

For these reasons, the Court should enter a judgment ordering Republic to pay a combined amount (to be allocated in the Court's discretion) of at least $7.5 million in civil penalties to the U.S. Treasury and to York County, Pennsylvania, for a remedial fund to restore Kreutz Creek.

Respectfully submitted,

s/Stephen G. Harvey
Stephen G. Harvey
Michael E. Gehring
E. Kelly Conway
Steve Harvey Law LLC
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
(215) 438-6600
steve@steveharveylaw.com
mike@steveharveylaw.com
kelly@steveharveylaw.com

---

[2] If the Court orders Republic to pay into a remedial fund for Kreutz Creek, it can take additional evidence about the specific projects to be funded. *See NRDC v. Texaco Refining & Marketing Co.,* 20 F. Supp.2d 700, 702-03 (D. Del. 1998) (After ordering CWA violator to conduct a monitoring program, the court "left for another day the contours of an appropriate monitoring program."

James M. Hecker
Public Justice
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
jhecker@publicjustice.net

Attorneys for Plaintiff

**Certification of Compliance with Page and Word Limits**

Subject to Fed. R. Civ. P. 11, I certify that this brief complies with the word-count limit described in this Local Rule 7.8(b)(2). Relying on the word count feature of the Microsoft Word word-processing system, the total number of words in the brief is 4,991.

/s/ Stephen G. Harvey
Stephen G. Harvey

**Certificate of Service**

I certify that on April 13, 2026, I served a copy of the foregoing document via the Court's ECF system on the following:

P. Leigh Bausinger
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103

/s/ Stephen G. Harvey
Stephen G. Harvey