**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>REPUBLIC SERVICES OF PENNSYLVANIA, LLC,<br><br>Defendant. | Civil Action No. 1:23-CV-00044-JPW |

# DEFENDANT REPUBLIC SERVICES OF PENNSYLVANIA, LLC'S POST-TRIAL BRIEF

FAEGRE DRINKER BIDDLE & REATH LLP
P. Leigh Bausinger
Bonnie A. Barnett
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Fax: (215) 988-2757
Email: leigh.bausinger@faegredrinker.com
Email: bonnie.barnett@faegredrinker.com

Kevin H. DeMaio (*pro hac vice*)
Pierre J. Avalos (*pro hac vice*)
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
Fax: (973) 360-9831
Email: kevin.demaio@faegredrinker.com
Email: pierre.avalos@faegredrinker.com

*Attorneys for Defendant*
*Republic Services of Pennsylvania, LLC*

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 1

III. LEGAL STANDARD .......... 2

IV. ARGUMENT .......... 2

A. Plaintiff Failed to Prove the Nexus Required for a Remedial Fund Injunction. .......... 2

B. The Statutory Factors Weigh Against Any Significant Penalty. .......... 7

*1. If any economic benefit from delayed compliance were realized, it is at most $534,992.* .......... 7

*2. Republic's good-faith efforts to comply weigh against the imposition of additional penalties.* .......... 10

a. Plaintiff's reliance on case law is misplaced .......... 10

b. Republic's early engagement and proactive response .......... 11

c. Internal deliberations and early steps toward a solution .......... 12

d. Stepwise and documented progress with PADEP .......... 13

e. Cooperative engagement with PADEP and acceptance of oversight .......... 14

f. Substantial investment, timely construction, and overcoming external challenges .......... 15

*3. Plaintiff failed to prove any serious harm.* .......... 16

*4. The economic impact factor is neutral.* .......... 18

*5. Plaintiff failed to prove a history of violations.* .......... 19

*6. Justice and equity weigh against the imposition of additional penalties.* .......... 20

V. CONCLUSION .......... 21

# TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Atl. States Legal Found. Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743 (N.D. Ind. 1992) ....... 10, 11, 15

*Californians for Alternatives to Toxins v. Kernen Constr. Co.*, 2021 WL 1734897 (N.D. Cal. May 2, 2021) ....... 8

*City of Mountain Park v. Lakeside at Ansley, LLC*, 2011 WL 13167917 (N.D. Ga. July 21, 2011) ....... 6, 16, 18, 20

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000) ....... 3

*Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, 620 F. Supp. 3d 108 (D. Del. 2022) ....... 11

*Formosa Plastics Corp. v. ACE Am. Ins. Co.*, 2024 WL 4891740 (D.N.J. Nov. 25, 2024) ....... 3

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987) ....... 20, 21

*Kleinman v. City of Austin*, 310 F. Supp. 3d 770 (W.D. Tex. 2018) ....... 7, 8, 17, 20

*NRDC v. Texaco Refining & Mktg. Co.*, 20 F. Supp. 2d 700 (D. Del. 1998) ....... 4

*NRDC v. Texaco Refining & Mktg., Inc.*, 800 F. Supp. 1 (D. Del. 1992), *aff'd in part, rev'd in part on other grounds*, 2 F.3d 493 (3d Cir. 1993) ....... 18

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Hercules, Inc.*, 970 F. Supp. 363 (D.N.J. 1997) ....... 2

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64 (3d Cir. 1990) ....... 2, 4, 17

*Pub. Int. Rsch. Grp. v. Powell Duffryn Terminals*, 720 F. Supp. 1158 (D.N.J. 1989) ....... 10

*Riverkeeper, Inc. v. Brooklyn Ready Mix Concrete, LLC*,
2016 WL 4384716 (E.D.N.Y. Aug. 16, 2016) ....................................17, 18

*Sierra Club, Inc. v. Elec. Controls Design, Inc.*,
909 F.2d 1350 (9th Cir. 1990) ....................................6, 11

*Sierra Club v. Va. Elec. & Power Co.*,
247 F. Supp. 3d 753 (E.D. Va. 2017), *aff'd in part, rev'd in part on other grounds*, 903 F.3d 403 (4th Cir. 2018)....................................8, 10, 11, 15

*Spriggs v. City of Harrisburg*,
679 F. Supp. 3d 144 (M.D. Pa. 2023)....................................3

*Sw. Marine, Inc. v. United States*,
535 F.3d 1012 (9th Cir. 2008) ....................................6

*Tenn. Clean Water Network v. Tenn. Valley Auth.*,
273 F. Supp. 3d 775 (M.D. Tenn. 2017), *rev'd on other grounds*, 905 F.3d 436 (6th Cir. 2018) ....................................5, 8, 16, 18

*United States v. Allegheny Ludlum Corp.*,
366 F.3d 164 (3d Cir. 2004) ....................................2, 19

*United States v. Andrews*,
2024 WL 2801708 (D. Conn. May 2, 2024)....................................20

*United States. v. Mun. Auth. of Union Twp.*,
929 F. Supp. 800 (M.D. Pa. 1996), *aff'd*, 150 F.3d 259 (3d Cir. 1998) ....................................17

*United States v. Righter*,
2010 WL 4977046 (M.D. Pa. Dec. 2, 2010)....................................7, 8

*United States v. Smith*,
2014 WL 3687223 (S.D. Ala. July 24, 2014)....................................8, 16

*W. Shore Home, LLC v. Chappell*,
2024 WL 2962842 (M.D. Pa. June 12, 2024)....................................6

**Statutes, Rules & Regulations**

33 U.S.C. § 1319(d) ....................................2, 7, 20

33 U.S.C. § 1365(a) ....................................................................................2

## I. INTRODUCTION[1]

Trial confirmed Republic's opening statement: no further penalty against Republic or any equitable relief is warranted. PADEP—the expert agency delegated to enforce the CWA—already determined appropriate penalties. Republic resolved all effluent exceedances, invested over $23 million in upgrading its wastewater facility, and worked transparently with PADEP throughout system upgrades—submitting regular reports and fully following directives. Today, Republic is in sustained compliance.

Trial also confirmed two main points: First, Plaintiff failed to show any credible link between its desired remedial projects and the OP or boron exceedances at issue. Second, every CWA penalty factor supports that no additional penalty is justified. Republic has already paid approximately $100,000 in penalties, has a record of good-faith compliance, and made major investments in Modern. If the Court finds further penalty is warranted, it should be minimal and reflect Republic's good-faith efforts, lack of environmental harm, and longstanding compliance.

## II. FACTUAL BACKGROUND

Republic respectfully refers the Court to its Proposed Findings of Fact ("PFF") and Responses to Plaintiff's Proposed Findings of Fact ("RPFF").

---

[1] Capitalized terms used but not defined have the same meaning as in Republic's PFF and RPFF.

## III. LEGAL STANDARD

The CWA authorizes district courts in citizen suits to "apply any appropriate civil penalties under section 1319(d)." 33 U.S.C. § 1365(a). Plaintiff has the ultimate burden to prove that a civil penalty should be imposed, and if so, in what amount. *See Pub. Int. Rsch. Grp. ("PIRG") of N.J., Inc. v. Hercules, Inc.*, 970 F. Supp. 363, 366 (D.N.J. 1997) ("As in all citizen suits brought under the [CWA], plaintiffs have the ultimate burden in this case."). It is well settled that "the imposition of [a CWA penalty] is subject to the exercise of a district court's discretion." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 177 (3d Cir. 2004); *Hercules*, 970 F. Supp. at 364.

## IV. ARGUMENT

### A. Plaintiff Failed to Prove the Nexus Required for a Remedial Fund Injunction.

Plaintiff failed to prove *any* credible nexus between the relevant OP and boron exceedances and the "remedial fund" that Plaintiff is asking the Court to create. Indeed, Plaintiff's attempt to create a remedial fund for its own private projects—which are ***wholly unrelated*** to the exceedances at issue in this lawsuit—fails on both the law and facts.

As to law, a CWA remedial fund injunction requires a nexus between the harm and the remedy. *PIRG of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 82-83 (3d Cir. 1990) (finding that civil penalties under the CWA "could only be paid

into the [U.S.] Treasury," and a remedial fund requires "a nexus between the harm and the remedy") (reversing district court order creating a remedial trust fund). However, Plaintiff failed to identify ***a single case*** where a court ordered a remedial fund injunction under similar circumstances.[2]

Notably, in its post-trial brief, Plaintiff only cited four cases related to its remedial fund injunction request, none of which support the creation of a remedial fund here. First, *Formosa Plastics Corp. v. ACE American Insurance Co.*, 2024 WL 4891740 (D.N.J. Nov. 25, 2024), involved a ***private settlement***—not a court's post-trial judgment—that was later memorialized in a judicially approved consent decree. In other words, the "remedial fund" at issue in *Formosa* was ***voluntarily agreed to*** by the parties, which is a critical distinction already recognized at trial by this Court. (PFF ¶ 232; RPFF ¶ 101).

Second, *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000), is a Ninth Circuit case concerning the issue of standing in CWA cases, and not the creation of a remedial fund.

---

[2] Plaintiff failed to identify any such case during motion in limine practice, its pretrial memorandum, or in its post-trial brief. *See* ECF Nos. 92, 95, 111. Any attempt to rectify this error on reply should be rejected. *See, e.g.*, *Spriggs v. City of Harrisburg*, 679 F. Supp. 3d 144, 155 n.3 (M.D. Pa. 2023) (Wilson, J.) (a reply brief cannot present a "full argument that should have been made in the original supporting brief").

Nor does *NRDC v. Texaco Refining & Marketing Co.*, 20 F. Supp. 2d 700 (D. Del. 1998), which dealt with a post-trial, post-appeal, and post-remand motion to enforce the court's previously entered injunction prohibiting the defendant from violating its permit. *Id.* at 702. Critically, that injunction specifically prohibited the defendant from violating the exact permit at issue in the lawsuit. *Id.* In contrast, here, there is no similar preexisting injunction at issue, and Plaintiff's only request for injunctive relief is limited to the creation of a "remedial fund" that is ***entirely unrelated*** to the exceedances at issue here.[3]

Finally, Plaintiff cited *Powell Duffryn Terminals*, 913 F.2d at 81-82, for the general proposition, stated in *dicta* by the Third Circuit, that a nexus between the harm and remedy is required to create a remedial fund. Notably, the Third Circuit in *Powell Duffryn* ***reversed*** the creation of a remedial fund because the district court improperly created a remedial fund when it should have ordered the civil penalties be paid to the U.S. Treasury. *Id.* at 83.

As to the facts, Plaintiff failed to carry its evidentiary burden at trial. Ted Evgeniadis was the only witness who offered to establish a nexus between the

[3] The court should reject Plaintiff's invitation to hold an *additional* evidentiary hearing (i.e., reopen trial). Plaintiff had every opportunity to call its desired witnesses at trial and failed to carry its burden.

alleged harm and the remedial fund. But Mr. Evgeniadis's testimony makes clear that no such nexus exists. For example, Mr. Evgeniadis testified that:

- The claimed remedial fund would fund "a lot of projects" with "different goals." (PFF ¶¶ 233-34; RPFF ¶ 101.) These projects include "habitat restoration projects," "infrastructure upgrade type projects such as culvert redesigns," "mitigation for flooding," and other "ecological restoration" projects. (PFF ¶ 234; RPFF ¶ 101.)

- Plaintiff desires funding "at probably over $10 million" for "all of those different projects." (PFF ¶ 235; RPFF ¶ 101.)

- Plaintiff's desired projects include projects located on private property. (PFF ¶ 236; RPFF ¶ 101.)

- Plaintiff wants a third party with discretion to reject the Court's funding—the Watershed Alliance of York ("WAY")—to manage the remedial fund. (PFF ¶ 237; RPFF ¶¶ 99-100.)

- Mr. Evgeniadis has a personal incentive to secure this funding because he is a ***member of the Board*** of WAY—the entity that Plaintiff claims would manage the "remedial fund." (PFF ¶ 238; RPFF ¶¶ 99-100.)

Moreover, Mr. Evgeniadis failed to connect in any way the boron or OP exceedances to Plaintiff's lengthy wish list.[4] Critically, Plaintiff failed to present any expert testimony on how the projects could even theoretically be connected to the relevant boron or OP exceedances. Nor has Plaintiff even attempted to demonstrate how its request for a "remedial fund" satisfies the traditional requirements for injunctive relief. *See, e.g.*, *Tenn. Clean Water Network v. Tenn. Valley Auth.*, 273 F.

---

[4] Plaintiff's argument on this point in its post-trial brief is noticeably bereft of citations to the trial record.

Supp. 3d 775, 844-45 (M.D. Tenn. 2017) (finding that permanent injunctive relief requires that plaintiff prove irreparable injury, inadequate remedies at law, that a balancing of the hardships favors Plaintiff, and the public interest supports injunctive relief), *rev'd on other grounds*, 905 F.3d 436 (6th Cir. 2018).

Equally as problematic, permitting a citizens group to recover for projects unrelated to the CWA exceedances at issue is contrary to the intent of the CWA. *See Sw. Marine, Inc. v. United States*, 535 F.3d 1012, 1017 (9th Cir. 2008) ("[T]the monetary penalties provided for by the [CWA]…inure to the United States Treasury, not to the citizen-plaintiff."); *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990) ("[A] court cannot order a defendant in a citizens' suit to make payments to an organization other than the U.S. treasury.").

Each of these issues is fatal to Plaintiff's request for injunctive relief. *See, e.g.*, *W. Shore Home, LLC v. Chappell*, 2024 WL 2962842, at *16 (M.D. Pa. June 12, 2024) (Wilson, J.) (denying permanent injunction because Plaintiff failed to prove multiple required elements for injunctive relief); *City of Mountain Park v. Lakeside at Ansley, LLC*, 2011 WL 13167917, at *1-2 (N.D. Ga. July 21, 2011) (denying remedial injunction because it did not "serve the purpose [of the CWA] identified by the Supreme Court, which is to secure prompt compliance with the CWA.").

### B. The Statutory Factors Weigh Against Any Significant Penalty.

Section 1319(d) establishes that courts "shall consider" six specific factors when determining civil penalties: (1) the economic benefit, if any, to Republic from noncompliance; (2) Republic's good-faith efforts to comply; (3) the seriousness of the violations adjudicated on summary judgment; (4) the economic impact of a civil penalty on Republic; (5) the history of Republic's violations, if any; and (6) other matters as justice may require. 33 U.S.C. § 1319(d). These factors weigh heavily against the imposition of additional civil penalties. Indeed, Republic undertook thorough and substantial efforts to comply and cooperate with PADEP, including a voluntary and enforceable Consent Order ("COA") and over $23 million in upgrades to Modern.

#### *1. If any economic benefit from delayed compliance were realized, it is at most $534,992.*

On summary judgment, this Court determined that it would employ the "bottom up" approach to the statutory factors. *See* ECF 65 at 28-29. Under the "bottom-up" approach, a court "first calculate[s] the economic benefit resulting from the violation and then use[s] the remaining Section 1319(d) factors to <u>adjust the figure upward or downward</u>." *Kleinman v. City of Austin*, 310 F. Supp. 3d 770, 781-82 (W.D. Tex. 2018) (emphasis added); *United States v. Righter*, 2010 WL 4977046, at *1 (M.D. Pa. Dec. 2, 2010) (cited by Plaintiff) (ECF 111 at 1).

In contrast to this well-settled law, Plaintiff argues that the penalty should ***only*** be adjusted upward from the economic benefit figure. *See* ECF 111 at 5. This is inconsistent with both this Court's findings on summary judgment and prevailing case law. Courts across the country routinely make significant downward adjustments from the calculated economic benefit figure after weighing the other statutorily enumerated factors. *See, e.g.*, *Kleinman*, 310 F. Supp. 3d at 783; *Sierra Club v. Va. Elec. & Power Co.*, 247 F. Supp. 3d 753, 764 (E.D. Va. 2017), *aff'd in part, rev'd in part on other grounds*, 903 F.3d 403 (4th Cir. 2018). Courts likewise make significant downward adjustments from the penalties requested by a plaintiff based on the statutory factors. *See, e.g.*, *Californians for Alternatives to Toxins v. Kernen Constr. Co.*, 2021 WL 1734897, at *3-5 (N.D. Cal. May 2, 2021); *Tenn. Clean Water Network*, 273 F. Supp. 3d at 844; *United States v. Smith*, 2014 WL 3687223, at *13-14 (S.D. Ala. July 24, 2014).

The objective "of the economic benefit analysis is to prevent a violator from profiting from its wrongdoing." *Righter*, 2010 WL 4977046, at *2. Plaintiff's position that Republic enjoyed an economic benefit commencing in July 2019 is irrational—for all practical purposes, that would mean Republic should have started designing and building a treatment plant upgrade prior to the new limits even being in effect and any exceedances occurring. Republic followed an established, regulator-driven sequence required by both its permit and the regulations. *See infra*

Section IV.B.2.d. Moreover, the evidence unequivocally proved that Republic did not avoid compliance, let alone profit from it. *See infra* Section IV.B.2. However, even if the Court accepts Plaintiff's position that Republic incurred an economic benefit from a noncompliance period commencing in July 2019, Plaintiff's expert, Mr. Jonathan Shefftz, incorrectly calculated this benefit by treating certain O&M costs and reject solidification costs associated with Republic's RO system costs as avoided instead of merely delayed. *See* ECF 111 at 4-5. This results in a vastly inflated economic benefit number.

Republic's expert, Mr. Michael Rockel, properly treated these costs as delayed rather than avoided. (PFF ¶¶ 199-201; RPFF ¶¶ 68, 82.) Avoided costs are expenses a violator never incurs because of noncompliance (i.e., expenditures that are never paid and never will be). (PFF ¶¶ 199-201; RPFF ¶¶ 68, 82.) Delayed costs are expenditures the violator eventually incurs—just at a later date due to delayed compliance. *Id.* Indeed, as advised in the BEN Help System—a document generated by the EPA—"[i]f the annual costs are delayed and not avoided, then enter them as one-time nondepreciable expenditures." (PFF ¶ 209; RPFF ¶ 68.) That is precisely the case here. Republic is indeed paying recurring O&M and reject solidification costs, simply at a later date than Plaintiff claims appropriate. (PFF ¶ 205; RPFF ¶ 68.) Republic will continue to incur those delayed costs for the life of the system. (PFF ¶¶ 199-201, 205; RPFF ¶ 68.)

Accounting for the penalties that Republic has already paid, the economic benefit figure for Republic's delayed compliance is $534,992. (PFF ¶ 231.)

*2. Republic's good-faith efforts to comply weigh against the imposition of additional penalties.*

Being a "good partner" and "good neighbor to our community" drives Republic's response to its permit obligations. (PFF ¶ 137.) Plaintiff's argument that Republic lacked good faith in complying with its permit obligations is unsupported by the record and disregards Republic's extensive and well-documented efforts to achieve compliance. ECF 111 at 9-15; *see also Sierra Club*, 247 F. Supp. 3d at 764 (defendant was a "good corporate citizen, not a chronic violator of water laws" because it secured the required permits, "cooperated" and "provided…an enormous amount of information" to the state agency).

a. <u>Plaintiff's reliance on case law is misplaced</u>

As an initial matter, Plaintiff cites *PIRG v. Powell Duffryn Terminals*, 720 F. Supp. 1158 (D.N.J. 1989), and other case law, for the proposition that the COA does not modify permit limits and that lenient penalties suggest a lack of diligent prosecution. ECF 111 at 13. However, neither issue is before the Court.

First, the relevant issue is not whether the COA modifies the permit, but whether Republic's conduct throughout the process demonstrates good faith to attain compliance with the permit. In *Universal Tool*, the court found that where a defendant "did not sit on its hands," but instead engaged consultants, worked with

regulators, and implemented improvements—as Republic did—those actions reflected good faith and warranted penalty reductions. *Atl. States Legal Found. Inc. v. Universal Tool & Stamping Co.*, 786 F. Supp. 743, 752-53 (N.D. Ind. 1992). Similarly, in *Sierra Club*, the court credited substantial investments, cooperation, and transparency as evidence of good faith and reduced the penalty accordingly. 247 F. Supp. 3d at 764.

Second, diligent prosecution is a jurisdictional question that Plaintiff did not present *any* evidence on and which this Court has made no findings at summary judgment (nor was it required to do so, given its finding that the Pennsylvania Clean Streams Law was not "comparable" to the CWA), ECF 65 at 16. Plaintiff raising the issue for the first time in post-trial briefing is untimely, and the Court has no record on which to rule. *See id.*; *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, 620 F. Supp. 3d 108, 140 n.20 (D. Del. 2022) ("This argument was not presented at trial or in the pre-trial order and is therefore waived.").

b. Republic's early engagement and proactive response

Plaintiff asserts that Republic failed to act promptly after becoming aware of increasing TDS and OP levels and impending permit limits. *See* ECF 111 at 12-15. In reality, Republic's efforts to comply with its permit obligations began well before the first OP exceedance. As early as December 1, 2016, Republic provided detailed comments on the draft NPDES permit, including on the new OP and boron limits,

demonstrating its early and serious engagement with the regulatory process, as well as the fact that it had no reason to believe it could not meet those new limits. (PFF ¶¶ 115-18.) The 2017 Permit's final limits on OP and reporting for boron were the same as in the Draft Permit for which Republic provided comments. (PFF ¶¶ 119-22.) After the 2017 Permit became effective in February 2017, Republic promptly began to assess and investigate effluent monitoring (PFF ¶¶ 123-26), following a well-established process with PADEP involving a series of evaluations and permit revisions (PFF ¶¶ 134-37; RPPF ¶¶ 22, 30.) When Republic identified initial exceedances in October 2017 and January 2018, it did not delay action—it undertook investigations and self-reported the exceedance to PADEP (PFF ¶¶ 123-25)—a clear indication of transparency and good faith. Republic also immediately acted to identify operational controls and best management practices to restore compliance. (PFF ¶ 126.)

c. Internal deliberations and early steps toward a solution

Plaintiff claims Republic's actions were "long delay[ed]" and only began after notices of violation. ECF 111 at 14-15. But Republic was not idle. Instead, it immediately took the steps necessary to design and implement a technically complex and capital-intensive project. Indeed, the record shows that by July 2018—within months of the first NOV—Republic's site staff and consultants discussed RO as "the only long-term remedy that's really possible for this facility" (PFF ¶¶ 127-30; RPPF

¶ 25.) On July 6, 2018, Republic's employees discussed "the planning, operational controls, the changes [Republic] had been contemplating or proposing for the facility to either return the facility to compliance or to consider improvements at the facility to help bring [Republic] back to compliance," including the need to "budget capital to purchase and install [RO] beginning in 2019." (*Id.*) By October 2018, Republic had retained O'Brien & Gere to evaluate the leachate treatment plant, and funds were budgeted for RO work. (PFF ¶¶ 133-34.) In November 2018, Republic engaged Civil & Environmental Consultants, Inc. for site visits and preliminary design on an RO system. (PFF ¶¶ 138-39.)

d. Stepwise and documented progress with PADEP

Plaintiff also asserts that "Republic did not decide [to start building the RO system] until February 2020." ECF 111 at 3, 14. This claim ignores the regulatory context and the necessity of phased approvals. Republic followed an established, regulator-driven sequence required by both its permit and the regulations: submitting the Phase I Toxic Reduction Evaluation (TRE) in February 2019 (PFF ¶ 140), moving to Phase II upon approval in July 2019 (PFF ¶ 143), and completing the Phase II TRE in October 2019 (PFF ¶ 145), which ultimately concluded that only RO technology would reliably achieve compliance (PFF ¶ 149).

Republic did not delay—it commenced the WQM permit and submission ahead of having the TRE Phase II approved due to concern over inability to meet

timelines "and be able to be the good partner, the good neighbor to our community that we want to be." (PFF ¶ 137.) On February 18, 2020, Republic "submitted an amendment for the [WQM] Permit" for the installation of the RO system. (PFF ¶ 150.) As soon as regulatory approval permitted, Republic began the process of constructing the new treatment plant. (PFF ¶ 181.)

e. Cooperative engagement with PADEP and acceptance of oversight

Plaintiff's suggestion that the August 25, 2020 COA somehow undermines Republic's good-faith compliance efforts belies the trial record. The COA was "the culmination of meetings and discussions and presenting of information to [PADEP] by [Republic] of the ongoing challenges we know we will experience and of the entire process of needing to expand our treatment plant to be able to handle the new parameters." (PFF ¶ 157.) Republic's ongoing meetings and communications with PADEP kept them informed about developments, including RO technology for implementation. (PFF ¶ 152.) The COA included specific milestones, dates and time guidelines for Republic to return to compliance (PFF ¶ 158), and Republic's actions were consistently aligned with these requirements. (PFF ¶¶ 156-165, 189; RPPF ¶ 39.) The COA was not used to delay compliance, but as a formal mechanism to expedite and structure the response to the exceedances, all with PADEP's approval. Republic's voluntary entry into the COA and strict adherence to its milestones are

strong indicia of its good faith compliance efforts. *See Sierra Club*, 247 F. Supp. 3d at 764; *Universal Tool*, 786 F. Supp. at 752-53.

f. <u>Substantial investment, timely construction, and overcoming external challenges</u>

Good faith is also evidenced in Republic's substantial financial commitment and timely execution of complex construction during a period of global supply chain disruptions due to COVID-19. Republic spent at least $23 million in upgrades to its facility, including those necessary to comply with the PADEP. (PFF ¶¶ 179, 267.) Republic also paid PADEP penalties with a present value of about $100,000—about 19% of Republic's economic benefit ($534,992). (PFF ¶¶ 160, 231.)

The record is clear that the initial cost approved by Republic, $14.5 million, substantially increased to $23.5 million. (PFF ¶ 179.) In fact, on March 9, 2022, a revision was made to Republic's business case for the construction of the RO system as part of Republic's routine business practice, reflecting a shift in projected costs from $14.5million to $23 million. (PFF ¶¶ 178-79.) Republic awarded the LTP project to a contractor by March 25, 2022, and construction commenced on upgrades, including the RO system, on May 23, 2022. (PFF ¶¶ 180-81.) Throughout 2022, a contractor hired by Republic faced "a myriad of supply chain issues caused by the ripple effects of COVID-19." (PFF ¶ 182; RPPF ¶ 44.) Despite these obstacles, Republic stayed on schedule during the pandemic—despite being faced with contractors' claiming force majeure—completing the plant on time and

remaining in compliance ever since. (RPPF ¶ 44.) The RO system became operational and compliant on April 25, 2023 (PFF ¶¶ 184, 222, 297), and as of August 1, 2024, Republic achieved full-scale implementation of its solidification of the RO reject. (PFF ¶ 190.) PADEP subsequently terminated the COA as Republic met all obligations. (PFF ¶¶ 189.)

### 3. *Plaintiff failed to prove any serious harm.*

Plaintiff failed to adduce any evidence of harm, or potential harm, to human, animal, or aquatic life resulting from the exceedances. This factor weighs heavily against the imposition of a significant civil penalty because Plaintiff failed to carry its burden at trial.

Courts across the country have consistently declined to award a civil penalty, or significantly decreased the civil penalty amount, where a plaintiff fails to prove serious actual, or potential, harm. *See, e.g.*, *Tenn. Clean Water Network*, 273 F. Supp. 3d at 844 (finding that the severity of the defendant's violations "counsels against an award of penalties" because the record was "largely bereft of evidence that would lead the Court to conclude that [defendant's] violations are particularly severe"); *Smith*, 2014 WL 3687223, at *13 (holding that "there has been no evidence of harm (or even potential harm) to human life, nor any specific evidence of harm to animal or aquatic life," which supported a "significant decrease" in the penalty amount); *City of Mountain Park*, 2011 WL 13167917, at *3 (finding that "the significance of

the violations" was "very small" because there was "no potential or actual harm to human health," "the harm to the lakes and streambeds…[was] almost completely aesthetic in nature," and "the harm [was] not permanent"); *Kleinman*, 310 F. Supp. 3d at 783 (imposing minimal civil penalty where there was no evidence of a detrimental effect on human health or the environment); *Riverkeeper, Inc. v. Brooklyn Ready Mix Concrete, LLC*, 2016 WL 4384716, at *8 (E.D.N.Y. Aug. 16, 2016) (civil penalty amount reduced because there was no "evidence of the specific harm caused by defendants' actions").

The cases cited by Plaintiff on this point do not change the logical conclusion that Plaintiff was required, but failed, to prove actual or potential harm. For example, Plaintiff cited *Powell Duffryn Terminals*, 913 F.2d at 79, to argue that "a particularized showing of the harm is not required and proof of the overall risk of the pollutants is sufficient." *See* ECF No. 111, § II(B) (cleaned up). Critically, however, Plaintiff conveniently omitted that *Powell Duffryn* is inapposite because the Third Circuit explicitly found that the district court's finding of "serious" harm was "amply supported by the record." *Powell Duffryn Terminals*, 913 F.2d at 79.

Plaintiff made the same convenient omission regarding the *Union Township* case. *See United States. v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, 803 (M.D. Pa. 1996) ("[I]t was evident that the POTW was degrading the Creek, and…poor substrate conditions resulting from solids deposition and bacterial growths were

directly affecting the benthic community, resulting in greater numbers of pollution-tolerant taxa."), *aff'd*, 150 F.3d 259 (3d Cir. 1998). Similarly, while Plaintiff relies on *NRDC*, it again conveniently omits that the plaintiff there presented an expert witness who testified that the relevant discharges "posed a definite threat to the River through contamination of sediments, water, and plant and animal life." *NRDC v. Texaco Refining & Mktg., Inc.*, 800 F. Supp. 1, 23 (D. Del. 1992), *aff'd in part, rev'd in part on other grounds*, 2 F.3d 493 (3d Cir. 1993). Each of these cases are thus factually inapposite.

Here, Plaintiff failed to present an expert witness on this scientific and technical question of environmental harm. Instead, Plaintiff argues that exceedance of an effluent limitation is *de facto* evidence of serious harm, and in doing so, improperly relies on material outside of the evidence admitted at trial. *See* ECF No. 111, § II(B); (RPPF ¶¶ 11-13). Plaintiff's argument is erroneous. Courts routinely find that CWA exceedances alone do not equate to actual or potential harm to the environment. *See, e.g.*, *Riverkeeper*, 2016 WL 4384716 at *8; *City of Mountain Park*, 2011 WL 13167917 at *3; *Tenn. Clean Water Network*, 273 F. Supp. 3d at 844. Plaintiff's failures support significantly decreasing any civil penalty.

*4. The economic impact factor is neutral.*

This factor is neutral. Republic has represented that it would be able to pay a judgment in the range of penalties that Plaintiff seeks. *See* ECF No. 57 at 34 n.16.

5. *Plaintiff failed to prove a history of violations.*

The history-of-violations factor likewise does not support a significant penalty. There is no evidence that Republic has a history of boron or OP violations. Before 2017, neither parameter was included in the permit and neither Republic nor PADEP anticipated the limits presenting an issue when the permit was amended in 2017. (PFF ¶¶ 114-18.)

Republic's data showed "historic data for OP demonstrates that the effluent discharge has been well below the limit proposed in the draft permit." (PFF ¶ 118; RPPF ¶ 4.) Upon initial exceedances of the new limits, Republic self-reported to PADEP based on its routine sampling, then undertook prompt, regulator-driven project development. *See supra* Section IV.B.2. This six-year period of project development reflects the time required to diagnose, design, permit, fund, and construct a multi-million-dollar treatment system in close consultation with PADEP—not a history of violations. *See id.*; *c.f.* ECF 111 at 9.

Plaintiff relies on *Smithfield Foods* and *Allegheny Ludlum*, but those cases involve chronic, willful violations of long-established parameters by repeat offenders. ECF 111 at 8. In contrast, Republic faced new regulatory limits and acted promptly and transparently. (PFF ¶¶ 115-26.) The purpose of this factor is to prevent recidivism and penalize repeat violators; it is not intended to punish regulated entities for exceedances of new permit requirements, especially when those entities

act swiftly and comprehensively to comply. *See, e.g.*, *Kleinman*, 310 F. Supp. 3d at 782 (reducing penalty where "no evidence that the City has any history of causing or exacerbating sedimentary erosion into navigable waters").

*6. Justice and equity weigh against the imposition of additional penalties.*

Multiple additional considerations weigh against the imposition of a significant, additional penalty. *See* 33 U.S.C. § 1319(d). First, the underlying goals of CWA civil penalties—present compliance and future deterrence—have already been accomplished here. *See, e.g.*, *United States v. Andrews*, 2024 WL 2801708, at *8 (D. Conn. May 2, 2024); *City of Mountain Park*, 2011 WL 13167917 at *1-2 (remedial injunction did not "serve the purpose [of the CWA] identified by the Supreme Court, which is to secure prompt compliance with the CWA.").

Republic was on the road to CWA compliance long before Plaintiff's January 2023 Complaint. (PFF ¶¶ 123-83.) Republic and PADEP worked collaboratively on compliance solutions for Modern for over three years prior to Plaintiff's filing of this lawsuit, and at no point was Plaintiff's influence needed to compel Republic into compliance or shorten the projected timeline. (*Id.*) In fact, Republic achieved compliance within three months of Plaintiff's Complaint. (PFF ¶¶ 183-84.)

Second, any additional penalty would amount to a usurpation of PADEP's regulatory authority. CWA citizen suits are meant to "supplement" government action; they were never intended to "supplant" government action. *Gwaltney of*

*Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 50 (1987). Government agencies such as PADEP retain primacy in enforcing environmental laws. *Id*. at 60-61.

PADEP—the expert regulatory authority delegated to oversee Republic's permit and actions—has already determined the appropriate penalty, and levied that penalty, against Republic. (PFF ¶¶ 105-06, 160; RPPF ¶ 52.) These penalties amounted to a present value of about $100,000—about 19% of Republic's economic benefit ($534,992). (PFF ¶ 160; RPPF ¶ 52.) PADEP further determined that Modern would not experience further exceedances of boron and OP and released Republic from its obligations under the COA. (PFF ¶¶ 189, 268-70.) No exceedances of these parameters have occurred since the treatment plant upgrades become operational in April 2023. (PFF ¶¶ 268-70.) The Court should refrain from second-guessing PADEP's well-founded regulatory actions.

## V. CONCLUSION

Republic respectfully asks that the Court (1) not impose any additional penalty, or alternatively, impose a minimal additional penalty; and (2) deny Plaintiff's request for a remedial fund.

Dated: May 4, 2026

Respectfully Submitted,

***/s/ Leigh Bausinger***
P. Leigh Bausinger
Bonnie A. Barnett

FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
Fax: (215) 988-2757
Email: leigh.bausinger@faegredrinker.com
Email: bonnie.barnett@faegredrinker.com

Kevin H. DeMaio (*pro hac vice*)
Pierre J. Avalos (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932
Telephone: (973) 549-7000
Fax: (973) 360-9831
Email: kevin.demaio@faegredrinker.com
Email: pierre.avalos@faegredrinker.com

*Attorneys for Defendant*
*Republic Services of Pennsylvania, LLC*

**CERTIFICATE OF WORD-COUNT COMPLIANCE**

I certify that this brief complies with the word count limit described in Local Rule 7.8(b)(2). This brief contains 4,937 words, as measured by Microsoft Word's word-count feature, not counting the title page, table of contents, table of authorities, signature block, or certificates.

Dated: May 4, 2026

***/s/ Leigh Bausinger***
P. Leigh Bausinger

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2026, a copy of the foregoing Post-Trial Brief of Defendant Republic Services of Pennsylvania, LLC was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

Dated: May 4, 2026

***/s/ Leigh Bausinger***
P. Leigh Bausinger