**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CASE NO. 1:23-cv-00044** **JUDGE JENNIFER P. WILSON** |
| **REPUBLIC SERVICES OF PENNSYLVANIA LLC,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S POST-TRIAL REPLY BRIEF**

James M. Hecker
Public Justice
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
jhecker@publicjustice.net

Stephen G. Harvey
Michael E. Gehring
E. Kelly Conway
Steve Harvey Law LLC
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
(215) 438-6600
steve@steveharveylaw.com
mike@steveharveylaw.com
kelly@steveharveylaw.com

Attorneys for Plaintiff Lower Susquehanna Riverkeeper Association

## Table of Contents


I. A Civil Penalty Is Required Under CWA § 309(d) ........................................ 1

II. Analysis of the Six Penalty Factors Demonstrates that Republic Should Pay a Large Amount ........................................ 1

A. Republic Obtained a $4.5 Million Economic Benefit from Its Delayed Compliance ........................................ 1

B. Republic's Violations Were Serious ........................................ 2

C. Republic's History of Violations Was Persistent and Lengthy ............ 5

D. Republic Did Not Act in Good Faith to Achieve Compliance ............ 6

E. A Civil Penalty Would Not Have a Substantial Economic Impact on Republic's Operations ........................................ 8

F. Republic's Arguments Relating to the "Other Matters as Justice May Require" Factor Are Not Persuasive ........................................ 8

III. For Injunctive Relief, the Court Should Require Republic to Establish a Remedial Fund for York County to Restore Kreutz Creek ........................ 10

Conclusion ........................................ 12

## I. A Civil Penalty Is Required Under CWA § 309(d)

Republic does not discuss or question the principle that once a CWA violation is found, "some form of penalty is required." *United States v. Brace*, 41 F.3d 117, 129 (3d Cir. 1994) (citation omitted); ECF 113 at 7. It also does not dispute LSRA's calculation that it has committed 3,711 days of violation with a maximum potential statutory penalty of $253,999,395.

## II. Analysis of the Six Penalty Factors Demonstrates that Republic Should Pay a Large Amount

### A. Republic Obtained a $4.5 Million Economic Benefit from Its Delayed Compliance

Republic admits that Shefftz and Rockel used the same inputs to calculate economic benefit. Republic Proposed Findings of Fact (RPFF), ECF 114 ¶¶ 86, 198. It identifies only one disputed issue that explains their different estimates of economic benefit, namely, their different treatment of the recurring costs for operation and maintenance of the RO system (O&M) and the solidification system during the noncompliance period. *Id.* ¶¶ 86, 88, 206-07. Shefftz treated those costs as avoided and Rockel treated them as delayed. *Id.*

Republic correctly states that "an avoided cost is a cost that cannot nor will be incurred." *Id.* ¶ 200. By that standard, those recurring costs must be treated as avoided. Republic concedes that the RO system did not exist during the 1,393-day noncompliance period and that it paid no RO-related costs during that time. *Id.* ¶ 91. It also concedes that Republic discharged 156 million gallons of wastewater during

those 1,393 days that were not treated by the RO system. *Id.* ¶¶ 20, 91. It does not deny that that that wastewater was not stored on site and cannot be recovered. *Id.* ¶ 83. It also does not deny that "you can't turn back the clock" and treat that wastewater. *Id.* ¶ 93. Consequently, it is indisputable that the recurring costs for RO O&M and solidification during the 1,393-day noncompliance period are avoided costs because Republic will never incur and pay for them. Shefftz is therefore correct that Republic's economic benefit is $4.5 million.

Republic argues that it is paying recurring O&M and solidification costs "at a later date." ECF 113 at 9. That is true but irrelevant. Those costs are for treating wastewater that is being discharged *after* the noncompliance period. As Mr. Shefftz explained, starting on August 1, 2024, there is no economic benefit because the compliance costs are the same under both the on-time and delayed scenarios. Tr. 70:4-7. At that point, "similar costs started to be incurred but they're just the same as the costs that would keep being incurred had the RO system become operational in the past." Tr. 107:10-14. There is no way to go back in time and pay for the costs for the RO system during the 1,393-day gap when it was not operating. Tr. 107:15-24.

**B. Republic's Violations Were Serious**

Republic's arguments about the seriousness of its violations focus solely on environmental harm. ECF 113 at 16-18. Republic does not challenge LSRA's

detailed analysis of the number, duration and severity of its permit violations. *See* RPFF ¶¶ 48-51. The Third Circuit requires courts to analyze those issues under the "seriousness" penalty factor. *PIRG v. Powell Duffryn*, 913 F.2d 64, 79 (3d Cir. 1990). For example, Republic violated its permit limit for the monthly average concentration of boron for 39 months in a row and by a cumulative average of 339% over the permit limit. FF49, 51. It also violated its permit limit for the monthly average of osmotic pressure in 42 of 46 months and by a cumulative average of 82% over the permit limit. *Id.* Those are unquestionably serious violations.

With regard to environmental harm, Republic argues that LSRA failed to present evidence or expert testimony that the violations caused actual measurable harm to Kreutz Creek. ECF 113 at 16-18. However, the lack of actual measurable harm is not a defense to imposition of a civil penalty. In *Powell Duffryn*, the Third Circuit held that a "particularized showing of the harm" is not required and proof of the overall risk of the pollutants is sufficient. 913 F.2d at 79.

The defendant in *Powell Duffryn* violated its water quality-based effluent limits for several pollutants, including total suspended solids (TSS). To evaluate environmental harm from the TSS violations, the district court cited only information about the general harm caused by that pollutant, without any analysis of site-specific harm to the receiving water. *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1162 (D.N.J. 1989). Specifically, the district court quoted a

decision by another federal district court in Massachusetts and an EPA report that established national water quality criteria for TSS. *Id*. The district court also stated that, because the TSS limit was a water quality-based effluent limit (WQBEL), "[a]ny violations of these [WQBELs] causes some degree of harm to the water quality of the Kill Van Kull." *Id.* The court of appeals affirmed and held that the district court "properly relied upon these reports . . . and the large number of gross exceedances in concluding that PDT's violations were serious." 913 F.2d at 79 (internal citation omitted).

That holding by the Third Circuit is controlling here. Like the TSS limit in *Powell Duffryn*, Republic's permit limits for TB and OP are WQBELs. FF ¶ 8. When discharge limits "are set at the level necessary to protect the designated uses of the receiving waterways, their violation necessarily means that these uses may be harmed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp*., 204 F.3d 149, 157 (4th Cir. 2000). Republic discharged 156 million gallons of inadequately treated wastewater in violation of its water quality-based limits for TB and OP, which caused substantial potential harm. The PADEP and EPA documents that LSRA has cited show that excessive osmotic pressure can kill aquatic organisms and boron is a toxic pollutant that is harmful to humans and aquatic life. FF ¶¶ 11-13. Those documents are indistinguishable from the reports and material that the Third

Circuit allowed the district court to rely on in *Powell Duffryn*.[1]

**C. Republic's History of Violations Was Persistent and Lengthy**

Republic argues that "[t]here is no evidence that Republic has a history of boron or OP violations." ECF 113 at 19. But Republic admits that it had 30 OP violations from October 2017 to July 2019. RPFF ¶ 35. It also admits that it violated its permit limits for TB and OP 419 times from July 2019 to April 2023. RPFF ¶ 48. Those 449 violations speak for themselves and demonstrate a persistent history of violations extending over more than five years. That long duration of noncompliance warrants a heavy penalty. *See U.S. v. Smithfield Foods, Inc.,* 972 F. Supp. 338, 349, 354 (E.D. Va. 1997), *aff'd in relevant part*, 191 F.3d 516 (4th Cir. 1999) (six-year history of CWA violations deemed "lengthy and persistent").

[1] Republic also argues that LSRA's reliance on those documents is improper because they were not admitted as trial exhibits. ECF 113 at 18; RPFF ¶¶ 11-13. Republic admits that its TB and OP limits are WQBELs and that those limits are designed to meet water quality standards set by PADEP. RPFF ¶ 8. In the public records cited by LSRA, PADEP explained how TB and OP harm aquatic and human life and provided the factual basis for setting the water quality standards that limit the presence of those pollutants in state surface waters. RPFF ¶¶ 11-12. Republic does not question the validity of those standards or PADEP's justifications for them. Courts grant judicial notice of indisputable facts in records and reports of administrative agencies. *E.g., Golden v. Cook,* 293 F. Supp.2d 546, 551 (W.D. Pa. 2003). "The federal courts have long taken judicial notice of scientific facts established and accepted in the appropriate scientific community." *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1240 (D.N.M. 2017), *aff'd*, 794 Fed. Appx. 703 (10th Cir. 2019). The facts about how TB and OP potentially harm aquatic and human life are indisputable scientific facts cited in PADEP's official records and are subject to judicial notice, which can be taken at any time. Fed. R. Evid. 201(f).

### D. Republic Did Not Act in Good Faith to Achieve Compliance

Republic's responses to LSRA's proposed findings of fact show it did not act in good faith to achieve permit compliance. Republic agrees that, prior to 2017, its own internal monitoring data showed that it is a "fair assumption" that Republic was "nowhere near meeting the 2017 permit limits for OP and TB." RPFF ¶ 19. When it received the final permit in February 2017, Republic immediately knew that its treatment system could not meet the OP and TB limits. RPFF ¶ 14. Republic's first OP violation was in October 2017, eight months after the permit became effective. RPFF ¶ 21. Republic claims that it began "investigations" prior to that time. ECF 113 at 12. But it identifies no specific investigations and relies on the testimony of Mr. Schmidt, who did not even start working at the Landfill until August 2020. RPFF ¶¶ 15, 124.

Mr. O'Donnell, who was the General Manager from 2018 to 2023, had no specific memory of any discussions about OP violations in 2018. Tr. 151:13-16, 154:21-24, 190:11-17. The first documented meeting about OP violations was not until July 2018, after Republic received a Notice of Violation from PADEP. RPFF ¶¶ 23-24. Republic states that "at this point, action was still in the planning stage and not yet underway." *Id.* ¶ 24.

Republic suggests that it needed to complete its Phase I and Phase II TRE reports before it could decide how to comply with its permit. ECF 113 at 13. But the

2017 Permit did not condition compliance on the completion of those reports. The permit was in effect and enforceable throughout the TRE process, including the deadlines for complying with the OP and TB limits. D9.023, ¶ B.I.A.1 ("The permittee shall comply with all conditions of this permit"). In any event, the timing of the TRE reports does not show good faith. They were finished a combined 18 months after the permit deadlines for their submission (6 months and 18 days late for Phase I and 11 months and 17 days late for Phase II). RPFF ¶¶ 34, 41. They should have been completed by about April 2019 but were not finished until November 2020.

Republic dragged its feet on the RO system, even though it knew that was the only feasible solution. RPFF ¶ 25. It did not start preliminary engineering until November 2018. RPFF ¶ 30. It did not decide to install RO until February 2020, three years after its permit was issued. FF 33, RPFF at 24. It should have begun the design process no later than January 2017 when it knew "definitively" that its existing treatment system was inadequate. RPFF ¶ 14.

Republic argues that its good faith is shown by its self-reporting of permit violations. ECF 113 at 12. But that cannot be true because Republic's permit requires self-reporting of all instances of permit noncompliance. D9.017, ¶ III.B.2; D9.021, ¶ III.C.5.

Republic claims that its good faith is measured by the $23 million it spent to

upgrade its treatment system. ECF 113 at 15, But Republic's answers to LSRA's interrogatories specified that it only needed to spend about $3.5 million to comply with its OP and TB limits. P88.005. Republic can't have it both ways. If it needed to spend $23 million, then its economic benefit is far higher than $4.5 million.[2] If it only needed to spend $3.5 million for permit compliance, then any additional expenditures cannot be credited toward its compliance efforts.

### E. A Civil Penalty Would Not Have a Substantial Economic Impact on Republic's Operations

Republic agrees that it has represented that it would be able to pay the penalty LSRA is seeking. ECF 113 at 18. Consequently, that factor cannot mitigate Republic's penalty.

### F. Republic's Arguments Relating to the "Other Matters as Justice May Require" Factor Are Not Persuasive

Under the "other matters as justice may require" factor, LSRA compared the

---

[2] The March 2022 "business case" presentation to Republic's management stated that the capital cost of the entire treatment plant upgrade was $23 million, that the upgrade would reduce recurring leachate costs by $4.4 million per year and "are therefore going to save money for Republic," and that it would take only 3.4 years for Republic to recover its capital investment. D40.004, -.006, -.009, Tr. 246:16-24, FF ¶ 43. Thus, Republic's primary incentive for making the additional capital expenditures was to reap that financial benefit and save money, not to comply in good faith with its permit. In any event, "[t]he fact that the violator has also penalized itself by failing to implement cost-effective methods that would have put it into compliance with its permit and thereby saved it money is certainly no basis to mitigate its penalty." *United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 266 (3d Cir. 1998).

penalty factors in this case with those in *United States v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, *aff'd,* 150 F.3d 259 (3d Cir. 1998), where the district court imposed a penalty of about $4 million. ECF 111 at 16-17. Republic's days of violation, average percent exceedance, maximum penalty, and economic benefit are all greater than those factors in *Union Twp*. Republic's duration of noncompliance is similar. Based on that comparison, LSRA concluded that Republic should be required to pay a combined amount of at least $7.5 million in civil penalties and toward a remedial fund. *Id.* at 17. Republic does not address this comparison or argument in its brief.

Instead, Republic argues that, under this factor, additional penalties would have no deterrent effect because it was already "on the road to compliance" when LSRA filed suit. ECF 113 at 20. The purpose of civil penalties is broader than Republic claims. Penalties "do more than promote immediate compliance," they "also deter future violations." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000). In *Laidlaw*, the Court held that plaintiffs' claim for civil penalties was still viable even after the district court denied injunctive relief and the defendant shut down its facility. *Id.* at 193-94. In addition, the purpose of the CWA's penalty provision is "deterrence with respect to both the violator's future conduct (specific deterrence) and the general population regulated by the Act (general deterrence)." *Union Township*, 929 F. Supp. at 806.

To attain the goal of deterrence, the penalty must have two components: (1) "it must encompass the economic benefit of noncompliance to ensure that the violator does not profit from its violation of the law" and (2) it "must include a punitive component in the form of a sum in addition to economic benefit which accounts for the degree of seriousness and/or willfulness of the violations." *Id*. On the first point, Republic must disgorge its $4.5 million of economic benefit to ensure that it does not profit from its wrongdoing. On the second point, a violator like Republic whose past noncompliance was serious and lengthy must pay an additional amount to deter future violations by itself and other potential violators.

Republic does not deny that its August 2020 consent order with PADEP did not modify its permit or excuse its noncompliance. ECF 113 at 10. Instead, it argues that any additional penalty would "usurp" PADEP's regulatory authority and that the Court should defer to PADEP's judgment about the amount of penalties that should be imposed. *Id.* at 20-21. In order to prove at the remedies stage that PADEP's penalties were adequate, however, Republic had to show that PADEP's administrative penalty process allowed meaningful citizen participation, that PADEP carefully considered all relevant facts, including economic benefit, and that PADEP's remedy abated and deterred pollution. *PIRG v. Hercules,* 970 F. Supp. 363, 365 (D.N.J. 1997). Republic failed to show at trial that there was meaningful citizen participation and that PADEP considered Republic's economic benefit.

PADEP's penalty fails two of the three *Hercules* criteria and therefore is not entitled to any deference.

## III. For Injunctive Relief, the Court Should Require Republic to Establish a Remedial Fund for York County to Restore Kreutz Creek

LSRA is seeking injunctive relief requiring Republic to pay monies into a remedial fund to mitigate the harm caused to Kreutz Creek by its past violations of its water-quality based effluent limits (WQBELs) for OP and TB. ECF 99 at 4-10. Republic argues that LSRA has cited no cases that have ordered the creation of such a fund using the standard set by the Third Circuit in *Powell Duffryn*. ECF 113 at 3. That is true, but Republic has cited no cases that have declined to order such a fund under that standard either. The absence of cases only shows that this case could be the first one to establish such a fund, not that no fund is authorized.

Republic argues that LSRA has not satisfied the four-pronged test for injunctive relief. ECF 113 at 4-5. But that test applies to mandatory or prohibitory injunctions, not to all equitable remedies. Federal courts have the "authority to issue … restorative orders so as to effectuate the stated goals of the Clean Water Act." *United States v. Cumberland Farms*, 826 F.2d 1151, 1164 (1st Cir. 1987). In evaluating remediation or restoration proposals, courts have considered three factors: (1) whether the proposal "would confer maximum environmental benefits," (2) whether it is "achievable as a practical matter," and (3) whether it bears "an equitable relationship to the degree and kind of wrong it is intended to remedy."

*United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003) (quoting *Cumberland).*

A remedial fund for Kreutz Creek confers maximum environmental benefits by reversing a substantial amount of the harm to water quality that Republic caused and by improving water quality in the same creek that Republic polluted. York County has made the improvement of water quality in Kreutz Creek a "high priority." Tr. 123:19-124:2. A fund is achievable as a practical matter because there are restoration projects for that creek that have already been designed and are awaiting funding. A fund bears an equitable relationship to the degree and kind of wrong it is intended to remedy because both Republic's violations and the funded projects address water quality impairments and improvements in the same creek.

Republic next argues that LSRA has not shown that "there is a nexus between the harm and the remedy." *Powell Duffryn,* 913 F.2d at 82; ECF 113 at 4-6. LSRA has shown that Republic has violated its WQBELs for OP and TB, which are designed to protect aquatic life in Kreutz Creek. The number and magnitude of those violations are quantifiable and documented in Republic's monitoring reports. Violations of WQBELs "necessarily means that [protected stream] uses may be harmed." *Gaston Copper*, 204 F.3d at 157. A "particularized showing of the harm" is not required and proof of the overall risk of the pollutants is sufficient. *Powell Duffryn*, 913 F.2d at 79. As we have shown above, both OP and TB have potentially harmful environmental effects on water quality in Kreutz Creek. That is sufficient

to satisfy the nexus requirement as a geographical and environmental matter.

## Conclusion

For these reasons, the Court should enter a judgment ordering Republic to pay a combined amount of at least $7.5 million in civil penalties to the U.S. Treasury and to York County, Pennsylvania for a remedial fund to restore Kreutz Creek.

Respectfully submitted,

s/Stephen G. Harvey
Stephen G. Harvey
Michael E. Gehring
E. Kelly Conway
Steve Harvey Law LLC
1880 John F. Kennedy Blvd.
Suite 1715
Philadelphia, PA 19103
(215) 438-6600
steve@steveharveylaw.com
mike@steveharveylaw.com
kelly@steveharveylaw.com

s/James M. Hecker
Public Justice
1620 L Street, N.W. Suite 630
Washington, DC 20036
(202) 797-8600 ext. 225
jhecker@publicjustice.net

Attorneys for Plaintiff Lower Susquehanna Riverkeeper Association

## Certificate of Service

I certify that on May 13, 2026, I served a copy of the foregoing document via the Court's ECF system on the following:

P. Leigh Bausinger
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103

s/Stephen G. Harvey
Stephen G. Harvey