**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**AT HARRISBURG**

| | |
|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>REPUBLIC SERVICES OF PENNSYLVANIA, LLC,<br><br>Defendant. | Civil Action No. 1:23-CV-00044-JPW |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT**

Plaintiff Lower Susquehanna Riverkeeper Association ("LSRA") submits the following response to Defendant's Proposed Findings of Fact (ECF 114):

102. Modern is a solid waste disposal facility operated by Republic. Trial Tr. 341:2–7, 342:2–3.

**Response to ¶ 102: No objection.**

103. At Modern, Republic operates a plant to treat wastewater generated by the facility, predominantly in the form of leachate. *Id.* 342:15–20.

**Response to ¶ 103: No objection.**

104. Leachate generation is common to landfills. *Id.* 343:20–21; see also *id.* 156:7–8.

**Response to ¶ 104: No objection.**

105. The Pennsylvania Department of Environmental Protection ("PADEP") has authority over the treatment of landfill leachate in Pennsylvania pursuant to the federal Clean Water Act and the Clean Streams Law of Pennsylvania. *Id.* 343:22–344:7; D09.001.

**Response to ¶ 105: No objection.**

106. PADEP authorizes wastewater discharges via National Pollutant Discharge Elimination System ("NPDES") permits, which are issued pursuant to PADEP's authority under the federal Clean Water Act and the Pennsylvania Clean Streams Law. D09.001.

**Response to ¶ 106: No objection.**

107. The wastewater treatment plant at Modern discharges into Kreutz Creek at Outfall 001. Trial Tr. 346:11–14; D56.005.

**Response to ¶ 107: No objection.**

108. Kreutz Creek is a watershed that receives flow from other sources upstream and downstream from Modern, including agricultural facilities, farms, and a metals processing and shredding facility. Trial Tr. 348:1–7; D56.004.

**Response to ¶ 108: No objection.**

109. Kreutz Creek has been impaired for aquatic life due to metals since March 2006 and polychlorinated biphenyls ("PCBs") since November 2013. Trial Tr. 349:1–350:8; D56.004.

**Response to ¶ 109: No objection.**

110. Neither metals nor PCBs are at issue in this lawsuit. Trial Tr. 350:9–11.

**Response to ¶ 110: No objection.**

111. The constituents at issue in this lawsuit are boron and osmotic pressure. *Id.* 350:22–24.

**Response to ¶ 111: No objection.**

112. Osmotic pressure is the force or energy required to push a solution through a semipermeable membrane. *Id.* 351:3–5.

**Response to ¶ 112: No objection.**

113. Boron is an element that is found widely in nature through a variety of different sources in everyday life. *Id.* 351:23–25.

**Response to ¶ 113: No objection.**

114. PADEP proposes limits for NPDES permits on wastewater constituents, prior to finalizing them, by issuing a draft to the regulated entity allowing for a response period from the regulated entity and the public. *Id.* 356:9–14.

**Response to ¶ 114: Objection. The sentence is incomplete. PADEP must also submit draft permits to U.S. EPA for comment. *See* 40 C.F.R. § 123.44.**

115. On December 1, 2016, Republic provided comments on the draft NPDES permit that PADEP issued on November 2, 2016 (the "Draft Permit"),

including osmotic pressure and boron limits. *Id.* 357:8–16; D08.

**Response to ¶ 115: No objection.**

116. In those comments, Republic agreed with total boron 3-year interim monitoring/reporting requirements and the final limits based on 0.5 million gallons per day ("MGD") discharge rate and the Water Quality Based Effluent Limits ("WQBELs") as specified in the draft NPDES permit. Trial Tr. 357:17–25; D08.001.

**Response to ¶ 116: No objection.**

117. Also in those comments, Republic requested to maintain the current frequency of quarterly sampling and analyses for osmotic pressure as opposed to the weekly sampling requirement that was specified in the draft permit. Trial Tr. 358:1–11; D08.002.

**Response to ¶ 117: No objection.**

118. Specifically, Republic noted that "[t]he historic data for osmotic pressure demonstrates that the effluent discharge has been well below the limit proposed in the draft permit. Therefore, there is no justification for an increase in sample frequency for it." D08.002; Trial Tr. 358:1–11.

**Response to ¶ 118: Objection. The paragraph is incomplete and misleading. Republic's own historic data for total dissolved solids (TDS), which is translatable into osmotic pressure (OP) at a 60:1 ratio, showed that Republic had increasing levels of TDS from 2010 to 2018 and was not meeting the**

**proposed OP limit starting in 2013. *See* FF16-17.**

119. February 1, 2017 was the effective date of a new NPDES permit ("2017 NPDES Permit") with limits on osmotic pressure and a reporting requirement for boron. Trial Tr. 354:14–18, 355:11–18; D09.002–5.

**Response to ¶ 119: No objection.**

120. The 2017 NPDES Permit's limits on osmotic pressure and reporting for boron were the same as in the Draft Permit for which Republic provided comments. See P2.007; Trial Tr. 357:17–25; D08.001.

**Response to ¶ 120: No objection.**

121. Effective on February 1, 2017, the Permit limited Modern's discharges of OP from Outfall 001 to 129 mg/l as a monthly average and 183 mg/l as a daily maximum. D09.002–5.

**Response to ¶ 121: No objection.**

122. The 2017 NPDES Permit also imposed limits for total boron effluent concentrations and loading beginning on February 1, 2020, including a daily maximum of 5.52 mg/L and a monthly average of 4.12 mg/L. Trial Tr. 354:14–355:10; D09.004–05.

**Response to ¶ 122: No objection.**

123. Republic's first violation for osmotic pressure occurred in October 2017, about 8 months after the new 2017 NPDES Permit limits for osmotic pressure

became effective. Trial Tr. 188:22–24.

**Response to ¶ 123: No objection.**

124. In October 2017, Republic began its assessment and investigation for effluent monitoring responsive to the 2017 NPDES Permit. See, e.g., *Id.* 358:20–359:2; D10.001.

**Response to ¶ 124: Objection. The sentence is incorrect. The citations are to an effluent monitoring report which merely lists Republic's measured OP level in its discharge from Outfall 001 in October 2017. That report does not indicate that Republic engaged in any assessment or investigative activities other than the monitoring required by Republic's NPDES permit.**

125. In January 2018, Republic self-reported the first OP exceedance, which occurred in October 2017, to PADEP based on its routine sampling. *Id.* 359:3–22; D10.003.

**Response to ¶ 125: Objection. The sentence is incorrect. The cited Non-Compliance Reporting Form reported two OP violations that occurred in January 2018, not in October 2017. D10.003. The October 2017 OP violation was reported to PADEP in November 2017. D10.002 ("DMR Received Date" column).**

126. Republic also undertook to identify any operational controls and best management practices to return to compliance with the 2017 NPDES Permit. See

Trial Tr. 359:23–360:4.

**Response to ¶ 126: Objection. The sentence is incorrect and misleading. The referenced testimony by Mr. Schmidt refers generally to actions Republic takes "whenever we have an exceedance" but does not identify any specific corrective actions Republic took in response to the OP violations that occurred at any particular time. In addition, Mr. Schmidt had no personal knowledge of any such actions prior to August 1, 2020 when his employment with Republic began. Tr. 432:1-7.**

127. On July 2, 2018, Republic's site staff and external consultants held a meeting where they discussed "the planning, the operational controls, the changes [Republic had] been contemplating or proposing for the facility to either return the facility to compliance or to consider improvements at the facility to help bring [Republic] back to compliance." *Id.* 195:1–21, 360:18–23, 363:6–20; P9.

**Response to ¶ 127: Objection. The sentence is incomplete and misleading. The Court noted the lack of a foundation for Mr. Schmidt's testimony about this meeting. Tr. 361:14, 364:10-13. Mr. Schmidt did not attend the meeting because he did not start working for Republic until August 1, 2020. Tr. 361:2-5, 432:1-7. The quoted statement was in response to a narrow question about "what role does this document play in the permitting process." Tr. 363:12-20. The cited document indicates that in July 2018 Republic had not**

**yet developed a plan to achieve compliance with the OP limit. It states that Republic "requires [an] action plan to reduce OP immediately" and asks staff to "develop [an] actin [sic] plan to meet OP limits." P9.002. The action plan was not developed until October 2018. See ¶ 133 below and D12.003.**

128. The meeting was among Randy Deardoff, Environmental Manager; Pavan Puttamraju, Senior Wastewater Solutions Manager; Karl Schmidt, Area Environmental Manager; and external consultants Ron Overholt, Scot McQueen, Ken Jones, and Andy Sokol. Trial. Tr. 191:1–9, 195:1–7, 197:21–198:10.

**Response to ¶ 128: No objection.**

129. Republic and its consultants sought to evaluate potential solutions for addressing leachate using the existing facilities at Modern as well as identify concerns and challenges with maintaining compliance with permit obligations. *Id.* 196:17–197:2, 363:7–11.

**Response to ¶ 129: Objection. There is no foundation for Mr. Schmidt's testimony at 363:7-11, as noted in response to ¶ 127 above. Mr. O'Donnell's testimony at 196:17-197:2 was that the meeting participants evaluated what Republic could do with its existing plant to achieve compliance, and that they all concurred the RO was the solution to the OP compliance problem. Tr. 198:4-10, 197:8-20.**

130. Republic and its consultants also discussed "reverse osmosis as a

remedy for osmotic pressure and total dissolved solids as well as possibly boron" as "the only long-term remedy that's really possible for this facility" and the need to "budget capital to purchase and install beginning in 2019." *Id.* 197:8–20, 364:18–365:6; P9.

**Response to ¶ 130: No objection.**

131. This proposal to budget capital for a reverse osmosis ("RO") system would require further collaboration with the area environmental team, which is responsible for landfill capital and engineering controls for a given budget year. Trial Tr. 364:16–365:6.

**Response to ¶ 131: Objection. There is no foundation for Mr. Schmidt's testimony at 363:7-11, as noted in response to ¶ 127 above. Mr. Schmidt was not responsible for the capital budget in 2019 because he was not employed by Republic until August 1, 2020.**

132. An RO system is a water treatment technology through which significant pressure is applied to wastewater to move it through very fine mesh filters, known as membranes, which separate constituents from the water to create a clean water byproduct. *Id.* 369:8–20.

**Response to ¶ 132: No objection.**

133. In October 2018, Republic engaged wastewater technical experts and operators, O'Brien & Gere ("OBG"), to "complete an evaluation of the entire

L[eachate] T[reatment] P[lant]" ("LTP") in connection with the challenges in meeting the OP limits in the 2017 NPDES Permit. *Id.* 368:4–369:7; D12.001, -03.

**Response to ¶ 133: No objection.**

134. When Republic receives a new permit, or addresses challenges with compliance with a permit, it follows an established process with PADEP involving a series of evaluations and permit revisions. Trial Tr. 378:12–19.

**Response to ¶ 134: No objection.**

135. The 2017 NPDES Permit requires Republic to follow this established process. D09.031–34.

**Response to ¶ 135: Objection. The sentence is incomplete and misleading. The Permit was in effect and enforceable throughout this process, including the deadlines for complying with the OP and TB limits. D9.023, ¶ B.I.A.1 ("The permittee shall comply with all conditions of this permit"). The Permit contains no compliance schedule for achieving compliance with the OP or TB limits in a delayed or phased manner that is conditioned on the results of further analysis such as a TRE. The Permit also provides that any permit revision "shall be considered a formal permitting action of DEP subject to applicable permit modification procedures." D9.032, ¶ IV.A.2.b.**

136. One of the initial steps in the established process is the Toxics Reduction Evaluation Phase I, followed by Phase II, then the Water Quality

Management Permit ("WQM"), then permit modification for the chosen method to manage leachate. Trial Tr. 378:15–380:3.

**Response to ¶ 136: No objection.**

137. In this instance, Republic commenced the WQM permit and submission ahead of having the TRE Phase II approved due to concern over inability to meet timelines "and be able to be the good partner, the good neighbor to our community that we want to be." *Id.* 380:8–16.

**Response to ¶ 137: Objection. There is no foundation for Mr. Schmidt's testimony at 380:8-16, as noted in response to ¶ 127 above because he did not start working for Republic until August 1, 2020.**

138. On November 19, 2018, Civil & Environmental Consultants, Inc. ("CEC") was engaged to perform a site visit for preliminary design and consultation on an RO system. *Id.* 376:17–377:11; D13.002–03.

**Response to ¶ 138: No objection.**

139. CEC's consultation involved completing a site inspection, evaluating the available space for an RO system, assessing existing technologies, and looking at key operating metrics for optimizing and expanding the LTP at Modern. Trial Tr. 377:12–22.

**Response to ¶ 139: No objection.**

140. In February 2019, CEC provided Republic with the Toxics Reduction

Evaluation Phase I Report ("Phase I TRE"). *Id.* 378:5–11; D16.001.

**Response to ¶ 140: No objection.**

141. The purpose of the Phase I TRE was to assess potential influences, operational changes, and best management practices that can be used to identify the remediation necessary for compliance. Trial Tr. 378:20–24; D16.004.

**Response to ¶ 141: Objection. The sentence is inaccurate. The purpose and scope of the Phase 1 TRE was defined by Republic's 2017 NPDES Permit to be: "a. influent and effluent quality review; b. source inventory and evaluation; c. source reduction evaluation; and d. implementation of pollution prevention, sound housekeeping practices, and other management practices." D9.032-33.**

142. On February 18, 2019, Republic submitted the Phase I TRE to PADEP. Trial Tr. 390:11–15; D29.006.

**Response to ¶ 142: Objection in part as misleading. Republic admits that this TRE was submitted six months and eighteen days late. *See* Response to FF ¶ 34.**

143. On July 3, 2019, PADEP notified Republic that the Phase I TRE was accepted, and Republic was permitted to proceed to the Toxics Reduction Evaluation Phase II Report ("Phase II TRE"). D29.006.

**Response to ¶ 143: No objection.**

144. On September 18, 2019, Republic requested "a compliance extension for total boron (boron) related to its current NPDES permit." D21.001; see also D23.001.

**Response to ¶ 144: Objection in part as misleading. Republic admits that PADEP denied this request. *See* Response to FF ¶ 36.**

145. In October 2019, CEC prepared the Phase II TRE. D29.003.

**Response to ¶ 145: Objection in part as misleading. This TRE was revised in October 2020 and not submitted in final form to PADEP until November 2020. *See* ¶¶ 161-63 below.**

146. As part of Phase II TRE, Republic evaluated which specific types of technology would be reliable and would be successful in treating for both boron and osmotic pressure. Trial Tr. 392:21–24; D29.013.

**Response to ¶ 146: No objection.**

147. The specific technologies identified as capable of treating both constituents were listed as ion exchange, evaporation, and RO. Trial Tr. 392:25–393:2; D29.014.

**Response to ¶ 147: No objection.**

148. The Phase II TRE also concluded that there are no operational changes and no best management practice that could be employed to use the existing plant to treat for boron removal. Trial Tr. 393:21–394:2; D29.022.

**Response to ¶ 148: No objection.**

149. It further concluded that the RO system is the only viable technology as the most effective, efficient, and reliable method for Republic to upgrade the LTP at Modern. Trial Tr. 394:2–5; D29.022.

**Response to ¶ 149: No objection.**

150. On February 18, 2020, while the Phase II TRE was in progress, Republic submitted an amendment for the Water Quality Management ("WQM") Permit No. 100113 for the on-site LTP at Modern Landfill. Trial Tr. 394:20–395:3; D22.001.

**Response to ¶ 150: No objection.**

151. Although the typical process involves Phase I and Phase II TRE, followed by WQM application prepared and submitted in series, there is no explicit PADEP rule that prevents filing the WQM application prior to the Phase II TRE. Trial Tr. 395:8–12.

**Response to ¶ 151: No objection.**

152. Republic's ongoing meetings and communications with PADEP kept the agency informed about developments, including RO technology for implementation. *Id.* 395:15–396:6.

**Response to ¶ 152: No objection.**

153. Republic's early submission of the WQM application aimed to expedite

the review process and enable timely construction of the RO treatment technology for boron and osmotic pressure. *Id.*

**Response to ¶ 153: Object to the words "early," "expedite" and "timely." Republic could have started designing the RO system earlier. *See* Response to FF ¶ 40. Nothing in Republic's Permit provides that the WQM process excuses noncompliance with the compliance deadlines in the permit.**

154. In this WQM application submission, Republic proposed the expansion and upgrade of the LTP, including the "[i]nstallation of a new RO treatment system and clean-in-place (CIP) system." D22.002; see Trial Tr. 394:20–395:3.

**Response to ¶ 154: No objection.**

155. On March 3, 2020, Republic submitted an application for NPDES permit amendment for extension of compliance date for boron limits, while "actively pursuing Plant upgrades to address boron." D23.003; see Trial Tr. 396:7–397:5.

**Response to ¶ 155: Objection in part as misleading. Republic admits that PADEP denied this request. *See* Response to FF ¶ 36.**

156. On August 25, 2020, Republic and PADEP entered into a Consent Order and Agreement ("COA"). Trial Tr. 397:6–15; D25.

**Response to ¶ 156: No objection.**

157. The COA was "the culmination of meetings and discussions and presenting of information to [PADEP] by [Republic] of the ongoing challenges we

know we will experience and of the entire process of needing to expand our treatment plant to be able to handle the new parameters." Trial Tr. 397:18–398:3, 168:23–25.

**Response to ¶ 157: No objection.**

158. The COA included specific milestones, dates and time guidelines for Republic to return to compliance. *Id.* 397:18–23; D25.007; Trial Tr. 171:4–172:1.

**Response to ¶ 158: No objection.**

159. PADEP, through the COA, determined appropriate penalties based on its schedules and rates for exceedances and relative impact to any environmental concerns or human health concerns. Trial Tr. 398:13–18.

**Response to ¶ 159: Objection. Schmidt did not testify that PADEP considered those factors when it issued Republic's COA. In any event, Schmidt had no basis to make such an assessment. No PADEP official testified about why it issued the COA.**

160. The total amount of penalties paid to PADEP by Republic was $77,800, which has a present value of over $100,000. *Id.* 79:7–13, 79:21–80:2; P108.

**Response to ¶ 160: No objection.**

161. In October 2020, CEC revised the Phase II TRE for submission to PADEP. D29.003.

**Response to ¶ 161: No objection.**

162. On October 22, 2020 Republic submitted the Phase II TRE to PADEP. Trial Tr. 216:12–19; D29.

**Response to ¶ 162: No objection.**

163. On November 17, 2020, PADEP accepted the Phase II TRE. Trial Tr. 394:6–14; D30.

**Response to ¶ 163: Objection as misleading because Republic admits this TRE was eleven months and seventeen days late. *See* Response to FF ¶ 41.**

164. Both phases of the TRE process took approximately a year and a half. Trial Tr. 394:15–19.

**Response to ¶ 164: Objection. This sentence is inaccurate. Republic's 2017 NPDES Permit required Republic to start the TRE process by June 1, 2017 (120 days after the permit effective date (PED), finish the Phase 1 TRE in twelve months by August 1, 2018, and finish the Phase II TRE in six months after PADEP's notice to proceed. D9.032, ¶ IV.B.2 (nine months for Phase I and 6 months for Phase II). The record does not reflect when Republic began the Phase I TRE or how long it took Republic to finish it. Republic submitted it on February 18, 2019, which was six months and eighteen days late. FF ¶34. PADEP gave Republic notice to proceed to Phase II on July 3, 2019. FF ¶41. Republic submitted the Phase II TRE on October 22, 2020, which was eleven months and seventeen days late. *Id*. The combined delay for both reports was**

**more than eighteen months. Counting backward in time, both reports should have been completed by mid-April 2019.**

165. On September 27, 2021, PADEP issued the WQM permit, allowing for construction of, among other things, the RO system for Modern. *Id.* 399:20–400:5; D34.

**Response to ¶ 165: No objection.**

166. The RO system for Modern has three individual treatment trains, each of which has between five and eight modules, and the modules are each 8 inches in diameter and roughly 20 feet in length. Trial Tr. 369:21–370:1.

**Response to ¶ 166: No objection.**

167. The entire RO system for Modern is contained in its own separate building about the size of the courtroom. *Id.* 370:1–10.

**Response to ¶ 167: No objection.**

168. The RO system for Modern can treat 120 gallons per minute, which equates to approximately 175,000 gallons per day. *Id.* 370:11–14.

**Response to ¶ 168: No objection.**

169. In addition to the clean water byproduct, the RO systems also yields (1) constituents in the form of sediment and silt that are removed from the water as well as (2) some volume of liquid that also does not make it through the membranes. *Id.* 370:15–20.

**Response to ¶ 169: No objection.**

170. These two byproducts are further concentrated into an RO brine, more commonly referred to as "RO reject." *Id.* 370:21–23.

**Response to ¶ 170: No objection.**

171. As of 2021 to 2022, Republic's potential options for addressing RO reject included trucking it to other wastewater treatment plants, further adopting some other treatment technology, and looking into solidification. *Id.* 371:1–5, 373:1–3; see D40.006.

**Response to ¶ 171: No objection.**

172. Trucking the RO reject would have involved transporting it to a publicly owned treatment works wastewater treatment plant ("POTW"). Trial Tr. 345:6–11, 371:6–11.

**Response to ¶ 172: No objection.**

173. Republic faced limited options with respect to where the RO reject could be trucked as many of the POTWs near Republic were incapable of taking the reject and treating it at their facilities. *Id.* 371:12–21, 373:10–14; see D40.006.

**Response to ¶ 173: No objection.**

174. The annual estimated cost of trucking the reject, assuming sufficient capacity at POTWs, was $5 million as of March 9, 2022. Trial Tr. 372:4–6, 373:22–374:20; see D40.006.

**Response to ¶ 174: No objection.**

175. Solidification is the process of moving the RO reject to "a container of some kind to store the liquid," and "add[ing] different components into the liquid and mix and agitate the solution so that we can convert that into a solid" that can be placed back into the landfill. Trial Tr. 375:8–376:11.

**Response to ¶ 175: No objection.**

176. Republic ultimately transitioned to solidification because it provided a closed-loop way of managing waste and wastewater generated for the facility. *Id.* 403:2–4.

**Response to ¶ 176: No objection.**

177. By solidifying the RO reject, Republic can take that waste, stabilize it, place it back in the facility for disposal and keep all contaminants from potentially entering the environment. *Id.* 403:7–10.

**Response to ¶ 177: No objection.**

178. On March 9, 2022, a revision was made to Republic's business case for the construction of the RO system responsive to the COA and as part of routine business practice. *Id.* 400:6–17, 401:6–9; D40.003–4.

**Response to ¶ 178: No objection.**

179. This revision reflected a change in cost for the RO system from approximately $14.5 million to $23 million. Trial Tr. 401:3–5; see D40.004–05; see

also Trial Tr. 172:5–13.

**Response to ¶ 179: No objection.**

180. On March 25, 2022, Republic awarded the LTP project to a contractor. D54.001.

**Response to ¶ 180: No objection.**

181. On May 23, 2022, construction commenced on upgrades to the LTP authorized by WQM permit, including the RO system. *Id.*

**Response to ¶ 181: No objection.**

182. Throughout 2022, a contractor hired by Republic for work on the LTP faced "a myriad of supply chain issues caused by the ripple effects of COVID-19." Trial Tr. 402:1–7; D58.002; see also Trial Tr. 167:17–20.

**Response to ¶ 182: No objection.**

183. On January 11, 2023, Plaintiff filed this citizens' suit against Republic. Dkt. 1.

**Response to ¶ 183: No objection.**

184. On April 25, 2023, Republic's RO system for Modern achieved operational and permit compliance. Trial Tr. 324:19–21.

**Response to ¶ 184: No objection.**

185. Since the RO system began operation in April 2023, there have not been any exceedances of osmotic pressure from Outfall 001. *Id.* 405:20–23. Since the RO

system began operation in April 2023, there have not been any exceedances of boron from Outfall 001. *Id.* 405:24–406:1.

**Response to ¶ 185: No objection.**

186. On May 18, 2023, Republic received a letter from its contractor's attorney attempting to invoke force majeure claims due to equipment, other construction supply chain concerns and requesting relief on timelines for construction. *Id.* 401:14–25; D58.002.

**Response to ¶ 186: No objection.**

187. In addition to Modern Landfill's discharge, there are several upstream and adjacent stormwater and industrial discharges contributing to Kreutz Creek. There are discharges upstream from Kreutz Creek including a Small Flow Treatment Facility, two municipal storm sewer (MS4) discharges, and an industrial stormwater discharge from a metals company upstream of Outfall 001. Kreutz Creek is considered a Trout Natural Reproduction stream between RMI 17.9 and 6.4, but it is not classified as a Class A Trout Stream. D56.005.

**Response to ¶ 187: No objection.**

188. Kreutz Creek is listed as impaired for aquatic life both upstream and downstream of Outfall 001, with causes of impairment identified as siltation and habitat modification. Trial Tr. 348:24–349:10; D56.004.

**Response to ¶ 188: No objection.**

189. On March 19, 2024, PADEP terminated the COA as Republic met all obligations. Trial Tr. 404:21–405:6; D74.002.

**Response to ¶ 189: No objection.**

190. On August 1, 2024, Republic achieved full-scale implementation of its solidification of the RO reject. Trial Tr. 402:19–403:6.

**Response to ¶ 190: No objection.**

191. Republic's annual recurring costs for reject solidification is approximately $578,000. *Id.* 404:13–15; P92 at 2.

**Response to ¶ 191: No objection.**

192. Republic's expert witness at trial, Michael Rockel, was admitted as an expert in the modeling of economic benefit specifically with respect to environmental noncompliance. Trial Tr. 274:20–25.

**Response to ¶ 192: No objection.**

193. Mr. Rockel has contributed to expert reports involving economic modeling in over two dozen cases, three of which have to do with the CWA. *Id.* 268:2–23.

**Response to ¶ 193: No objection.**

194. Mr. Rockel used the United States Environmental Protection Agency's BEN model to calculate an economic benefit figure for Republic's period of noncompliance. *Id.* 275:6–276:4.

**Response to ¶ 194: No objection.**

195. The primary difference between the BEN model and Plaintiff's expert at trial, Jonathan Shefftz's model is the ability to use multiple discount rates. *Id.* 276:14–23.

**Response to ¶ 195: No objection.**

196. The categories of inputs for the BEN model are comprised of (1) the dates that ultimately drive the benefit calculation; (2) rates for inflation, discount, and taxes; and (3) costs that are broken into three subcategories. *Id.* 278:3–11.

**Response to ¶ 196: No objection.**

197. The costs are categorized into: (a) depreciable capital investments like components used for the RO system and solidification, which include tubing, piping, tanks, the RO membrane; (b) nondepreciable one-time expenses like those that take place as necessary for ultimate compliance; and (c) annual recurring expenses like insurance, utilities, and chemicals used for RO processing. *Id.* 278:12–15, 286:1–23.

**Response to ¶ 197: No objection.**

198. Mr. Shefftz and Mr. Rockel both used the same categories of inputs for their economic-benefit modeling. *Id.* 278:16–18.

**Response to ¶ 198: No objection.**

199. A delayed cost is a cost that will be incurred. *Id.* 293:15–25.

**Response to ¶ 199: No objection.**

200. In contrast, an avoided cost is a cost that cannot nor will be incurred. *Id.* 293:19–20.

**Response to ¶ 200: No objection.**

201. Mr. Rockel treated as delayed the capital investment costs, such as the cost to install the RO system, because those costs were actually incurred. *Id.* 293:15–25.

**Response to ¶ 201: No objection.**

202. Similarly, Mr. Shefftz also treated as delayed the capital investment costs such as the cost to install the RO system. *Id.* 294:1–2.

**Response to ¶ 202: No objection.**

203. Mr. Rockel treated as delayed the costs associated with the trucking of the RO reject because they were actually incurred. *Id.* 294:3–7.

**Response to ¶ 203: No objection.**

204. Mr. Shefftz also treated as delayed the costs associated with the trucking of the RO reject. *Id.* 294:8–9.

**Response to ¶ 204: No objection.**

205. Because they were actually incurred and will continue to be incurred, Mr. Rockel treated as delayed the costs: (i) associated with the recurring maintenance and operation of the RO system, and (ii) associated with the solidification system. *Id.* 294:10–20.

**Response to ¶ 205: Objection. Mr. Rockel treated these costs as delayed, but they are properly considered to be avoided costs, for the reasons stated by Mr. Shefftz. *See* FF81-83, 88, 91-97.**

206. Mr. Shefftz treated as avoided the recurring costs: (i) associated with the recurring maintenance and operation of the RO system, and (ii) associated with the solidification system. *Id.* 294:21–24.

**Response to ¶ 206: No objection.**

207. The difference in treatment between these two categories of recurring costs, as avoided instead of delayed, accounts for the difference between Mr. Shefftz's opinion and Mr. Rockel's as to the total economic benefit. *Id.* 294:25–295:3.

**Response to ¶ 207: No objection.**

208. For Republic's economic benefit modeling, Mr. Rockel used the 2024 version of the BEN Help System, as well as the parties' interrogatory responses and spreadsheet data associated with those responses that included the pertinent costs and dates. *Id.* 279:18–280:1; D76.

**Response to ¶ 208: No objection.**

209. Mr. Rockel treated recurring costs for the RO system and solidification as advised in the BEN Help System: "[i]f the annual costs are delayed and not avoided, then enter them as one-time nondepreciable expenditures." Trial Tr. 295:4–

13; D76.015.

**Response to ¶ 209: Objection. As Mr. Shefftz explained, the BEN Help System, which he ghost-wrote, supports his conclusion that these costs are avoided, not delayed. *See* FF94-97.**

210. For LSRA's economic-benefit modeling, Mr. Shefftz relied on the same interrogatory responses and spreadsheet data associated with those responses. Trial Tr. 280:2–5.

**Response to ¶ 210: No objection.**

211. The BEN model uses different groupings of cost categories that are subdivided into individual scenarios. *Id.* 280:6–281:1.

**Response to ¶ 211: No objection.**

212. The RO system has a series of capital investments that were costed with a corresponding cost estimate date. *Id.* 280:13–17.

**Response to ¶ 212: No objection.**

213. These capital investments depreciate, which separates them from costs that do not depreciate. *Id.* 280:18–20.

**Response to ¶ 213: No objection.**

214. A component's useful life, how long it lasts until replacement is necessary, is another consideration when grouping costs into scenarios. *Id.* 280:20–23.

**Response to ¶ 214: No objection.**

215. Each scenario is representative and compiles the costs being considered so that hypothetical cost scenarios can be compared to the actual costs. *Id.* 281:6–9.

**Response to ¶ 215: Objection. This misstates the economic benefit methodology. As stated in the BEN Help System (P120, ¶ 1.1.1):**

> **BEN calculates the costs of complying on-time [“the on-time or compliance scenario”) and of complying late [“the delayed or noncompliance scenario”], adjusted for inflation and tax deductibility. To compare the on-time and delayed compliance costs in a common measure, BEN calculates the present value of both streams of costs, or “cash flows,” as of the date of initial noncompliance. BEN derives these values by discounting the annual cash flows at an average cost of capital throughout this time period.**
>
> **BEN can then subtract the delayed-case present value from the on-time-case present value to determine the initial economic benefit as of the noncompliance date. Finally, BEN compounds this initial economic benefit forward to the penalty payment date at the same cost of capital to determine the final economic benefit of noncompliance.**

216. The sum of the results from each individual scenario amounts to a final economic benefit figure. *Id.* 281:9–11.

**Response to ¶ 216: Objection. This misstates the economic benefit methodology. *See* Response to ¶ 215 above.**

217. Mr. Rockel used the date of his report as the penalty payment date, May 31, 2024. *Id.* 281:20–282:8.

**Response to ¶ 217: No objection.**

218. Mr. Shefftz used the date of his revised report as the penalty payment

date, July 19, 2024. *Id.* 282:9–11.

**Response to ¶ 218: No objection.**

219. Neither Mr. Shefftz nor Mr. Rockel offered an independent opinion as to the feasibility of Republic's compliance by July 2, 2019. *Id.* 81:8–82:12, 315:2–4.

**Response to ¶ 219: No objection.**

220. Both Mr. Shefftz and Mr. Rockel acknowledge that economic modeling, like an economic benefit figure, provides an estimate. *Id.* 92:22–24, 267:23–268:1.

**Response to ¶ 220: No objection.**

221. The noncompliance date assumed by both Mr. Shefftz and Mr. Rockel is the first day of Republic's violation, July 2, 2019. *Id.* 282:25–283:2.

**Response to ¶ 221: Objection in part. It is correct that both experts assumed that July 2, 2019 is the initial noncompliance date for calculating economic benefit. But that day is not first day of Republic's violations of its 2017 NPDES permit. July 2, 2019 is the first day of OP permit violations that the Court determined were properly pleaded in Plaintiff's Complaint. ECF 65 at 22-25; ECF 24. Republic had 30 OP violations prior to that date. *See* FF35.**

222. The compliance date is the first day that Republic came into compliance, April 25, 2023. *Id.* 283:12–16.

**Response to ¶ 222: No objection.**

223. The noncompliance period assumed by both Mr. Shefftz and Mr. Rockel amounted to 1,393 days. *Id.* 288:3–6.

**Response to ¶ 223: No objection.**

224. The discount rate is the present-value calculation, using Republic's weighted average cost of capital. *Id.* 283:22–284:3.

**Response to ¶ 224: Objection. This sentence is incorrectly phrased. The discount rate is used to determine the present value of delayed and avoided costs of compliance. *See* Response to ¶ 215. In this case, both Mr. Shefftz and Mr. Rockel used Republic's weighted average cost of capital as the discount rate. *See* FF59-60, 305.**

225. For inflation, Mr. Rockel used the Produce Price Index ("PPI"), which compares the PPI rate as of a certain month and year, to adjust a present period to a future or prior period. *Id.* 284:11–25.

**Response to ¶ 225: Objection. This sentence is incorrectly phrased. The Producer Price Index (PPI), released monthly by the Bureau of Labor Statistics, measures the average change over time in selling prices received by domestic producers for their output. *See* https://www.bls.gov/ppi/#. Both Mr. Shefftz and Mr. Rockel used the PPI as the cost index to adjust compliance costs for inflation. Tr. 59:16-23; 276:13.**

226. For tax rates on nondepreciating costs, Mr. Rockel used the Pennsylvania rate and the federal rate. *Id.* 285:12–17.

**Response to ¶ 226: No objection.**

227. For tax rates on depreciating costs, Mr. Rockel used the accelerated depreciation schedule that Mr. Shefftz assembled. *Id.* 285:18–21.

**Response to ¶ 227: No objection.**

228. Mr. Rockel treated as a disbenefit to Republic the penalties paid to PADEP, chose to inflate the cost to the present value date for comparison purposes of May 31, 2024, and then subtracted the penalties paid from any benefit that was calculated with the BEN model. *Id.* 286:24–287:8.

**Response to ¶ 228: No objection.**

229. During the 1,393-day period of noncompliance assumed by both Mr. Shefftz and Mr. Rockel, there were (i) 464 days of recurring costs for transportation and disposal of RO reject (from July 2, 2019 to April 25, 2023), and (ii) 929 days of recurring costs for solidification (from April 25, 2023 to August 1, 2024). *Id.* 287:24–290:19.

**Response to ¶ 229: Objection. The number of days in clauses (i) and (ii) should be switched. There are 929 days from July 2, 2019 to April 25, 2023 and 464 days from April 25, 2023 to August 1, 2024.**

230. Mr. Rockel's preliminary economic benefit figure for Republic's

delayed compliance is $627,339. *Id.* 295:23–296:3.

**Response to ¶ 230: Objection. This figure is incorrect because Mr. Rockel improperly treated certain avoided costs as delayed costs. *See* FF81-83, 88, 91-97.**

231. Accounting for the penalties that Republic has already paid to PADEP, the final economic benefit figure for Republic's delayed compliance is $534,992. *Id.* 296:4–10.

**Response to ¶ 231: Objection. This figure is incorrect because Mr. Rockel improperly treated certain avoided costs as delayed costs. *See* FF81-83, 88, 91-97.**

232. At trial, this Court recognized that the settlement in a prior CWA citizen suit against Keystone Protein Company involved a private settlement—not a court's post-trial judgment—that was later memorialized in a judicially approved consent decree. *Id.* 119:20–120:15, 136:23–137:3.

**Response to ¶ 232: No objection.**

233. Plaintiff's representative, Ted Evgeniadis, claimed a remedial fund would fund "a lot of projects" with "different goals." *Id.* 118:21–22.

**Response to ¶ 233: Objection in part. Republic has truncated Mr. Evgeniadis' testimony and taken his words out of their context. Mr. Evgeniadis explained those goals as "generally speaking, you know, looking at stream bank**

**and habitat restoration, looking at habitat improvement structures that are going to ultimately improve water quality, especially improving aquatic life and the aquatic life that's been impacted by the landfill's pollution." Tr. 118:21-119:2.**

234. These various projects would include "habitat restoration projects," "infrastructure upgrade type projects such as culvert redesigns," "mitigation for flooding," and other "ecological restoration" projects. *Id.* 116:6–11; 118:21–119:5.

**Response to ¶ 234: Objection. Republic has truncated Mr. Evgeniadis' testimony and taken his words out of their context. Mr. Evgeniadis explained that the projects "are going to effectively enhance water quality for York County and for Kreutz Creek and the watershed." Tr. 119:6-12.**

235. Plaintiff desires funding "at probably over $10 million" for "all of those different projects." *Id.* 121:13–22.

**Response to ¶ 235: Objection. The monetary figure is correct but the money would go to York County, not to Plaintiff.**

236. Plaintiff's desired projects include projects located on private property. *Id.* 128:3–130:3.

**Response to ¶ 236: Objection. The addresses for some of the projects refer to private property but Mr. Evgeniadis stated that "these projects are all to do with the Kreutz Creek watershed." Tr. 130:6-7.**

237. Plaintiff wants WAY, a third party with discretion to reject the Court's funding, to manage the remedial fund. *Id.* 134:12– 135:8.

**Response to ¶ 237: No objection.**

238. Mr. Evgeniadis has a personal incentive to secure this funding because he is a member of the Board of WAY—the entity that Plaintiff claims would manage the "remedial fund." *Id.* 122:1–2.

**Response to ¶ 238: Objection. Mr. Evgeniadis stated that he receives no compensation as a member of the Board of WAY and would recuse himself from any decisions regarding the funds, as he did previously for the funds from the Keystone Protein settlement. Tr. 122:1-23, 134:7-11.**

Respectfully submitted,

s/Stephen G. Harvey
Stephen G. Harvey
1880 John F. Kennedy Blvd., Ste 1715
Philadelphia, PA 19103
Telephone: 215.438.6600
steve@steveharveylaw.com

Jim Hecker (pro hac vice)
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 861-5225
jhecker@publicjustice.net

Attorneys for Plaintiff Lower Susquehanna Riverkeeper Association

**Certificate of Service**

I certify that on May 13, 2026, I served a copy of the foregoing document via the Court's ECF system on the following:

P. Leigh Bausinger
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103

s/Stephen G. Harvey
Stephen G. Harvey